## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

ALLSTATE INDEMNITY COMPANY      )    Case No.:
                                                 )
                        Plaintiff,      )
                                                 )
    -against-                        )
                                             )
PAUL COLLURA, CHRISTINE COLLURA, BANK OF )
NEW YORK MELLON FKA BANK OF NEW YORK AS )
TRUSTEE FOR CERTIFICATE HOLDER CWALT, INC )
UNITED STATES OF AMERICA, CAPITAL ONE     )
HOME LOANS, LLC, COUNTRYWIDE HOME LOANS,)
INC, BANK OF AMERICA CORPORATION
                        Defendants.

## COMPLAINT IN INTERPLEADER

Plaintiff, Allstate Indemnity Company ("AIC"), by and through its undersigned counsel, hereby alleges as follows:

### THE PARTIES

1. AIC is an insurance company incorporated in Illinois, with its principal place of business in Northbrook Illinois.

2. Upon information and belief, Defendant PAUL COLLURA is a citizen of Melville, New York and has presented an insurance claim against AIC, for property damage as a result of a water loss that occurred at 14 Landing Lane, South Hampton, New York, on March 16, 2015.

3. Upon information and belief, Defendant CHRISTINE COLLURA is a citizen of Melville, New York and has presented an insurance claim against AIC, for property damage as a result of a water loss that occurred at 14 Landing Lane, South Hampton, New York, on March 16, 2015.

4. Upon information and belief, the BANK OF NEW YORK MELLON F/K/A THE BANK OF NEW YORK, AS TRUSTEE IN FOR THE CERTIFICATEHOLDERS OF CW ALT, INC., (hereinafter "BANK OF NY") was and is a corporation duly organized and incorporated under the laws of the State of Delaware and doing business in the State of New York and is a potential lienholder on the proceeds of the water loss that occurred at 14 Landing Lane, South Hampton, New York, on March 16, 2015.

5. Defendant, the UNITED STATES OF AMERICA, has been named as a Defendant in this action, as, upon information and belief, it maintains two (2) Federal Tax Liens, one dated March 10, 2010 in the amount of $75,690.80 and one dated April 19, 2011 in the amount of $80,537.52, ( the "Tax Liens") and is a potential lienholder on the proceeds of the water loss that occurred at 14 Landing Lane, South Hampton, New York, on March 16, 2015.

6. Upon information and belief, CAPITAL ONE HOME LOANS, LLC (hereinafter "CAPITAL ONE") was and is Limited Liability Company duly organized and incorporated under the laws of the State of Delaware and doing business in New York and is a potential lienholder on the proceeds of the water loss that occurred at 14 Landing Lane, South Hampton, New York, on March 16, 2015 .

7. Upon information and belief, COUNTRYWIDE HOME LOANS, INC (hereinafter "COUNTRYWIDE") was and is a corporation duly organized and incorporated under the laws of the State of New York and doing business in the State of New York and is a potential lienholder on the proceeds of the water loss that occurred at 14 Landing Lane, South Hampton, New York, on March 16, 2015 .

8. Upon information and belief, the BANK OF AMERICA CORPORATION (hereinafter BANK OF AMERCIA) was and is a corporation duly organized and incorporated under the laws of the State of Delaware and doing business in the State of New York and is a potential lienholder on the proceeds of the water loss that occurred at 14 Landing Lane, South Hampton, New York, on March 16, 2015 .

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this statutory interpleader action pursuant to 28 USC § 1335 (a), which requires only minimal diversity. The minimal diversity requirement is met because AIC is diverse from among other defendants, BANK OF NY, CAPITAL ONE, and BANK OF AMERICA, which are citizens of Delaware and COUNTRYWIDE which is a citizen of New York.

10. This Court has jurisdiction over this statutory interpleader action pursuant to 28 USC § 1335 (a) (2) because after filing the complaint AIC will move for judgment and order permitting the deposit of the proceeds of the AIC insurance policy into the Registry of this Court.

11. This court is the proper venue for this action pursuant to 28 USC § 1397 because, upon information and belief, claimants PAUL and CHRISTINE COLLURA reside in this judicial district.

## SUMMARY OF ADVERSE CLAIMS

12. AIC issued a Deluxe Plus policy to PAUL and CHRISTINE COLLURA under Policy No.: 078711771, which was in effect on March 16, 2015, insuring the premises identified as 14 Landing Lane, South Hampton, New York 11968 (hereinafter "The Policy"). (Exhibit "A")

13. AIC incorporates herein by reference all of the terms, conditions and provisions of The Policy.

14. AIC does not waive any of its rights under The Policy and reserves the right to rely upon any applicable provisions, exclusions or conditions of The Policy.

15. On March 16, 2015, 14 Landing Lane, South Hampton, New York 11968 sustained damage as a result of a water loss at the home.

16. AIC has adjusted the claim and is prepared to settle the claim for $65,822.77. (Annexed hereto as Exhibit "B" is AIC's Estimate of Damages completed on 5/15/15)

17. AIC sent correspondence to the insured's on August 11, 2015 advising of the damages estimate and explaining the insured's right to recoverable depreciation.  ( Exhibit "C")

18. AIC conducted an investigation into all potential lienholders to the proceeds of any settlement for damage to the dwelling at 14 Landing Lane, South Hampton, New York 11968 and discovered the following (see Exhibit "D"):

   a) A mortgage from Capital One Home Loans, LLC, from May 4, 2007.
   b) Capital One Home Loans, LLC, is on the deed.
   c) An assignment of that mortgage from Capital One Home Loans, LLC to Bank of New York Mellon FKA Bank of New York, on June 15, 2012.
   d) A title search which reflects that the mortgagee, was Capital One Home Loans, LLC, and that the mortgage was assigned to the Bank of New York Mellon FKA Bank of New York, as trustee for the certificate holders of CWALT, Inc.
   e) The title search which indicates that the servicer of this loan was Bank of America N.A.
   f) Two (2) notices of Federal Tax Lien, one dated March 10, 2010 in the amount of $75,690.80 and one dated April 19, 2011 in the amount of $80,537.52.
   g) A March 23, 2010 and April 26, 2011 Notice of FTL and a January 24, 2014 Notice of Pendency.

19. AIC was also provided with the Decision and Order of the Honorable James F. Quinn dismissing the claims of BANK OF NY IN A MORTGAGE FORECLOSURE ACTION. (Exhibit "E")

20. AIC is unable to ascertain which parties should be included on the settlement checks as proper lienholders on any damage payments to PAUL and CHRISTINE COLLURA for the damage to 14 Landing Lane, South Hampton, New York 11968.

21. AIC cannot safely pay the policy proceeds until it is determined to whom the payments should be made.

22. AIC is interpleading the Policy proceeds so that the Court can determine to whom payment should be made.

WHRERFORE, AIC demands judgment

(a) That the Court enters an Order permitting AIC to deposit into the Registry of the Court the amount of        .

(b) That Defendants be required to interplead and settle between themselves their respective rights to said sum deposited with the Court, and that AIC be discharged from any other liability to the Defendants, upon AIC's payment of the proceeds into this Court; and

(c) For such other further relief as the Court deems just, proper and equitable.

Dated: August 14, 2015

LEWIS JOHS AVALLONE AVILES, LLP
Attorneys for ALLSTATE INDEMNITY COMPANY
One CA Plaza, Suite 225
Islandia, New York 11749
(631) 755-0101
LJAA File No.: 21-1684
rmfeeney@lewisjohs.com

By: *Rosa M. Feeney*
    Rosa M. Feeney

TO:

PAUL COLLURA
38 Cottontail Rd
Melville, NY 11747-2319384

CHRISTINE COLLURA
38 Cottontail Rd
Melville, NY 11747-2319384

BANK OF NEW YORK MELLON F/K/A
THE BANK OF NEW YORK, AS TRUSTEE
IN FOR THE CERTIFICATEHOLDERS OF CWALT, INC.
c/o Superintendant of Financial Services, New York
One State Street, New York, NY  10004

VIA CERTIFIED MAIL
UNITED STATES OF AMERICA
Civil Process Clerk
 U.S. Attorney's Office
271 Cadman Plaza East
Brooklyn, NY 11201

VIA CERTIFIED MAIL
UNITED STATES OF AMERICA
Attorney General of the United States at Washington, D.C.,
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

CAPITAL ONE HOME LOANS, LLC
c/o Superintendant of Financial Services, New York
One State Street, New York, NY  10004

COUNTRYWIDE HOME LOANS, INC
c/o CT Corporation Systems
111 Eighth Avenue
New York, New York 10011

BANK OF AMERICA CORPORATION
c/o Superintendant of Financial Services, New York
One State Street, New York, NY  10004

# EXHIBIT "A"



Claim# 0361697799

To Whom It May Concern:

I, Patricia Torres _____, employee of Allstate Insurance Company Irving, Texas,

do certify that the enclosed is a copy of policy and or declaration page for the above

claim number, showing the coverages that were on the policy at the time of loss

of 03/16/2015 _____. The enclosed copy of policy and or declaration

page was printed and mailed through Allstate's Output Processing Center.

Claim Support

State of Texas, County of Dallas

On this _____17th_____ day of _____August_____2015, before me personally

appeared Patricia Torres ___ to me known to be the person who executed the

foregoing instrument and acknowledged that he/she executed the same as a free act

and deed.

Notary Public

MARY PERL
Notary Public, State of Texas
My Commission Expires
October 17, 2015

G52-3

*P Collura Ins Agenc*
*149-15 Union Tpke*
*Flushing NY 11367*

**Your Quick Insurance Check**

√ Verify the information listed in the Policy Declarations.

√ Please call if you have any questions.

√ Now you can pay your premium before your bill is issued - visit allstate.com or call 1-800-Allstate ®.

Paul S. & Christine G.
Collura
38 Cottontail Rd
Melville NY  11747-2319

**Confirming Your Policy Change**

We've sent along this mailing to verify the changes to your policy that you recently requested. The changes took effect on March 16, 2015. Please look over all the information in this mailing, and call us right away if you have any questions or if anything isn't exactly right.

The accompanying Amended Policy Declarations includes these changes:
1st Mortgage information has been deleted.

There is no change in premium for the current premium period.

The coverages and limits you carry for your property, and the costs of those coverages, are listed in detail on the enclosed Amended Policy Declarations. You can see the specific changes to your policy by comparing this Amended Policy Declarations to the Policy Declarations previously mailed to you.

If you have any questions or concerns, please contact P Collura Ins Agenc at (718) 969-7300---or call the Allstate Customer Information Center at 1-800-ALLSTATE (1-800-255-7828).

Sincerely,

*Thomas Wilson*

Thomas J. Wilson
President, Allstate Insurance Company

PROP *0100031150316530022703011*          000000078711771  070    010    NY

Information as of
March 16, 2015

EP29

**Allstate Insurance Company**

### AMENDED

# Deluxe Plus Homeowners Policy Declarations

## *Summary*

| NAMED INSURED(S) | YOUR ALLSTATE AGENT IS: | CONTACT YOUR AGENT AT: |
|---|---|---|
| Paul S. & Christine G. Collura<br>38 Cottontail Rd<br>Melville NY 11747-2319 | P Collura Ins Agenc<br>149-15 Union Tpke<br>Flushing NY 11367 | (718) 969-7300 |

| POLICY NUMBER | POLICY PERIOD | PREMIUM PERIOD |
|---|---|---|
| 0 78 711771 07/15 | Begins on July 15, 2014<br>at 12:01 A.M. standard time,<br>with no fixed date of expiration | July 15, 2014  to July 15, 2015<br>at 12:01 A.M. standard time |

**LOCATION OF PROPERTY INSURED**
14 Landing Lane, Southampton, NY 11968-4405

**LEGAL DESCRIPTION**
14 LANDING LANE        SOUTHAMPTON        NY 119680000

## *Total Premium for the Premium Period*   *(Your bill will be mailed separately)*

| | |
|---|---|
| Premium for Property Insured | $1,817.00 |
| **TOTAL** | **$1,817.00** |

*Your policy change(s) are effective as of Mar. 16, 2015*



# Allstate Insurance Company

Policy Number:  **0 78 711771 07/15**     Your Agent:   **P Collura Ins Agenc  (718) 969-7300**
For Premium Period Beginning:    **July 15, 2014**

## POLICY COVERAGES AND LIMITS OF LIABILITY

| COVERAGE AND APPLICABLE DEDUCTIBLES<br>(See Policy for Applicable Terms, Conditions and Exclusions) | LIMITS OF LIABILITY | |
|---|---|---|
| Dwelling Protection - with Building Structure Reimbursement Extended Limits<br> • $2,000  Other Peril Deductible Applies<br> • Deductible for Severe Hurricanes Applies* | $363,000 | |
| Other Structures Protection<br> • $2,000  Other Peril Deductible Applies<br> • Deductible for Severe Hurricanes Applies* | $36,300 | |
| Personal Property Protection – Reimbursement Provision<br> • $2,000  Other Peril Deductible Applies<br> • Deductible for Severe Hurricanes Applies* | $272,250 | |
| Optional Protection for Mold<br> • Remediation Limit | $50,000 | |
| Additional Living Expense | Up To 12 Months | |
| Family Liability Protection | $300,000 | each occurrence |
| Guest Medical Protection | $5,000 | each person |
| Workers' Compensation and Employers' Liability<br>Coverage for Residence Employees | Statutory/See Form | |

**\* $18,150   ( 5%  of your Dwelling Protection limit) is your Deductible for Severe Hurricanes, which applies to the total of all losses under the coverages indicated above.**

**DISCOUNTS**    Your premium reflects the following discounts on applicable coverage(s):
Renovated House                                  10 %
Protective Device Rate Applied

## RATING INFORMATION
The dwelling is of Frame construction and is occupied by   1 family

# Allstate Insurance Company

Policy Number:  0 78 711771 07/15    Your Agent:   P Collura Ins Agenc  (718) 969-7300
For Premium Period Beginning:   **July 15, 2014**

## Your Policy Documents

Your Homeowners policy consists of this Policy Declarations and the documents listed below. Please keep these together.

- Deluxe Plus Policy form AP317
- NY Amendment of Policy Provisions form AP1948
- Declarations Supplement Pg (New York) form AU233-1
- New York PIA Amendatory End. form AP4577
- Deductible for Severe Hurricanes End. form AP585-1
- Off Premises Theft Excluded End. form AU9010-1

- New York Amendatory Endorsement form AP497-2
- Amendment of Policy Provisions form AP521
- Domestic Workers' Comp & Emp Liability AP1105-1
- New York Amendatory Endorsement form AP1727
- Bldg. Struct. Reimb. Ext. Limits End. form AP693
- Deluxe Plus Amendatory End.form AP1356-1

## Important Payment and Coverage Information

The Property Insurance Adjustment condition applies using the Marshall Swift Boeckh Publications building cost index.

IN WITNESS WHEREOF, **Allstate** has caused this policy to be signed by two of its officers at Northbrook, Illinois, and if required by state law, this policy shall not be binding unless countersigned on the Policy Declarations by an authorized agent of **Allstate**.

Thomas J. Wilson
President

Mary J. McGinn
Secretary

# Policy Endorsement

*The following endorsement changes your policy. Please read this document carefully and keep it with your policy.*

*This Endorsement Changes Your Policy—Keep It With Your Policy*

## New York
## Workers' Compensation And Employers' Liability Coverage For Residence Employees Coverage Form — AP1105-1

THIS COVERAGE FORM AMENDS THE FOLLOWING ALLSTATE INSURANCE COMPANY AND ALLSTATE INDEMNITY COMPANY POLICIES: Deluxe, Deluxe Plus, Standard Homeowners, Condominium and Co-Op.

### Part A—Coverages Defined
When "Workers' Compensation and Employers' Liability Coverage For Residence Employees" appears on the Policy Declarations (Coverage WC), the following coverages apply:

### Coverage I: Workers' Compensation
With respect to a **residence employee**, Allstate will pay on behalf of an **insured person** as an employer of a **residence employee** all benefits when due as required by the New York Insurance Law Section 3420, as amended. At a minimum, such benefits will be equivalent to those benefits in the standard workers' compensation policy issued in New York. If benefits prescribed by a state other than the State of New York apply, **Allstate** will pay those instead; and

### Coverage II: Employers' Liability
With respect to a **residence employee**, **Allstate** will pay on behalf of an **insured person**, all damages for which an **insured person** is legally liable because of **bodily injury** sustained by a **residence employee**.

### Definitions Used in This Coverage Form
The following definitions apply only for the purposes of this coverage form:
1. **Business**—means:
   a. any full or part-time activity of any kind engaged in for economic gain and the use of any part of any premises for such purposes. The providing of home day care services to other than an **insured person** or relative of an **insured person** for economic gain is also a **business**; however, the mutual exchange of home day care services is not considered a **business**.

   b. unless described on the Policy Declarations, any property rented or held for rental by an **insured person**. Rental of **your residence premises** is not considered a **business** when:
      i.   it is rented occasionally for residential purposes;
      ii.  a portion is rented to not more than two roomers or boarders; or
      iii. a portion is rented as a private garage.

2. **Bodily injury**—means bodily harm, sickness or occupational disease, including required care, and death including reasonable burial expense.

3. **Residence employee**—means any employee of any **insured person** who is:
   a. engaged at or about an **insured premises,** in employment of less than 40 hours or casual employment as defined in the New York Insurance Law, Section 3420, as amended; or
   b. performing similar duties elsewhere which are related to or arise from an **insured premises,** except those duties performed in connection with a **business** of any **insured person.**

**Conditions of Coverage**

This coverage applies only if all of the following conditions are met:

1. The **bodily injury** to the **residence employee** must be caused by an employment related accident or an occupational disease.

2. The **bodily injury** to a **residence employee** must occur while the **residence employee** is:
   a. in the United States of America, its territories or possessions, or Canada; or
   b. temporarily located elsewhere but only if they are a citizen or legal resident of the United States or Canada.

3. The **bodily injury** to a **residence employee** must occur during the policy period.

4. If **bodily injury** to a **residence employee** results from or is aggravated by an occupational disease, the employee's last day of exposure to the conditions causing or aggravating such **bodily injury** must occur during the policy period while the **residence employee** is in the employment of an **insured person.**

**Applicable Policy Provisions**

In addition to the provisions specific to this coverage form, the following policy parts apply:

A. Under the General Policy Section:
   1. Definitions Used In This Policy, the following definitions apply: **Allstate, We, Us, Our, Insured person(s), Insured premises, Residence Premises, You** and **your.**
   2. Coverage Changes
   3. Policy Transfer
   4. Continued Coverage After Your Death
   5. Cancellation
   6. Concealment or Fraud

B. Under Section II—Family Liability and Guest Medical Protection, Coverage X—Family Liability Protection, Losses We Cover Under Coverage X, only that part of the provision pertaining to the defense of any **insured person.**

C. Under Section II—Additional Protection: Claim Expense(s)

D. Under Section II—Conditions:
   a. What You Must Do After an Accidental Loss, except those references to "property damage" and "Damage To Property of Others" within this provision do not apply.
   b. Bankruptcy
   c. Our Rights to Recover Payment—Coverage X—Family Liability Protection
   d. Suit Against Us

Page 2

**Additional Provisions Applicable to This Coverage Form**

1. **Conformity to State Statutes**
   If any part of this coverage form conflicts with the New York Insurance Law, Section 3420, as amended, regarding any part time **residence employee**, that part is amended to conform to the appropriate state law.

2. **Other Insurance**
   If a loss covered by this coverage form is also covered by other insurance, **Allstate** will pay only that proportion of benefits and/or damages the limits of liability applying to this coverage form bear to the total amount of insurance covering the loss. If however, any other insurance is written specifically on an excess basis over the limits of liability of this policy, coverage under this form will be primary.

3. **Notice of Claim**
   Under Coverage I: Workers' Compensation, knowledge by any **insured person** of **bodily injury** to a **residence employee** will be considered knowledge by **us**.

4. **Our Rights to Review Your Employment Records**
   **Allstate** or our legal representative has the right but not the obligation to review any records related to the employment of a **residence employee** by an **insured person**. **We** may review these records and adjust premiums for a period of up to three years from the last anniversary date of the policy to which this coverage form is attached. **Our** review, performed with **your** knowledge and cooperation, will occur during regular business hours and may be used to determine and adjust the premiums accordingly for the latest three policy terms this coverage was in force.

**Limits of Liability—Coverage II:**

For a **residence employee** subject to the New York Insurance Law, Section 3420, as amended, **our** total limit of liability, regardless of the number of injured persons or claims, shall not exceed $300,000 in damages for any one employment related accident for which **you** are liable:

1. because of **bodily injury** sustained by one or more **residence employee;** or
2. because of **bodily injury** resulting in occupational disease and sustained by one or more **residence employee.**

**Exclusions**

Coverage does not apply:

1. Under Coverages I and II, to any **bodily injury** or liability:
   a. to anyone other than a **residence employee;**
   b. arising from any **business** of an **insured person;** or
   c. because of the employment of an **insured person** by any other **insured person.**

2. Under Coverage II, to any damages for which **you** become liable because of:
   a. assumption by any **insured person** under any contract or agreement;
   b. any liability resulting from intentional acts of any **insured person;**
   c. any liability resulting from the employment of any **residence employee** employed in violation of law;
   d. any obligations imposed by a workers' compensation, occupational disease, unemployment compensation, disability benefits law or similar law;
   e. any liability for **bodily injury** by an occupational disease unless a written claim is made or suit brought against **an insured person** within 36 months after the end of the policy period to which this coverage form applies;
   f. punitive or exemplary damages; or
   g. any employment practices prohibited by any State or Federal statute.

Page 3

# Policy Endorsement

*The following endorsement changes your policy. Please read this document carefully and keep it with your policy.*

## New York
## Amendatory Endorsement — AP1356-1

This endorsement amends your Deluxe Plus Homeowners Policy and is in addition to all other amendatory endorsements which apply to this policy.

I.   In **Section I—Your Property**, under **Losses We Do Not Cover Under Coverages A and B**, item 15.d), "rust or other corrosion, mold, wet or dry rot", is replaced by:

15.   d)  rust or other corrosion;

II.  In **Section I - Your Property,** under **Losses We Do Not Cover Under Coverages A and B,** the following is added:

24.   Mold, fungus, wet rot, dry rot or bacteria. This includes any loss which, in whole or in part, arises out of, is aggravated by or results from mold, fungus, wet rot, dry rot or bacteria.

This exclusion applies regardless of whether mold, fungus, wet rot, dry rot or bacteria arises from any other cause of loss, including but not limited to a loss involving water, water damage or discharge, which may otherwise be covered by this policy, except as specifically provided in **Section I, Conditions —Mold, Fungus, Wet Rot and Dry Rot Remediation as a Direct Result of a Covered Loss**. However, if mold, fungus, wet rot, dry rot or bacteria ensues from a covered fire or lightning loss, this exclusion does not apply.

III. In **Section I - Your Property,** under **Losses We Do Not Cover Under Coverage C**, the following is added:

16.   Mold, fungus, wet rot, dry rot or bacteria. This includes any loss which, in whole or in part, arises out of, is aggravated by or results from mold, fungus, wet rot, dry rot or bacteria.

This exclusion applies regardless of whether mold, fungus, wet rot, dry rot or bacteria arises from any other cause of loss, including but not limited to a loss involving water, water damage or discharge, which may otherwise be covered by this policy, except as specifically provided in **Section I, Conditions —Mold, Fungus, Wet Rot and Dry Rot Remediation as a Direct Result of a Covered Loss**. However, if mold, fungus, wet rot, dry rot or bacteria ensues from a covered fire or lightning loss, this exclusion does not apply.

IV.  In **Section I - Your Property**, under **Additional Protection - Additional Living Expense** is replaced by the following:

1.   **Additional Living Expense**
    a)   **We** will pay the reasonable increase in living expenses necessary to maintain **your** normal standard of living when a direct physical loss **we** cover under **Coverage A - Dwelling Protection, Coverage B - Other Structures Protection** or **Coverage C - Personal Property Protection** makes **your residence premises** uninhabitable. However, additional living expense due to remediation of mold, fungus, wet rot or dry rot will not be paid in addition to any amounts paid or payable under **Section I, Conditions —Mold, Fungus, Wet Rot and Dry Rot Remediation as a Direct Result of a**

**Page 1**

**Covered Loss** unless mold, fungus, wet rot, dry rot or bacteria ensues from a covered fire or lightning loss.

Payment for additional living expense as a result of a covered loss under **Coverage A - Dwelling Protection, Coverage B - Other Structures Protection** or **Coverage C - Personal Property Protection** will be limited to the least of the following:

1) the time period required to repair or replace the property **we** cover, using due diligence and dispatch; or

2) if **you** permanently relocate, the shortest time for **your** household to settle elsewhere;

3) 12 months.

b) **We** will pay **your** lost fair rental income resulting from a covered loss under **Coverage A - Dwelling Protection, Coverage B - Other Structures Protection** or **Coverage C - Personal Property Protection,** less charges and expenses which do not continue, when a loss **we** cover under **Coverage A - Dwelling Protection, Coverage B - Other Structures Protection** or **Coverage C - Personal Property Protection** makes the part of the **residence premises you** rent to others, or hold for rental, uninhabitable. **We** will pay for lost fair rental income for the shortest time required to repair or replace the part rented or held for rental but not to exceed 12 months. However, payments for **your** lost fair rental income expense due to remediation of mold, fungus, wet rot or dry rot will not be paid in addition to any amounts paid or payable under **Section I, Conditions - Mold, Fungus, Wet Rot and Dry Rot Remediation as a Direct Result of a Covered Loss** unless mold, fungus, wet rot, dry rot or bacteria ensues from a covered fire or lightning loss.

c) **We** will pay the reasonable and necessary increase in living expenses and the lost fair rental income for up to two weeks should civil authorities prohibit the use of the **residence premises** due to a loss at a neighboring premises caused by a loss **we** insure against. However, payments for increase in living expenses or **your** lost fair rental income expense due to remediation of mold, fungus, wet rot or dry rot will not be paid in addition to any amounts paid or payable under **Section I, Conditions —Mold, Fungus, Wet Rot and Dry Rot Remediation as a Direct Result of a Covered Loss** unless mold, fungus, wet rot, dry rot or bacteria ensues from a covered fire or lightning loss.

These periods of time are not limited by the termination of this policy.

**We** do not cover any lost income or expense due to the cancellation of a lease or agreement.

No deductible applies to this protection.

V. In **Section I - Conditions**, under item 5, **How We Pay For A Loss**, the following changes are made:

1. Sub-item b) Actual Cash Value is replaced by the following:

b) Actual Cash Value

If **you** do not repair or replace the damaged, destroyed or stolen property, payment will be on an actual cash value basis. This means there may be a deduction for depreciation. Payment will not exceed the limit of liability shown on the Policy Declarations for the coverage that applies to the damaged, destroyed or stolen property, regardless of the number of items involved in the loss.

**You** may make claim for additional payment as described in paragraph "c" and paragraph "d" if **you** repair or replace the damaged, destroyed or stolen covered property within two years after the date of the loss.

2. Under sub-item c) Building Structure Reimbursement, the first paragraph is replaced by the following:

    c) Building Structure Reimbursement.

Under **Coverage A - Dwelling Protection** and **Coverage B - Other Structures Protection**, **we** will make additional payment to reimburse **you** for cost in excess of actual cash value if **you** repair, rebuild or replace damaged, destroyed or stolen covered property within two years after the date of the loss. This additional payment includes the reasonable and necessary expense for treatment or removal and disposal of contaminants, toxins or pollutants as required to complete repair or replacement of that part of a **building structure** damaged by a covered loss. This additional payment shall not include any amounts which may be paid or payable under **Section I, Conditions —Mold, Fungus, Wet Rot and Dry Rot Remediation as a Direct Result of a Covered Loss**, and shall not be payable for any losses excluded in **Section I—Your Property**, under **Losses We Do Not Cover Under Coverages A and B**, item 24, unless mold, fungus wet rot, dry rot or bacteria ensues from a covered fire or lightning loss.

3. Under sub-item d) Personal Property Reimbursement, the first paragraph is replaced by the following:

    d) Personal Property Reimbursement

Under **Coverage C—Personal Property Protection**, **we** will make additional payment to reimburse **you** for cost in excess of actual cash value if **you** repair, rebuild or replace damaged, destroyed or stolen covered personal property or wall-to-wall carpeting within two years after the date of the loss.

VI. In **Section I - Conditions**, the following is added:

    19. **Mold, Fungus, Wet Rot and Dry Rot Remediation as a Direct Result of a Covered Loss**

In the event of a covered loss under **Coverage A - Dwelling Protection, Coverage B - Other Structures Protection** or **Coverage C - Personal Property Protection, we** will pay up to $20,000 for mold, fungus, wet rot or dry rot **remediation**. However, if a premium is shown on the Policy Declarations for **Optional Protection For Mold** the **remediation** limit shown on the Policy Declarations for **Optional Protection For Mold** is the maximum **we** will pay for all mold, fungus, wet rot or dry rot **remediation** resulting from any one covered loss.

**Remediation** means the reasonable and necessary treatment, removal or disposal of mold, fungus, wet rot or dry rot as required to complete repair or replacement of property **we** cover under **Coverage A - Dwelling Protection, Coverage B - Other Structures Protection** or **Coverage C - Personal Property Protection** damaged by a covered loss, including payment for any reasonable increase in living expenses necessary to maintain **your** normal standard of living if mold, fungus, wet rot or dry rot makes **your residence premises** uninhabitable. **Remediation** also includes any investigation or testing to detect, measure or evaluate mold, fungus, wet rot or dry rot.

This Condition does not increase the limits of liability under **Coverage A - Dwelling Protection, Coverage B - Other Structures Protection** or **Coverage C - Personal Property Protection**. This Condition does not apply if mold, fungus, wet rot, dry rot or bacteria ensues from a covered fire or lightning loss.

All other policy terms and conditions apply.

# Policy Endorsement
*The following endorsement changes your policy. Please read this document carefully and keep it with your policy.*

*This Endorsement Changes Your Policy— Keep It With Your Policy*

## New York
## Amendatory Endorsement – AP1727

In **Section I — Your Property**, under **Section I Conditions**, the following condition is added:

**Request for Written Estimate of Real Property**
In the event of a pending claim for damage to real property, upon request, **Allstate** shall furnish to **your** representative, designated in writing, or if none has been designated, to **you**, a copy of any written estimate or estimates of the cost of damages to real property resulting from the loss which **Allstate** has independently prepared for **our** purposes, or had prepared on **our** behalf for **our** purposes, specifying all appropriate deductions, within thirty days after the request or preparation, whichever is later, of such estimate or estimates. **Allstate** shall not be required to provide an estimate on claims for damages to real property unless **we** have independently prepared one or had one prepared on **our** behalf for **our** own purposes.

All other policy terms and conditions apply.

## Policy Endorsement
*The following endorsement changes your policy. Please read this document carefully and keep it with your policy.*

*This Endorsement Changes Your Policy— Keep It With Your Policy*

**New York**
**Amendment of Policy Provisions — AP1948**

It is agreed that:

I.   The General section is amended as follows:

    A.   Under **Definitions Used In This Policy**, the following definitions are added:

        **"Certified contractor"** means an abatement contractor, inspector, risk assessor or supervisor and their employees who have successfully completed a certified **lead abatement** training program and have met any other requirements for obtaining and maintaining certification or licensing as established by the United States Environmental Protection Agency, New York State, or any state which has implemented such a certification program.

        **"Certified report"** means a written report completed by a **certified contractor** which details the results of the inspection and the testing at the **residence premises** for the presence of lead.

        **"Lead abatement"** — means any measure or set of measures designed to permanently eliminate lead-based hazards, including, but not limited to:
        a)   the removal of lead-based paint and lead-contaminated dust, the permanent enclosure or encapsulation of lead-based paint, the replacement of lead-painted surfaces or fixtures; and
        b)   all preparation, clean-up, disposal and post-abatement clearance testing activities associated with these measures.

        **"Lead-safe"** means conditions at the **residence premises** have been established by a **certified contractor** through inspection, testing and completion of a **certified report** which states:
        a)   the **residence premises** is free of lead; or
        b)   exposure to lead has been controlled by **lead abatement** procedures.

    B.   The following provisions are added:

        **What Law Will Apply**
        This policy is issued in accordance with the laws of New York and covers property or risks principally located in New York. Subject to the following paragraph, the laws of New York shall govern any and all claims or disputes in any way related to this policy.

If a covered loss to property, or any other **occurrence** for which coverage applies under this policy happens outside New York, claims or disputes regarding that covered loss to property, or any other covered **occurrence** may be governed by the laws of the jurisdiction in which that covered loss to property, or other covered **occurrence** happened, only if the laws of that jurisdiction would apply in the absence of a contractual choice of law provision such as this.

**Where Lawsuits May Be Brought**

Subject to the following two paragraphs, any and all lawsuits in any way related to this policy, shall be brought, heard and decided only in a state or federal court located in New York. Any and all lawsuits against persons not parties to this policy but involved in the sale, administration, performance, or alleged breach of this policy, or otherwise related to this policy, shall be brought, heard and decided only in a state or federal court located in New York, provided that such persons are subject to or consent to suit in the courts specified in this paragraph.

If a covered loss to property, or any other **occurrence** for which coverage applies under this policy happens outside New York, lawsuits regarding that covered loss to property, or any other covered **occurrence** may also be brought in the judicial district where that covered loss to property, or any other covered **occurrence** happened.

Nothing in this provision, **Where Lawsuits May Be Brought**, shall impair any party's right to remove a state court lawsuit to a federal court.

II.  In **Section II, Family Liability and Guest Medical Protection**, the following changes have been made:

A.  Under **Losses We Do Not Cover Under Coverage X**, the following exclusions are added:

1.  **We** do not cover **bodily injury** or **property damage** arising out of:
    a)  lead paint; or
    b)  the discharge, dispersal, release or escape of oil, fuel oil, kerosene, liquid propane or gasoline intended for, or from, a storage tank. This exclusion does not apply when the discharge, dispersal, release or escape is sudden and accidental.

    **We** do cover **bodily injury** or **property damage** arising out of lead paint:
    a)  in that portion of the **residence premises** occupied by **you** and which is not used for **business** purposes; or
    b)  in any building on or portion of the **residence premises** that was built in 1980 or later or which has undergone **lead abatement** procedures and has been inspected by a **certified contractor** and found to be **lead-safe**.

2.  **We** do not cover any liability imposed upon any **insured person** by any governmental authority arising out of:
    a)  lead paint; or
    b)  the discharge, dispersal, release or escape of oil, fuel oil, kerosene, liquid propane or gasoline intended for, or from, a storage tank. This exclusion does not apply when the discharge, dispersal, release or escape is sudden and accidental.

**We** do cover **bodily injury** or **property damage** arising out of lead paint:

a) in that portion of the **residence premises** occupied by **you** and which is not used for **business** purposes; or

b) in any building on or portion of the **residence premises** that was built in 1980 or later or which has undergone **lead abatement** procedures and has been inspected by a **certified contractor** and found to be **lead-safe**.

3. **We** do not cover any loss, cost, or expense arising out of any request, demand, or order that any **insured person** test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize or in any way respond to or assess the effects of:

a) lead paint; or

b) the discharge, dispersal, release or escape of oil, fuel oil, kerosene, liquid propane, or gasoline intended for, or from, a storage tank. This exclusion does not apply when the discharge, dispersal, release or escape is sudden and accidental.

**We** do cover **bodily injury** or **property damage** arising out of lead paint:

a) in that portion of the **residence premises** occupied by **you** and which is not used for **business** purposes; or

b) in any building on or portion of the **residence premises** that was built in 1980 or later or which has undergone **lead abatement** procedures and has been inspected by a **certified contractor** and found to be **lead-safe**.

B. Under **Losses We Do Not Cover Under Coverage Y**, the following exclusion is added:

**We** do not cover **bodily injury** arising out of:

a) lead paint; or

b) the discharge, dispersal, release or escape of oil, fuel oil, kerosene, liquid propane or gasoline intended for, or from, a storage tank. This exclusion does not apply when the discharge, dispersal, release or escape is sudden and accidental.

**We** do cover **bodily injury** arising out of lead paint:

a) in that portion of the **residence premises** occupied by **you** and which is not used for **business** purposes; or

b) in any building on or portion of the **residence premises** that was built in 1980 or later or which has undergone **lead abatement** procedures and has been inspected by a **certified contractor** and found to be **lead-safe**.

All other policy terms and conditions apply.

# Allstate Insurance Company
# Deluxe
# Plus
# Policy

**NEW YORK**

**Policy:** (((((((((((((((

**Effective:** /////////////////

**Issued to:**
)))))))))))))))))))))))))))))
)))))))))))))))))))))))))))))
)))))))))))))))))))))))))))))
)))))))))))))))))))))))))))))

/////////////////////////////////
((((((((((((((((((((((((((((((((((
{{{{{{{{{{{{{{{{{{{{{{{{{{{{{{{{
{{{{{{{{{{{{{{{{{{{{{{{{{{{{{{{{

Allstate Insurance Company
The Company Named in the Policy Declarations
A Stock Company---Home Office: Northbrook, Illinois 60062



AP317

*Table of Contents*

*General*

2 Definitions Used In This Policy
4 Insuring Agreement
4 Agreements We Make With You
4 Conformity To State Statutes
4 Coverage Changes
4 Policy Transfer
4 Continued Coverage After Your Death
5 Cancellation
5 Concealment Or Fraud

*Section I — Your Property*

*Coverage A*
*Dwelling Protection*

6 Property We Cover Under Coverage A
6 Property We Do Not Cover Under Coverage A

*Coverage B*
*Other Structures Protection*

6 Property We Cover Under Coverage B
6 Property We Do Not Cover Under Coverage B
6 Losses We Cover Under Coverages A and B
6 Losses We Do Not Cover Under Coverages
  A and B

*Coverage C*
*Personal Property Protection*

9 Property We Cover Under Coverage C
9 Limitations On Certain Personal Property
10 Property We Do Not Cover Under Coverage C
11 Losses We Cover Under Coverage C
12 Losses We Do Not Cover Under Coverage C

*Additional Protection*

14 Additional Living Expense
14 Credit Card, Bank Fund Transfer Card,
   Check Forgery and Counterfeit Money
15 Debris Removal
15 Emergency Removal Of Property
15 Fire Department Charges
15 Temporary Repairs After A Loss
15 Trees, Shrubs, Plants and Lawns
15 Temperature Change
16 Power Interruption
16 Building Codes
16 Arson Reward
16 Collapse
16 Land
17 Lock Replacement

*Section I Conditions*

17 Deductible
17 Insurable Interest and Our Liability
17 What You Must Do After A Loss
18 Our Settlement Options
18 How We Pay For A Loss
20 Our Settlement Of Loss
20 Appraisal
20 Abandoned Property
20 Permission Granted To You
20 Our Rights To Recover Payment
20 Our Rights To Obtain Salvage
21 Suit Against Us
21 Loss To A Pair Or Set
21 Glass Replacement
21 No Benefit To Bailee
21 Other Insurance
21 Property Insurance Adjustment
21 Mortgagee

*Section II — Family Liability and*
*Guest Medical Protection*

*Coverage X*
*Family Liability Protection*

22 Losses We Cover Under Coverage X
22 Losses We Do Not Cover Under
   Coverage X

**Coverage Y**
**Guest Medical Protection**

24   Losses We Cover Under Coverage Y
24   Losses We Do Not Cover Under
       Coverage Y

**Additional Protection**

25   Claim Expenses
25   Emergency First Aid
25   Damage To Property Of Others

**Section II Conditions**
26   What You Must Do After An
       Accidental Loss
26   What An Injured Person Must Do—
       Guest Medical Protection
26   Our Payment Of Loss
       Guest Medical Protection
26   Our Limits of Liability
27   Bankruptcy
27   Our Rights To Recover Payment—
       Family Liability Protection
27   Suit Against Us
27   Other Insurance—
       Family Liability Protection

**Section III— Optional Protection**

**Optional Coverages**
**You May Buy**

27   Coverage BP
       Business Personal Property
27   Coverage DP
       Increased Coverage On Electronic Data
       Processing Equipment
27   Coverage F
       Fire Department Charges
28   Coverage G
       Loss Assessments
28   Coverage J
       Extended Coverage On Jewelry, Watches
       and Furs
29   Coverage K
       Incidental Office, Private School Or Studio

29   Coverage M
       Increased Coverage On Money
29   Coverage P
       Business Pursuits
30   Coverage R
       Additional Dwelling Rented To Others
30   Coverage S
       Increased Coverage On Securities
30   Coverage SD
       Satellite Dish Antenna Systems
30   Coverage SE
       Cellular Communication and Sound
       Reproducing Equipment
30   Coverage ST
       Increased Coverage On Theft Of Silverware

## Definitions Used In This Policy

1.   **"You"** or **"your"**— means the person named
       on the Policy Declarations as the insured and
       that person's resident spouse.

2.   **"Allstate," "We," "Us,"** or **"Our"**— means the
       company named on the Policy Declarations.

3.   **"Insured person(s)"**— means **you** and, if a
       resident of **your** household:
       a)   any relative; and
       b)   any dependent person in **your** care.

       Under **Coverage X— Family Liability
       Protection** and **Coverage Y — Guest
       Medical Protection, "insured person"** also
       means:
       c)   any person or organization legally
             responsible for loss caused by animals
             or watercraft covered by this policy
             which are owned by an **insured person**.
             **We** do not cover any person or
             organization using or having custody of
             animals or watercraft in any **business, or**
             without permission of the owner.
       d)   with respect to the use of any vehicle
             covered by this policy, any person while
             engaged in the employment of an
             **insured person**.

4. "**Bodily Injury**"— means physical harm to the body, including sickness or disease, and resulting death, except that **bodily injury** does not include:
   a) any venereal disease;
   b) Herpes;
   c) Acquired Immune Deficiency Syndrome (AIDS);
   d) AIDS Related Complex (ARC);
   e) Human Immunodeficiency Virus (HIV);
   or any resulting symptom, effect, condition, disease or illness related to (a) through (e) listed above.

   Under **Coverage Y — Guest Medical Protection, bodily injury** means physical harm to the body, including sickness or disease, except that **bodily injury** does not include:
   a) any venereal disease;
   b) Herpes;
   c) Acquired Immune Deficiency Syndrome (AIDS);
   d) AIDS Related Complex (ARC);
   e) Human Immunodeficiency Virus (HIV);

   or any resulting symptom, effect, condition, disease or illness related to (a) through (e) listed above.

5. "**Building Structure**"— means a structure with walls and a roof.

6. "**Business**"— means:
   a) any full or part-time activity of any kind engaged in for economic gain including the use of any part of any premises for such purposes. The providing of home day care services to other than an **insured person** or relative of an **insured person** for economic gain is also a **business**. However, the mutual exchange of home day care services is not considered a **business**;
   b) any property rented or held for rental by an **insured person**. Rental of **your**

residence premises is not considered a **business** when:
   1) it is rented occasionally for residential purposes;
   2) a portion is rented to not more than two roomers or boarders; or
   3) a portion is rented as a private garage.

7. "**Residence Premises**"— means the **dwelling**, other structures and land located at the address stated on the Policy Declarations.

8. "**Insured premises**"— means:
   a) the **residence premises**; and
   b) under **Section II** only:
      1) the part of any other premises, other structures and grounds used by **you** as a residence. This includes premises, structures and grounds **you** acquired for **your** use as a private residence while this policy is in effect;
      2) any part of a premises not owned by an **insured person** but where an **insured person** is temporarily living;
      3) cemetery plots or burial vaults owned by an **insured person**;
      4) vacant land, other than farmland, owned by or rented to an **insured person**;
      5) land owned by or rented to an **insured person** where a one, two, three or four family dwelling is being built as that person's residence;
      6) any premises used by an **insured person** in connection with the **residence premises**;
      7) any part of a premises occasionally rented to an **insured person** for other than **business** purposes.

9. "**Occurrence**"— means an accident, including continuous or repeated exposure to substantially the same general harmful conditions during the policy period, resulting in **bodily injury** or **property damage**.

Page 3

10. **"Property damage"** — means physical injury to or destruction of tangible property, including loss of its use resulting from such physical injury or destruction.

11. **"Residence employee"** — means an employee of an **insured person** while performing duties arising out of and in the course of employment in connection with the maintenance or use of **your residence premises**. This includes similar duties performed elsewhere for an **insured person**, not in connection with the **business** of an **insured person**.

12. **"Dwelling"** — means a one, two, three or four family **building structure**, identified as the insured property on the Policy Declarations, where **you** reside and which is principally used as a private residence.

### Insuring Agreement

In reliance on the information **you** have given **us**, **Allstate** agrees to provide the coverages indicated on the Policy Declarations. In return, **you** must pay the premium when due and comply with the policy terms and conditions, and inform **us** of any change in title, use or occupancy of the **residence premises**.

Subject to the terms of this policy, the Policy Declarations shows the location of the **residence premises**, applicable coverages, limits of liability and premiums. The policy applies only to losses or **occurrences** that take place during the policy period. The policy period is shown on the Policy Declarations. This policy is not complete without the Policy Declarations.

The terms of this policy impose joint obligations on the person named on the Policy Declarations as the insured and on that person's resident spouse. These persons are defined as **you** or **your**. This means that the responsibilities, acts and omissions of a person defined as **you** or **your** will be binding upon any other person defined as **you** or **your**.

The terms of this policy impose joint obligations on persons defined as an **insured person**. This means that the responsibilities, acts and failures to act of a person defined as an **insured person** will be binding upon another person defined as an **insured person**.

### Agreements We Make With You

**We** make the following agreements with **you**:

### Conformity to State Statutes

When the policy provisions conflict with the statutes of the state in which the **residence premises** is located, the provisions are amended to conform to such statutes.

### Coverage Changes

When **Allstate** broadens coverage during the premium period without charge, **you** have the new features if **you** have the coverage to which they apply. Otherwise, the policy can be changed only by endorsement.

The coverage provided and the premium for the policy is based on information **you** have given **us**. **You** agree to cooperate with **us** in determining if this information is correct and complete. **You** agree that if this information changes, is incorrect or incomplete, **we** may adjust **your** coverage and premium accordingly during the policy period.

Any calculation of **your** premium or changes in **your** coverage will be made using the rules, rates and forms on file, if required, for **our** use in **your** state. The rates in effect at the beginning of **your** current premium period will be used to calculate any change in **your** premium.

### Policy Transfer

**You** may not transfer this policy to another person without **our** written consent.

### Continued Coverage After Your Death

If **you** die, coverage will continue until the end of the premium period for:
1) **your** legal representative while acting as such, but only with respect to the **residence**

Page 4

premises and property covered under this policy on the date of your death.

2) an insured person, and any person having proper temporary custody of your property until a legal representative is appointed and qualified.

## Cancellation

**Your** Right to Cancel:
**You** may cancel this policy by notifying **us** of the future date **you** wish to stop coverage.

**Our** Right to Cancel:
**Allstate** may cancel this policy by mailing notice to **you** at the mailing address shown on the Policy Declarations. When this policy has been in effect for less than 60 days, and it is not a renewal with **us**, **we** may cancel this policy for any reason by giving **you** at least 10 days notice of cancellation if evidence of any of the following is present:

1) the policy was obtained by fraud, material misrepresentation, or concealment of material facts; or
2) arson.

If the cancellation is for non-payment of premium, **we** will give **you** at least 15 days notice. If cancellation is for any other reason, **we** will give **you** at least 30 days notice.

When the policy has been in effect for 60 days or more, or if it is a renewal with **us**, **we** may cancel or non-renew this policy for one or more of the following reasons:

1) non-payment of premium;
2) the policy was obtained by misrepresentation, fraud or concealment of material facts;
3) material misrepresentation, fraud or concealment of material fact in presenting a claim, or violation of any of the policy terms; or
4) physical changes in the covered property that occur after the policy was issued or last renewed which makes the property uninsurable; or

5) **you** or any occupant of the covered property has been convicted of a crime and one of the elements of that crime was an act increasing any hazard **we** cover.

If the cancellation is for non-payment of premium, **we** will give **you** at least 15 days notice. If the cancellation is for any of the other reasons, **we** will give **you** at least 30 days notice. If the policy is non-renewed, **we** will give **you** at least 45 days notice, but not more than 60 days notice.

Proof of **our** mailing the notice of cancellation to **you** will be deemed proof of notice. Coverage under this policy will terminate on the effective date and hour stated on the cancellation notice. **Your** return premium, if any, will be calculated on a pro rata basis and refunded at the time of cancellation or as soon as possible. However, refund of unearned premium is not a condition of cancellation.

**Our** Right Not to Renew or Continue:
If we don't intend to continue or renew the policy, we will mail you notice at least 45 days, but not more than 60 days before the end of the policy period. Proof of our mailing the notice of nonrenewal to you will be deemed proof of notice.

## Concealment or Fraud

This policy is void if it was obtained by misrepresentation, fraud or concealment of material facts. If it is determined that this policy is void, all premiums paid will be returned to **you** since there has been no coverage under this policy.

**We** do not cover any loss or **occurrence** in which any **insured person** has concealed or misrepresented any material fact or circumstance.

## Section I — Your Property

### Coverage A
### Dwelling Protection

#### Property We Cover Under Coverage A:
1. **Your dwelling** including attached structures. Structures connected to **your dwelling** by only a fence, utility line, or similar connection are not considered attached structures.

2. Construction materials and supplies at the **residence premises** for use in connection with **your dwelling**.

3. Wall-to-wall carpeting fastened to **your dwelling**.

#### Property We Do Not Cover Under Coverage A:
1. Any structure including fences or other property covered under **Coverage B — Other Structures Protection.**

2. Land, except as specifically provided in **Section I — Additional Protection** under item 13, "Land."

3. Satellite dish antennas and their systems, whether or not attached to **your dwelling**.

### Coverage B
### Other Structures Protection

#### Property We Cover Under Coverage B:
1. Structures at the address shown on the Policy Declarations separated from **your dwelling** by clear space.

2. **Structures** attached to **your dwelling** by only a fence, utility line, or similar connection.

3. Construction materials and supplies at the address of the **residence premises** for use in

connection with structures other than **your dwelling**.

4. Wall-to-wall carpeting fastened to other **building structures.**

#### Property We Do Not Cover Under Coverage B:
1. Structures used in whole or in part for **business** purposes.

2. Any structure or other property covered under **Coverage A — Dwelling Protection**.

3. Land, no matter where located, or the replacement, rebuilding, restoration, stabilization or value of any such land.

4. Construction materials and supplies at the address of the **residence premises** for use in connection with the **dwelling**.

5. Satellite dish antennas and their systems, whether or not attached to **building structures.**

#### Losses We Cover Under Coverages A and B:
**We** will cover sudden and accidental direct physical loss to property described in **Coverage A — Dwelling Protection** and **Coverage B — Other Structures Protection** except as limited or excluded in this policy.

#### Losses We Do Not Cover Under Coverages A and B:
We do not cover loss to the property described in **Coverage A — Dwelling Protection** or **Coverage B — Other Structures Protection** consisting of or caused by:
1. Flood, including, but not limited to, surface water, waves, tidal water or overflow of any body of water, or spray from any of these, whether or not driven by wind.

2. Water or any liquid or sludge which contains water, whether or not combined with other chemicals or impurities, that backs up through sewers or drains.

3. Water or any liquid or sludge which contains water, whether or not combined with other chemicals or impurities, that overflows from a sump pump, sump pump well or other system designed for the removal of subsurface water which is drained from a foundation area of a structure.

4. Water or any liquid or sludge which contains water, whether or not combined with other chemicals or impurities, on or below the surface of the ground, regardless of its source. This includes water or any liquid or sludge which contains water, whether or not combined with other chemicals or impurities, which exerts pressure on, or flows, seeps or leaks through any part of the **residence premises**.

   **We** do cover sudden and accidental direct physical loss caused by fire, explosion or theft resulting from items 1 through 4 listed above.

5. Earth movement of any type, including, but not limited to earthquake, volcanic eruption, lava flow, landslide, subsidence, mudflow, pressure, sinkhole, erosion, or the sinking, rising, shifting, creeping, expanding, bulging, cracking, settling or contracting of the earth.

   This exclusion applies whether or not the earth movement is combined with water.

   **We** do cover sudden and accidental direct physical loss caused by fire, explosion, theft or breakage of glass or safety glazing materials resulting from earth movement.

6. Enforcement of any building codes, ordinances or laws regulating the construction, reconstruction, maintenance,

repair, placement or demolition of any **structure** or land at the **residence premises**. **We** do cover sudden and accidental direct physical loss caused by actions of civil authority to prevent the spread of fire.

7. The failure by any **insured person** to take all reasonable steps to preserve property when the property is endangered by a cause of loss **we** cover.

8. Any substantial change or increase in hazard, if changed or increased by any means within the control or knowledge of an **insured person**.

9. Intentional or criminal acts of or at the direction of an **insured person**, if the loss that occurs:
   a) may be reasonably expected to result from such acts; or
   b) is the intended result of such acts.

   This exclusion applies only to those persons who commit, conspire, collude, direct, or acquiesce to such acts.

10. Nuclear action, meaning nuclear reaction, discharge, radiation or radioactive contamination or any consequence of any of these. Loss caused by nuclear action is not considered loss by fire, explosion or smoke.

    **We** do cover sudden and accidental direct physical loss by fire resulting from nuclear action.

11. War or warlike acts, including, but not limited to insurrection, rebellion or revolution.

12. Collapse, except as specifically provided in **Section I — Additional Protection** under item 12, "Collapse."

13. Soil conditions, including, but not limited to corrosive action, chemicals, compounds,

elements, suspensions, crystal formations or gels in the soil.

14. Vapors, fumes, acids, toxic chemicals, toxic gasses, toxic liquids, toxic solids, waste materials or other irritants, contaminants or pollutants.

In addition, we do not cover loss consisting of or caused by any of the following;

15. a) wear and tear, aging, marring, scratching, deterioration, inherent vice, or latent defect;
   b) mechanical breakdown;
   c) growth of trees, shrubs, plants or lawns whether or not such growth is above or below the surface of the ground;
   d) rust or other corrosion, mold, wet or dry rot;
   e) contamination, including, but not limited to the presence of toxic, noxious, or hazardous gasses, chemicals, liquids, solids or other substances at the residence premises or in the air, land or water serving the residence premises;
   f) smog, smoke from the manufacturing of any controlled substance, agricultural smudging and industrial operations;
   g) settling; cracking; shrinking; bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings;
   h) insects, rodents, birds or domestic animals. We do cover the breakage of glass or safety glazing materials caused by birds; or
   i) Covered property seized by government authority.

If any of (a) through (h) cause the sudden and accidental escape of water or steam from a plumbing, heating or air conditioning system, household appliance or fire protective sprinkler system within your dwelling, we cover the direct physical damage caused by the water or steam. If loss to covered property is caused by water or

steam not otherwise excluded, we will cover the cost of tearing out and replacing any part of your dwelling necessary to repair the system or appliance. This does not include damage to the defective system or appliance from which the water escaped.

16. Freezing of plumbing, fire protective sprinkler systems, heating or air conditioning systems or household appliances, or discharge, leakage or overflow from within the systems or appliances caused by freezing, while the building structure is vacant, unoccupied or being constructed unless you have used reasonable care to:
   a) maintain heat in the building structure; or
   b) shut off the water supply and drain the system and appliances.

17. Freezing, thawing, pressure or weight of water, ice or snow, whether driven by wind or not. This exclusion applies only to fences, pavements, patios, swimming pools, foundations, retaining walls, bulkheads, piers, wharves or docks.

18. Seepage, meaning continuous or repeated seepage or leakage over a period of weeks, months, or years, of water, steam or fuel:
   a) from a plumbing, heating, air conditioning or automatic fire protection system or from within a domestic appliance; or
   b) from, within or around any plumbing fixtures, including, but not limited to shower stalls, shower baths, tub installations, sinks or other fixtures designed for the use of water or steam.

19. Theft from your residence premises while your dwelling is under construction, or of materials and supplies for use in construction, until your dwelling is completed and occupied.

Page 8

20. Vandalism or Malicious Mischief if **your dwelling** is vacant for more than 30 consecutive days immediately prior to the vandalism or malicious mischief. A **dwelling** under construction is not considered vacant.

21. Weather Conditions that contribute in any way with a cause of loss excluded in this section to produce a loss.

22. Planning, Construction or Maintenance, meaning faulty, inadequate or defective:
    a) planning, zoning, development, surveying, siting;
    b) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
    c) materials used in repair, construction, renovation or remodeling; or
    d) maintenance

    of property whether on or off the **residence premises** by any person or organization.

23. **We** do not cover loss to covered property described in **Coverage A — Dwelling Protection** or **Coverage B — Other Structures Protection** when:
    a) there are two or more causes of loss to the covered property; and
    b) the predominant cause(s) of loss is (are) excluded under **Losses We Do Not Cover**, items 1 through 22 above.

## Coverage C
## Personal Property Protection

### Property We Cover Under Coverage C:
1. Personal property owned or used by an **insured person** anywhere in the world. When personal property is located at a residence other than the **residence premises**, coverage is limited to 10% of **Coverage C — Personal Property Protection**. This limitation does not apply to personal property in a newly acquired principal residence for the 30 days

immediately after **you** begin to move property there or to personal property in student dormitory, fraternity or sorority housing.

2. At **your** option, personal property owned by a guest or **residence employee** while the property is in a residence **you** are occupying.

### Limitations On Certain Personal Property:
Limitations apply to the following groups of personal property. If personal property can reasonably be considered a part of two or more of the groups listed below, the lowest limit will apply. These limitations do not increase the amount of insurance under **Coverage C — Personal Property Protection**. The total amount of coverage for each group in any one loss is as follows:

1. $   200 — Money, bullion, bank notes, coins and other numismatic property.

2. $   200 — Property used or intended for use in a **business** while the property is away from the **residence premises**. This does not include electronic data processing equipment or the recording or storage media used with that equipment.

3. $ 2,000 — Property used or intended for use in a **business**, including property held as samples or for sale or delivery after sale, while the property is on the **residence premises**. This does not include electronic data processing equipment or the recording or storage media used with that equipment.

4. $ 1,000 — Trading cards, comic books and Hummels, subject to a maximum amount of $250 per item.

5. $ 1,000 — Accounts, bills, deeds, evidences of debt, letters of credit, notes other than bank notes, passports, securities, tickets, and stamps, including philatelic property.

6. $ 1,000 — Manuscripts, including documents stored on electronic media.

7. $ 2,000 — Watercraft, including their attached or unattached trailers, furnishings, equipment, parts and motors.

8. $ 1,000 — Trailers not used with watercraft.

9. $ 2,500 — Theft of jewelry, watches, precious and semi-precious stones, gold other than goldware, silver other than silverware, platinum and furs, including any item containing fur which represents its principal value; subject to a maximum amount of $1,000 per item.

10. $ 2,000 — Any motorized land vehicle parts, equipment or accessories not attached to or located in or upon any motorized land vehicle.

11. $ 3,000 — Theft of firearms.

12. $ 2,500 — Theft of silverware, pewterware and goldware.

13. $ 5,000 — Electronic data processing equipment and the recording or storage media used with that equipment whether or not the equipment is used in a **business**. Recording or storage media will be covered only up to:
   a) the retail value of the media, if pre-programmed; or

   b) the retail value of the media in blank or unexposed form, if blank or self-programmed.

14. $10,000 — Theft of rugs, including, but not limited to, any handwoven silk or wool rug, carpet, tapestry, wall-hanging or other similar article whose principal value is determined by its color, design, quality of wool or silk, quality of weaving, condition or age; subject to a maximum amount of $2,500 per item.

### Property We Do Not Cover Under Coverage C:

1. Personal property specifically described and insured by this or any other insurance.

2. Animals.

3. Motorized land vehicles, including, but not limited to any land vehicle powered or assisted by a motor or engine. **We** do not cover any motorized land vehicle parts, equipment or accessories attached to or located in or upon any motorized land vehicle. **We** do cover motorized land vehicles designed for assisting the handicapped or used solely for the service of the **insured premises** and not licensed for use on public roads.

4. Aircraft and aircraft parts. This does not include model or hobby craft not designed to carry people or cargo.

5. Property of roomers, boarders, tenants not related to an **insured person**.

6. Property located away from the **residence premises** and rented or held for rental to others.

7. Any device, cellular communication system, radar signal reception system, accessory,

tapes, discs, records, wires, antennas or other mediums designed for reproducing, detecting, receiving, transmitting, recording or playing back data, sound or picture which may be powered by electricity from a motorized land vehicle or watercraft and while in or upon a motorized land vehicle or watercraft.

8. Satellite dish antennas and their systems.

## Losses We Cover Under Coverage C:

**We** will cover sudden and accidental direct physical loss to the property described in **Coverage C — Personal Property Protection**, except as limited or excluded in this policy, caused by:

1. Fire or Lightning.

2. Windstorm or Hail.

   **We** do not cover:
   a) loss to covered property inside a **building structure**, caused by rain, snow, sleet, sand or dust unless the wind or hail first damages the roof or walls and the wind forces rain, snow, sleet, sand or dust through the damaged roof or wall;
   b) loss to watercraft and their trailers, furnishings, equipment and motors unless inside a fully enclosed **building structure**. However, **we** do cover canoes and rowboats on the **residence premises**.

3. Explosion.

4. Riot or Civil Commotion, including pillage and looting during, and at the site of, the riot or civil commotion.

5. Aircraft, including self-propelled missiles and spacecraft.

6. Vehicles.

7. Smoke.

   **We** do not cover loss caused by smoke from the manufacturing of controlled substances, agricultural smudging or industrial operations.

8. Vandalism and Malicious Mischief.

   **We** do not cover vandalism or malicious mischief if **your** dwelling has been vacant for more than 30 consecutive days immediately prior to the vandalism or malicious mischief. A dwelling under construction is not considered vacant.

9. Falling objects.

   **We** do not cover loss to personal property inside a **building structure** unless the falling object first damages the exterior walls or roof of the **building structure**.

10. Weight of ice, snow or sleet which causes damage to personal property in a **building structure**, but only if the **building structure** is damaged due to the weight of ice, snow or sleet.

11. Increase or decrease of artificially generated electrical current to electrical appliances, fixtures and wiring.

12. Bulging, burning, cracking or rupture of a steam or hot water heating system, an air conditioning system, an automatic fire protection system or an appliance for heating water.

13. Water or steam that escapes from a plumbing, heating or air conditioning system, an automatic fire protection system, or from a household appliance due to accidental discharge or overflow.

    **We** do not cover loss to the system or appliance from which the water or steam

Page 11

escapes, or loss from water which backs up through sewers or drains or overflows from a sump pump, sump pump well or other system designed for the removal of subsurface water which is drained from a foundation area of a structure.

14. Freezing of a plumbing, heating or air conditioning system or a household appliance. **We** do not cover loss at the **residence premises** under perils (12), (13), and (14) caused by or resulting from freezing while the **building structure** is vacant, unoccupied or under construction unless **you** have used reasonable care to:
    a) maintain heat in the **building structure**; or
    b) shut off the water supply and drain the water from the systems and appliances.

15. Theft, or damage to personal property caused by attempted theft, including disappearance of property from a known place when it is likely that a theft has occurred. Any theft must be promptly reported to the police.
    **We** do not cover:
    a) theft or attempted theft committed by an **insured person**;
    b) theft in or from the **residence premises** while under construction or of materials and supplies for use in construction, until the **dwelling** is completed and occupied;
    c) theft of any property while at any other residence owned, rented to or occupied by an **insured person** unless the **insured person** is temporarily residing there;
    d) theft of trailers, campers, watercraft, including furnishings, equipment and outboard motors, away from the **residence premises**;
    e) theft from that part of the **residence premises** rented by **you** to other than an **insured person**.

16. Breakage of glass, meaning damage to covered personal property caused by breakage of glass constituting a part of any **building structure** on the **residence premises**. This does not include damage to the glass.

## Losses We Do Not Cover Under Coverage C:

**We** do not cover loss to the property described in **Coverage C — Personal Property Protection** caused by or consisting of:

1. Flood, including, but not limited to surface water, waves, tidal water or overflow of any body of water, or spray from any of these, whether or not driven by wind.

2. Water or any liquid or sludge which contains water, whether or not combined with other chemicals or impurities, that backs up through sewers or drains.

3. Water or any liquid or sludge which contains water, whether or not combined with other chemicals or impurities, that overflows from a sump pump, sump pump well or other system designed for the removal of subsurface water which is drained from a foundation area of a structure.

4. Water or any liquid or sludge which contains water, whether or not combined with other chemicals or impurities, on or below the surface of the ground, regardless of its source. This includes water or any liquid or sludge which contains water, whether or not combined with other chemicals or impurities, which exerts pressure on, or flows, seeps or leaks through any part of the **residence premises**.

    **We** do cover sudden and accidental direct physical loss caused by fire, explosion or theft resulting from items 1 through 4 listed above.

Page 12

5. Earth movement of any type, including, but not limited to earthquake, volcanic eruption, lava flow, landslide, subsidence, mudflow, pressure, sinkhole, erosion, or the sinking, rising, shifting, creeping, expanding, bulging, cracking, settling or contracting of the earth. This exclusion applies whether or not the earth movement is combined with water.

   **We** do cover sudden and accidental direct physical loss caused by fire, explosion, theft or breakage of glass or safety glazing materials resulting from earth movement.

6. Enforcement of any building codes, ordinances or laws regulating the construction, reconstruction, maintenance, repair, placement or demolition of any **building structure** or other structure at the **residence premises**.

   **We** do cover sudden and accidental direct physical loss to covered property caused by actions of civil authority to prevent the spread of fire.

7. The failure by any **insured person** to take all reasonable steps to save and preserve property when the property is endangered by a cause of loss **we** cover.

8. Any substantial change or increase in hazard, if changed or increased by any means within the control or knowledge of an **insured person**.

9. Intentional or criminal acts of or at the direction of an **insured person**, if the loss that occurs:
   a) may be reasonably expected to result from such acts; or
   b) is the intended result of such acts.

   This exclusion applies only to those persons who commit, conspire, collude, direct, or acquiesce to such acts.

10. Nuclear action, meaning nuclear reaction, discharge, radiation or radioactive contamination, or any consequence of any of these. Loss caused by nuclear action is not considered loss by fire, explosion or smoke.

    **We** do cover sudden and accidental direct physical loss by fire resulting from nuclear action.

11. Vapors, fumes, acids, toxic chemicals, toxic gasses, toxic liquids, toxic solids, waste materials or other irritants, contaminants or pollutants.

12. War or warlike acts, including, but not limited to insurrection, rebellion or revolution.

13. Weather Conditions that contribute in any way with a cause of loss excluded in this section to produce a loss.

14. Planning, Construction or Maintenance, meaning faulty, inadequate or defective:
    a) planning, zoning, development, surveying, siting;
    b) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
    c) materials used in repair, construction, renovation or remodeling; or
    d) maintenance

    of property whether on or off the **residence premises** by any person or organization.

15. **We** do not cover loss to covered property described in **Coverage C — Personal Property Protection** when:
    a) there are two or more causes of loss to the covered property; and
    b) the predominant cause(s) of loss is (are) excluded under **Losses We Do Not Cover**, items 1 through 14 above.

**Page 13**

## Additional Protection

1. **Additional Living Expense**
   a) **We** will pay the reasonable increase in living expenses necessary to maintain **your** normal standard of living when a direct physical loss **we** cover makes **your residence premises** uninhabitable.

      Payment for covered additional living expense will be limited to the least of the following:
      1) the time period required to repair or replace the property **we** cover, using due diligence and dispatch; or
      2) if **you** permanently relocate, the shortest time for **your** household to settle elsewhere;
      3) 12 months.
   b) **We** will pay **your** lost fair rental income resulting from a covered loss, less charges and expenses which do not continue, when a loss **we** cover makes the part of the **residence premises you** rent to others, or hold for rental, uninhabitable. **We** will pay for lost fair rental income for the shortest time required to repair or replace the part rented or held for rental but not to exceed 12 months.
   c) **We** will pay the reasonable and necessary increase in living expenses and the lost fair rental income for up to two weeks should civil authorities prohibit the use of the **residence premises** due to a loss at a neighboring premises caused by a peril **we** insure against.

   These periods of time are not limited by the termination of this policy.

   **We** do not cover any lost income or expense due to the cancellation of a lease or agreement.

   No deductible applies to this protection.

2. **Credit Card, Bank Fund Transfer Card, Check Forgery and Counterfeit Money**
   **We** will pay for loss:
   a) that an **insured person** is legally required to pay for the unauthorized use of any credit card or bank fund transfer card issued to or registered in the name of an **insured person**;
   b) caused by forgery or alteration of a check or negotiable instrument made or drawn upon an **insured person's** account;
   c) to an **insured person** through acceptance in good faith of counterfeit United States or Canadian paper currency.

   **Our** maximum limit of liability for any one loss is $1,000. All loss due to forgery or unauthorized use by or involving any one person is considered one loss.

   **We** do not cover:
   a) loss arising from any **business** of an **insured person**;
   b) loss caused by or at the direction of an **insured person** or any other person who has been entrusted with any credit card or bank fund transfer card;
   c) loss arising out of dishonesty of an **insured person**.

   When loss is discovered, the **insured person** must give **us** immediate written notice. If the loss involves a credit card, charge plate or bank fund transfer card, the **insured person** must also give immediate written notice to the company or bank that issued the card or plate. Failure to comply with the terms and conditions of the card or plate voids this protection.

   **We** will pay only for loss occurring during the policy period, including those losses discovered and reported to **us** within one year after the policy has terminated. **We** have the right to investigate and settle any claim or suit as **we** deem appropriate. Full payment of

the amount of insurance for any one loss ends **our** obligation under each claim or suit arising from the loss.

**We** will defend any suit brought against an **insured person** for the enforcement of payment covered under paragraph 2(a) of this protection. The defense will be at **our** expense, with counsel of **our** choice.

**We** have the option to defend an **insured person** or the **insured person's** bank against a suit for the enforcement of payment covered under paragraph 2(b) of this protection. The defense will be at **our** expense, with counsel of **our** choice.

No deductible applies to this protection.

3. **Debris Removal**
   **We** will pay reasonable expenses **you** incur to remove debris of covered property damaged by a loss **we** cover. If the loss to the covered property and the cost of debris removal are more than the limit of liability shown on the Policy Declarations for the covered property, **we** will pay up to an additional 5% of that limit for debris removal.

4. **Emergency Removal of Property**
   **We** will pay for sudden and accidental direct physical loss to covered property from any cause while removed from a premises because of danger from a loss **we** cover. Protection is limited to a 30-day period from date of removal. This protection does not increase the limit of liability that applies to the covered property.

5. **Fire Department Charges**
   **We** will pay up to $500 for service charges made by fire departments called to protect **your** property from a loss **we** cover at the **residence premises**.

   No deductible applies to this protection.

6. **Temporary Repairs After a Loss**
   **We** will reimburse **you** up to $5000 for the reasonable and necessary cost **you** incur for temporary repairs to protect covered property from further imminent covered loss following a loss **we** cover. This coverage does not increase the limit of liability applying to the property being repaired.

7. **Trees, Shrubs, Plants and Lawns**
   **We** will pay up to an additional 5% of the limit of liability shown on the Policy Declarations under **Coverage A — Dwelling Protection** for loss to trees, shrubs, plants and lawns at the address of the **residence premises**. **We** will not pay more than $500 for any one tree, shrub, or plant including expenses incurred for removing debris. This coverage applies only to direct physical loss caused by fire or lightning, explosion, riot or civil commotion, aircraft, vehicles not owned by an occupant of the **residence premises**, vandalism or malicious mischief, theft or collapse of a **building structure** or any part of a **building structure**.

   **We** will pay up to $500 for reasonable expenses **you** incur for the removal of debris of trees at the address of the **residence premises** for direct physical loss caused by windstorm, hail, or weight of ice, snow or sleet. The fallen tree must have caused damage to property covered under **Coverage A — Dwelling Protection** or **Coverage B — Other Structures Protection**.

   **We** do not cover trees, shrubs, plants, or lawns grown for **business** purposes.

8. **Temperature Change**
   **We** will pay for loss to covered personal property in a **building structure** at the **residence premises** resulting from a change in temperature. The change in temperature must result from a covered loss to the **building structure**.

This coverage does not increase the limit of liability applying to the damaged property.

9. **Power Interruption**

**We** will pay up to $500 for any one loss to the contents of freezers and refrigerated units on the **residence premises** caused by the interruption of power which occurs off the **residence premises**. If a power interruption is known to an **insured person**, all reasonable means must be used to protect the contents of freezers and refrigerated units.

This coverage does not increase the limit of liability applying to the damaged property.

10. **Building Codes**

**We** will pay up to 10% of the amount of insurance shown on the Policy Declarations under **Coverage A — Dwelling Protection** to comply with local building codes after a covered loss to the **dwelling** and when repair or replacement results in increased cost due to the enforcement of building codes, ordinances or laws regulating the construction, reconstruction, maintenance, repair or demolition of the **dwelling**.

11. **Arson Reward**

**We** will pay up to $5,000 for information leading to an arson conviction in connection with a fire loss to property covered under **Section I** of this policy. The $5,000 limit applies regardless of the number of persons providing information.

12. **Collapse**

**We** will cover:
a) the entire collapse of a covered **building structure**;
b) the entire collapse of part of a covered **building structure**; and
c) direct physical loss to covered property caused by (a) or (b) above.

For coverage to apply, the collapse of a **building structure** specified in (a) or (b) above must be a sudden and accidental direct physical loss caused by one or more of the following:
a) a loss we cover under **Section I, Coverage C — Personal Property Protection;**
b) hidden decay of the **building structure;**
c) hidden damage to the **building structure** caused by insects or vermin;
d) weight of persons, animals, equipment or contents;
e) weight of rain or snow which collects on a roof;
f) defective methods or materials used in construction, repair, remodeling or renovation, but only if the collapse occurs in the course of such construction, repair, remodeling or renovation.

Collapse does not include settling, cracking, shrinking, bulging or expansion.

This protection does not change the limit of liability that applies to the covered property.

13. **Land**

If a sudden and accidental direct physical loss results in both a covered loss to the **dwelling,** other than the breakage of glass or safety glazing material, and a loss to land stability, **we** will pay up to $10,000 as an additional amount of insurance for repair costs associated with the land. This includes the costs required to replace, rebuild, stabilize or otherwise restore the land necessary to support that part of the **dwelling** sustaining the covered loss.

The **Section I — Losses We Do Not Cover Under Coverages A and B** reference to earth movement does not apply to the loss of land stability provided under this Additional Protection.

14. **Lock Replacement**
    **Coverage A — Dwelling Protection** is
    extended to include reasonable expenses **you**
    incur to replace or re-key exterior door locks
    at the **residence premises** with locks or
    cylinders of like kind and quality. Coverage is
    provided when a key to a lock is stolen as
    part of a covered theft loss. The limit of
    liability under this coverage following any one
    theft loss is $500.

## Section I Conditions

1. **Deductible**
   **We** will pay when a covered loss exceeds the
   deductible shown on the Policy Declarations.
   **We** will then pay only the excess amount,
   unless **we** have indicated otherwise in this
   policy.

2. **Insurable Interest and Our Liability**
   In the event of a covered loss, **we** will not pay
   for more than an **insured person's** insurable
   interest in the property covered, nor more
   than the amount of coverage afforded by this
   policy.

3. **What You Must Do After a Loss**
   In the event of a loss to any property that
   may be covered by this policy, **you** must:
   a) promptly give **us** or **our** agent notice.
      Report any theft to the police as soon as
      possible. If the loss involves a credit
      card, charge plate or bank fund transfer
      card, give written notice to the company
      or bank that issued the card or plate.
   b) protect the property from further loss.
      Make any reasonable repairs necessary
      to protect it. Keep an accurate record of
      any repair expenses.
   c) separate damaged from undamaged
      personal property. Give **us** a detailed list
      of the damaged, destroyed or stolen
      property, showing the quantity, cost,
      actual cash value and the amount of loss
      claimed.

   d) give **us** all accounting records, bills,
      invoices and other vouchers, or certified
      copies, which **we** may reasonably
      request to examine and permit **us** to
      make copies.
   e) produce receipts for any increased costs
      to maintain **your** standard of living while
      **you** reside elsewhere, and records
      supporting any claim for loss of rental
      income.
   f) as often as **we** reasonably require:
      1) show **us** the damaged property.
      2) at **our** request, submit to
         examinations under oath, separately
         and apart from any other person
         defined as **you** or **insured person**
         and sign a transcript of the same.
      3) produce representatives,
         employees, members of the
         insured's household or others to the
         extent it is within the insured
         person's power to do so; and
   g) within 60 days after the loss, give **us** a
      signed, sworn proof of the loss. This
      statement must include the following
      information:
      1) the date, time, location and cause of
         loss;
      2) the interest **insured persons** and
         others have in the property,
         including any encumbrances;
      3) the actual cash value and amount of
         loss for each item damaged,
         destroyed or stolen;
      4) any other insurance that may cover
         the loss;
      5) any changes in title, use, occupancy
         or possession of the property that
         have occurred during the policy
         period;
      6) at **our** request, the specifications of
         any damaged **building structure** or
         other structure;
      7) evidence supporting any claim
         under the Credit Card, Bank Fund
         Transfer Card, Check Forgery and

Counterfeit Money protection. State the cause and amount of loss.

4. **Our Settlement Options**

In the event of a covered loss, **we** have the option to:

a) repair, rebuild or replace all or any part of the damaged, destroyed or stolen property with property of like kind and quality within a reasonable time; **or**

b) pay for all or any part of the damaged, destroyed or stolen property as described in Condition 6 "How We Pay For a Loss."

Within 30 days after **we** receive **your** signed, sworn proof of loss **we** will notify you of the option or options **we** intend to exercise.

5. **How We Pay For A Loss**

Under **Coverage A — Dwelling Protection**, **Coverage B — Other Structures Protection** and **Coverage C — Personal Property Protection**, payment for covered loss will be by one or more of the following methods:

a) Special Payment

At **our** option, **we** may make payment for a covered loss before **you** repair, rebuild or replace the damaged, destroyed or stolen property if:

1) the whole amount of loss for property covered under **Coverage A — Dwelling Protection** and **Coverage B — Other Structures Protection**, without deduction for depreciation, is less than $2,500 and if the property is not excluded from the Building Structure Reimbursement provision, or;

2) the whole amount of loss for property covered under **Coverage C — Personal Property Protection** without deduction for depreciation, is less than $2,500 and if **your** Policy Declarations shows that the Personal Property Reimbursement

provision applies, and the property is not excluded from the Personal Property Reimbursement provision.

b) Actual Cash Value

If **you** do not repair or replace the damaged, destroyed or stolen property, payment will be on an actual cash value basis. This means there may be a deduction for depreciation. Payment will not exceed the limit of liability shown on the Policy Declarations for the coverage that applies to the damaged, destroyed or stolen property, regardless of the number of items involved in the loss.

**You** may make claim for additional payment as described in paragraph "c" and paragraph "d" if **you** repair or replace the damaged, destroyed or stolen covered property within 180 days of the actual cash value payment.

c) Building Structure Reimbursement

Under **Coverage A — Dwelling Protection** and **Coverage B — Other Structures Protection**, **we** will make additional payment to reimburse **you** for cost in excess of actual cash value if **you** repair, rebuild or replace damaged, destroyed or stolen covered property within 180 days of the actual cash value payment. This additional payment includes the reasonable and necessary expense for treatment or removal and disposal of contaminants, toxins or pollutants as required to complete repair or replacement of that part of a **building structure(s)** damaged by a covered loss.

Building Structure Reimbursement will not exceed the smallest of the following amounts:

1) the replacement cost of the part(s) of the building structure(s) for like kind and quality construction, for similar use, on the same premises;

2) the amount actually and necessarily spent to repair or replace the damaged building structure(s) with like kind and quality construction, for similar use, on the same premises; or

3) the limit of liability applicable to the **building structure(s)** as shown on the Policy Declarations for **Coverage A— Dwelling Protection** or **Coverage B— Other Structures Protection**, regardless of the number of **building structures** and structures other than **building structures** involved in the loss.

If you replace the damaged **building structure(s)** at an address other than shown on the Policy Declarations through construction of a new structure or purchase of an existing structure, such replacement will not increase the amount payable under Building Structure Reimbursement described above. The amount payable under Building Structures Reimbursement described above does not include the value of any land associated with the replacement structure(s).

Building Structure Reimbursement payment will be limited to the difference between any actual cash value payment made for the covered loss to **building structures** and the smallest of 1), 2) or 3) above.

Building Structure Reimbursement will not apply to:
1) property covered under **Coverage C— Personal Property Protection**;
2) property covered under **Coverage B— Other Structures Protection** that is not a **building structure**;
3) wall-to-wall carpeting, fences, awnings and outdoor antennas whether or not fastened to a **building structure**; or
4) land.

Payment under "a", "b", "c" above will not include any increased cost due to the enforcement of building codes, ordinances or laws regulating the construction, reconstruction, maintenance, repair, relocation or demolition of **building structures** or other structures except as provided under **Section I, Additional Protection 10, — Building Codes**.

d) Personal Property Reimbursement Under **Coverage C — Personal Property Protection**, **we** will make additional payment to reimburse **you** for cost in excess of actual cash value if **you** repair, rebuild or replace damaged, destroyed or stolen covered personal property or wall-to-wall carpeting within 180 days of the actual cash value payment.

Personal Property Reimbursement payment will not exceed the smallest of the following amounts:
1) the amount actually and necessarily spent to repair or replace the property with similar property of like kind and quality;
2) the cost of repair or restoration; or
3) the limit of liability shown on the Policy Declarations for **Coverage C — Personal Property Protection**, or any special limit of liability described in the policy, regardless of the number of items of personal property involved in the loss.

Personal Property Reimbursement will be limited to the difference between any actual cash value payment made for the covered loss to personal property and the smallest of 1), 2), or 3) above.

Personal Property Reimbursement will not apply to:
1) property insured under **Coverage A— Dwelling Protection** and **Coverage B — Other Structures Protection**, except wall-to-wall carpeting;
2) antiques, fine arts, paintings, statuary and similar articles which, by their inherent nature, cannot be replaced;

3) articles whose age or history contribute substantially to their value. This includes but is not limited to memorabilia, souvenirs and collector's items; or

4) property that was obsolete or unusable for the originally intended purpose because of age or condition prior to the loss.

6. **Our Settlement Of Loss**

**We** will settle any covered loss with **you** unless another payee is named in the policy. **We** will settle within 60 days after the amount of loss is finally determined. This amount may be determined by an agreement between **you** and **us**, an appraisal award, or a court judgment.

7. **Appraisal**

If **you** and **we** fail to agree on the amount of loss, either party may make written demand for an appraisal. Upon such demand, each party must select a competent and impartial appraiser and notify the other of the appraiser's identity within 20 days after the demand is received. The appraisers will select a competent and impartial umpire. If the appraisers are unable to agree upon an umpire within 15 days, **you** or **we** can ask a judge of a court of record in the state where the **residence premises** is located to select an umpire.

The appraisers shall then determine the amount of loss, stating separately the actual cash value and the amount of loss to each item. If the appraisers submit a written report of an agreement to **you** and to **us**, the amount agreed upon shall be the amount of loss. If they cannot agree, they will submit their differences to the umpire. A written award agreed upon by any two will determine the amount of loss.

Each party will pay the appraiser it chooses, and equally bear expenses for the umpire and all other appraisal expenses.

8. **Abandoned Property**

**We** are not obligated to accept any property or responsibility for any property abandoned by an **insured person**.

9. **Permission Granted To You**

a) The **residence premises** may be vacant or unoccupied for any length of time, except where a time limit is indicated in this policy for specific perils. A **building structure** under construction is not considered vacant.

b) **You** may make alterations, additions or repairs, and **you** may complete structures under construction.

10. **Our Rights to Recover Payment**

When **we** pay for any loss, an **insured person's** right to recover from anyone else becomes **ours** up to the amount **we** have paid. An **insured person** must protect these rights and help **us** enforce them. **You** may waive **your** rights to recover against another person for loss involving the property covered by this policy. This waiver must be in writing prior to the date of loss.

11. **Our Rights to Obtain Salvage**

**We** have the option to take all or any part of the damaged or destroyed covered property upon replacement by **us** or payment of the agreed or appraised value.

**We** will notify **you** of **our** intent to exercise this option within 30 days after **we** receive **your** signed, sworn proof of loss.

When **we** settle any loss caused by theft or disappearance, **we** have the right to obtain all or part of any property which may be recovered. An **insured person** must protect this right and inform **us** of any property recovered. **We** will inform **you** of **our** intent to exercise this right within 10 days of **your** notice of recovery to **us**.

## 12. Suit Against Us

No suit or action may be brought against **us** unless there has been full compliance with all policy terms. Any suit or action must be brought within two years after the inception of loss or damage.

## 13. Loss to a Pair or Set

If there is a covered loss to a pair or set, **we** may:

a) repair or replace any part of the pair or set to restore it to its actual cash value before the loss; or

b) pay the difference between the actual cash value of the pair or set before and after the loss.

## 14. Glass Replacement

Payment for loss to covered glass includes the cost of using safety glazing materials when required by law.

## 15. No Benefit to Bailee

This insurance will not benefit any person or organization who may be caring for or handling **your** property for a fee.

## 16. Other Insurance

If both this insurance and other insurance apply to a loss, **we** will pay the proportionate amount that this insurance bears to the total amount of all applicable insurance. However, in the event of a loss by theft, this insurance shall be excess over any other insurance that covers loss by theft.

## 17. Property Insurance Adjustment

When the Policy Declarations indicates that the Property Insurance Adjustment Condition applies:

The limit of liability shown on the Policy Declarations for **Coverage A — Dwelling Protection** will be revised at each policy anniversary to reflect the rate of change in the Index identified on the Policy Declarations.

The limit of liability for **Coverage A — Dwelling Protection** for the succeeding premium period will be determined by changing the existing limit in proportion to the change in the Index between the time the existing limit was established and the time the change is made. The resulting amount will be rounded to the nearest $1,000.

Adjustment in the limit of liability for **Coverage A — Dwelling Protection** will result in an adjustment in the limit of liability for **Coverage B — Other Structures Protection** and **Coverage C — Personal Property Protection** in accordance with the **Allstate** manual of Rules and Rates.

**We** will not reduce the limit of liability shown on the Policy Declarations without **your** consent.

Any adjustment in premium resulting from the application of this condition will be made based on premium rates in use by **Allstate** at the time a change in limits is made.

**Allstate** has the right to change to another cost index or to withdraw this condition as of a policy anniversary date by giving **you** at least 30 days notice. This applies only if the change or withdrawal applies to all similar policies issued by **Allstate** in **your** state.

## 18. Mortgagee

A covered loss will be payable to the mortgagees named on the Policy Declarations, to the extent of their interest and in the order of precedence. All provisions of **Section I** of this policy apply to these mortgagees.

**We** will:

a) protect the mortgagee's interest in a covered **building structure** in the event of an increase in hazard, intentional or criminal acts of, or directed by, an **insured person**, failure by any **insured**

**person** to take all reasonable steps to save and preserve property after a loss, a change in ownership, or foreclosure if the mortgagee has no knowledge of these conditions; and

b) give the mortgagee at least 10 days notice if **we** cancel this policy.

The mortgagee will:

a) furnish proof of loss within 60 days after notice of the loss if an **insured person** fails to do so;

b) pay upon demand any premium due if an **insured person** fails to do so;

c) notify **us** in writing of any change of ownership or occupancy or any increase in hazard of which the mortgagee has knowledge;

d) give **us** the mortgagee's right of recovery against any party liable for loss; and

e) after a loss, and at **our** option, permit **us** to satisfy the mortgage requirements and receive full transfer of the mortgage.

This mortgagee interest provision shall apply to any trustee or loss payee or other secured party.

# Section II — Family Liability and Guest Medical Protection

## Coverage X
## Family Liability Protection

### Losses We Cover Under Coverage X:
Subject to the terms, conditions and limitations of this policy, **Allstate** will pay damages which an **insured person** becomes legally obligated to pay because of **bodily injury** or property damage arising from an **occurrence** to which this policy applies, and is covered by this part of the policy. **We** are not obligated to pay any claim or judgment after **we** have exhausted **our** limit of liability.

If an **insured person** is sued for these damages, **we** will provide a defense at **our** expense with counsel of **our** choice, even if the allegations are groundless, false or fraudulent. **We** may investigate or settle any claim or suit for covered damages against an **insured person**.

### Losses We Do Not Cover Under Coverage X:

1. **We** do not cover any **bodily injury** or **property damage** intended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions of, an **insured person**.

   This exclusion applies regardless of whether or not such **insured person** is actually charged with, or convicted of a crime.

2. **We** do not cover **bodily injury** to an **insured person** or **property damage** to property owned by an **insured person** whenever any benefit of this coverage would accrue directly or indirectly to an **insured person**.

3. **We** do not cover **bodily injury** to any person eligible to receive benefits required to be provided or voluntarily provided by an **insured person** under any workers' compensation, non-occupational disability or occupational disease law.

4. **We** do not cover **bodily injury** or **property damage** arising out of the ownership, maintenance, use, occupancy, renting, loaning, entrusting, loading or unloading of aircraft.

5. **We** do not cover **bodily injury** or **property damage** arising out of the ownership, maintenance, use, occupancy, renting, loaning, entrusting, loading or unloading of any motor vehicle or trailer. However, this exclusion does not apply to:
   a) a motor vehicle in dead storage or used exclusively on an **insured premises**;

b) any motor vehicle designed principally for recreational use off public roads, unless that vehicle is owned by an **insured person** and is being used away from an **insured premises**;

c) a motorized wheel chair;

d) a vehicle used to service an **insured premises** which is not designed for use on public roads and not subject to motor vehicle registration;

e) a golf cart owned by an **insured person** when used for golfing purposes;

f) a trailer of the boat, camper, home or utility type unless it is being towed or carried by a motorized land vehicle;

g) lawn and garden implements under 40 horsepower;

h) **bodily injury** to a **residence employee**.

6. **We** do not cover **bodily injury** or **property damage** arising out of the ownership, maintenance, use, occupancy, renting, loaning, entrusting, loading or unloading of watercraft away from an **insured premises** if the watercraft:

a) has inboard or inboard-outboard motor power of more than 50 horsepower;

b) is a sailing vessel 26 feet or more in length;

c) is powered by one or more outboard motors with more than 25 total horsepower;

d) is designated as an airboat, air cushion, or similar type of watercraft; or

e) is a personal watercraft, meaning a craft propelled by a water jet pump engine and designed to be operated by a person or persons sitting, standing or kneeling on the craft.

This exclusion does not apply to **bodily injury** to a **residence employee**.

7. **We** do not cover **bodily injury** or **property damage** arising out of:

a) the negligent supervision by an **insured person** of any person; or

b) any liability statutorily imposed on any **insured person**

arising from the ownership, maintenance, use, occupancy, renting, loaning, entrusting, loading or unloading of any aircraft, watercraft, motor vehicle or trailer which is not covered under **Section II** of this policy.

8. **We** do not cover **bodily injury** or **property damage** arising out of the rendering of, or failure to render, professional services by an **insured person**.

9. **We** do not cover **bodily injury** or **property damage** arising out of the past or present business activities of an **insured person**.

**We** do cover the occasional or part-time **business** activities of an **insured person** who is a student under 21 years of age.

10. **We** do not cover **bodily injury** or **property damage** arising out of any premises, other than an **insured premises**, owned, rented or controlled by an **insured person**. This exclusion does not apply to **bodily injury** to a **residence employee**.

11. **We** do not cover **property damage** to property rented to, occupied or used by, or in the care of, an **insured person**. This exclusion does not apply if the **property damage** is caused by fire, explosion or smoke.

12. **We** do not cover any liability an **insured person** assumes arising out of any contract or agreement.

13. **We** do not cover **bodily injury** or **property damage** caused by war or warlike acts, including, but not limited to insurrection, rebellion or revolution.

## Coverage Y
## Guest Medical Protection

### Losses We Cover Under Coverage Y:

**Allstate** will pay the reasonable expenses incurred for necessary medical, surgical, x-ray and dental services; ambulance, hospital, licensed nursing and funeral services; and prosthetic devices, eye glasses, hearing aids, and pharmaceuticals. These expenses must be incurred and the services performed within three years from the date of an **occurrence** causing **bodily injury** to which this policy applies, and is covered by this part of the policy.

Each person who sustains **bodily injury** is entitled to this protection when that person is:

1. on the **insured premises** with the permission of an **insured person**; or
2. off the **insured premises**, if the **bodily injury**:
   a) arises out of a condition on the **insured premises** or immediately adjoining ways;
   b) is caused by the activities of an **insured person** or a **residence employee**;
   c) is caused by an animal owned by or in the care of an **insured person**; or
   d) is sustained by a **residence employee**.

### Losses We Do Not Cover Under Coverage Y:

1. **We** do not cover any **bodily injury** intended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions of, an **insured person**.

   This exclusion applies regardless of whether or not such **insured person** is actually charged with, or convicted of a crime.

2. **We** do not cover **bodily injury** to any **insured person** or regular resident of the **insured premises**. However, this exclusion does not apply to a **residence employee**.

3. **We** do not cover **bodily injury** to any person eligible to receive any benefits voluntarily provided, or required to be provided, under any workers' compensation, non-occupational disability or occupational disease law.

4. **We** do not cover **bodily injury** arising out of the ownership, maintenance, use, occupancy, renting, loaning, entrusting, loading or unloading of aircraft.

5. **We** do not cover **bodily injury** arising out of the ownership, maintenance, use, occupancy, renting, loaning, entrusting, loading or unloading of any motor vehicle or trailer. However, this exclusion does not apply to:
   a) a motor vehicle in dead storage or used exclusively on an **insured premises**;
   b) any motor vehicle designed principally for recreational use off public roads, unless that vehicle is owned by an **insured person** and is being used away from an **insured premises**;
   c) a motorized wheel chair;
   d) a vehicle used to service an **insured premises** which is not designed for use on public roads and not subject to motor vehicle registration;
   e) a golf cart owned by an **insured person** when used for golfing purposes;
   f) a trailer of the boat, camper, home or utility type unless it is being towed or carried by a motorized land vehicle;
   g) lawn or garden implements under 40 horsepower;
   h) **bodily injury** to a **residence employee**.

6. **We** do not cover **bodily injury** arising out of the ownership, maintenance, use, occupancy, renting, loaning, entrusting, loading or unloading of watercraft away from an **insured premises** if the watercraft:
   a) has inboard or inboard-outboard motor power of more than 50 horsepower;

b) is a sailing vessel 26 feet or more in length;

c) is powered by one or more outboard motors with more than 25 total horsepower;

d) is designated as an airboat, air cushion, or similar type of watercraft; or

e) is a personal watercraft, meaning a craft propelled by a water jet pump engine and designed to be operated by a person or persons sitting, standing or kneeling on the craft.

This exclusion does not apply to **bodily injury** to a **residence employee**.

7. **We** do not cover **bodily injury** arising out of:
   a) the negligent supervision by any **insured person** of any person; or
   b) any liability statutorily imposed on any insured person

   arising from the ownership, maintenance, use, occupancy, renting, loaning, entrusting, loading or unloading of any aircraft, watercraft, motorized land vehicle or trailer which is not covered under **Section II** of this policy.

8. **We** do not cover **bodily injury** arising out of the rendering of, or failure to render professional services by, an **insured person**.

9. **We** do not cover **bodily injury** arising out of the past or present **business** activities of an **insured person**.

   **We** do cover the occasional or part-time **business** activities of an **insured person** who is a student under 21 years of age.

10. **We** do not cover **bodily injury** to any person on the **insured premises** because of a **business** activity or professional service conducted there.

11. **We** do not cover **bodily injury** arising out of any premises, other than an **insured premises**, owned, rented or controlled by an **insured person**. This exclusion does not apply to **bodily injury** to a **residence employee**.

12. **We** do not cover **bodily injury** caused by war or warlike acts, including, but not limited to insurrection, rebellion, or revolution.

## *Additional Protection*

**We** will pay, in addition to the limits of liability:

1. **Claim Expenses**
   **We** will pay:
   a) all costs **we** incur in the settlement of any claim or the defense of any suit against an **insured person**;
   b) interest accruing on damages awarded until such time as **we** have paid, formally offered, or deposited in court the amount for which **we** are liable under this policy; interest will be paid only on damages which do not exceed **our** limits of liability;
   c) premiums on bonds required in any suit **we** defend; **we** will not pay bond premiums in an amount that is more than **our** limit of liability; **we** have no obligation to apply for or furnish bonds;
   d) up to $250 per day for loss of wages and salary, when **we** ask **you** to attend trials and hearings;
   e) any other reasonable expenses incurred by an **insured person** at **our** request.

2. **Emergency First Aid**
   **We** will pay reasonable expenses incurred by an **insured person** for first aid to other persons at the time of an accident involving **bodily injury** covered under this policy.

3. **Damage to Property of Others**
   At **your** request, **we** will pay up to $1000 each time an **insured person** causes

Page 25

**property damage** to someone else's property. At **our** option, **we** will pay the cost to either repair or replace the property damaged by an **insured person**, without deduction for depreciation.

**We** will not pay for **property damage**:
a) to property covered under **Section I** of this policy;
b) to property intentionally damaged by an **insured person** who has attained the age of 13;
c) to property owned by or rented to an **insured person**, any tenant of an **insured person**, or any resident in **your** household; or
d) arising out of:
   1) past or present **business** activities;
   2) any act or omission in connection with a premises, other than an **insured premises**, owned, rented or controlled by an **insured person**; or
   3) the ownership or use of a motorized land vehicle, trailer, aircraft or watercraft.

## Section II Conditions

1. **What You Must Do After An Accidental Loss**
   In the event of **bodily injury** or **property damage**, you must do the following:
   a) Promptly notify **us** or **our** agent stating:
      1) **your** name and policy number;
      2) the date, the place and the circumstances of the loss;
      3) the name and address of anyone who might have a claim against an **insured person**;
      4) the names and addresses of any witnesses.
   b) Promptly send **us** any legal papers relating to the accident.
   c) At **our** request, an **insured person** will:
      1) cooperate with **us** and assist **us** in any matter concerning a claim or suit;

   2) help **us** enforce any right of recovery against any person or organization who may be liable to an **insured person**;
   3) attend any hearing or trial.
   d) Under the **Damage to Property of Others** protection, give **us** a sworn statement of the loss. This must be made within 60 days after the date of loss. Also, an **insured person** must be prepared to show **us** any damaged property under that person's control.

   Any **insured person** will not voluntarily pay any money, assume any obligations or incur any expense, other than for first aid to others at the time of the loss as provided for in this policy.

2. **What an Injured Person Must Do —— Coverage Y — Guest Medical Protection**
   If someone is injured, that person, or someone acting for that person, must do the following:
   a) Promptly give **us** written proof of the loss. If **we** request, this must be done under oath.
   b) Give **us** written authorization to obtain copies of all medical records and reports.
   c) Permit doctors **we** select to examine the injured person as often as **we** may reasonably require.

3. **Our Payment of Loss —— Coverage Y —— Guest Medical Protection**
   **We** may pay the injured person or the provider of the medical services. Payment under this coverage is not an admission of liability by **us** or an **insured person**.

4. **Our Limits of Liability**
   Regardless of the number of **insured persons**, injured persons, claims, claimants or policies involved, **our** total liability under the **Coverage X — Family Liability Protection** for damages resulting from one

**occurrence** will not exceed the limit shown on the Policy Declarations. All **bodily injury** and **property damage** resulting from continuous or repeated exposure to the same general conditions is considered the result of one **occurrence**.

**Our** total liability under **Coverage Y — Guest Medical Protection** for all medical expenses payable for **bodily injury**, to any one person, shall not exceed the "each person" limit shown on the Policy Declarations.

5. **Bankruptcy**
   **We** are not relieved of any obligation under this policy because of the bankruptcy or insolvency of an **insured person**.

6. **Our Rights to Recover Payment — Coverage X — Family Liability Protection**
   When **we** pay any loss, an **insured person's** right to recover from anyone else becomes **ours** up to the amount **we** have paid. An **insured person** must protect these rights and help **us** enforce them.

7. **Suit Against Us**
   a) No suit or action can be brought against **us** unless there has been full compliance with all the terms of this policy.
   b) No suit or action can be brought against **us** under **Coverage X — Family Liability Protection** until the obligation of an **insured person** to pay is finally determined either by judgment against the **insured person** after actual trial, or by written agreement of the **insured person**, injured person, and **us**.
   c) No one shall have any right to make **us** a party to a suit to determine the liability of an **insured person**.

8. **Other Insurance — Coverage X — Family Liability Protection**
   This insurance is excess over any other valid and collectible insurance except insurance

that is written specifically as excess over the limits of liability that apply to this policy.

## Section III — Optional Protection

### Optional Coverages You May Buy

The following Optional Coverages may supplement coverages found in **Section I** or **Section II** and apply only when they are indicated on the Policy Declarations. The provisions of this policy apply to each Optional Coverage in this section unless modified by the terms of the specific Optional Coverage.

1. **Coverage BP**
   **Increased Coverage on Business Property**
   The $2,000 limitation on **business** property located on the **residence premises**, under **Coverage C — Personal Property Protection**, is increased to the amount shown on the Policy Declarations. This increased coverage includes property held as samples or for sale or delivery after sale, while the property is on the **residence premises**.

2. **Coverage DP**
   **Increased Coverage on Electronic Data Processing Equipment**
   The $5,000 limitation on electronic data processing equipment under **Coverage C — Personal Property Protection**, and the recording or storage media used with that equipment, is increased to the amount shown on the Policy Declarations.

3. **Coverage F**
   **Fire Department Charges**
   The $500 limit applying to the fire department service charges under **Additional Protection** is increased to the amount shown on the Policy Declarations.

4. **Coverage G**
   **Loss Assessments**
   If **your residence premises** includes a **building structure** which is constructed in common with one or more similar buildings, and **you** are a member of, and subject to the rules of, an association governing the areas held in common by all building owners as members of the association, the **insured premises** means the **building structure** occupied exclusively by **your** household as a private residence, including the grounds, related structures and private approaches to them.

   **We** will pay **your** share of any special assessments charged against all building owners by the association up to the limit of liability shown on the Policy Declarations, when the assessment is made as a result of:
   a) sudden and accidental direct physical loss to the property held in common by all building owners caused by a loss **we** cover under **Section I** of this policy; or
   b) **bodily injury** or **property damage** covered under **Section II** of this policy.

   Any reduction or elimination of payments for losses because of any deductible applying to the insurance coverage of the association of building owners collectively is not covered under this protection.

   **Allstate** will pay only when the assessment levied against the **insured person**, as a result of any one loss, for **bodily injury** or **property damage** exceeds $250 and then only for the amount of such excess. This coverage is not subject to any deductible applying to **Section I** of this policy.

   In the event of an assessment, this coverage is subject to all the exclusions applicable to **Sections I** and **II** of this policy and the **Sections I** and **II Conditions**, except as otherwise noted.

This coverage is excess over any insurance collectible under any policy or policies covering the association of building owners.

5. **Coverage J**
   **Extended Coverage on Jewelry, Watches and Furs**
   **Coverage C — Personal Property Protection** is extended to pay for sudden and accidental direct physical loss to the following property, subject to the provisions in this coverage:
   a) jewelry, watches, gems, precious and semi-precious stones, gold, platinum; and
   b) furs, including any item containing fur which represents its principal value.

   The total amount of coverage and per item limit is shown on the Policy Declarations. This amount is not in addition to the amount of insurance applying to **Coverage C — Personal Property Protection**. However, in no event will coverage be less than would have applied in the absence of **Coverage J**.

   **We** do not cover loss caused by or consisting of:
   a) intentional or criminal acts of or act the direction of any **insured person**, if the loss that occurs:
      1) may be reasonably expected to result from such acts; or
      2) is the intended result of such acts.
   b) wear and tear, gradual deterioration, inherent vice, insects or vermin;
   c) nuclear action, meaning nuclear reaction, discharge, radiation or radioactive contamination or any consequence of any of these. Loss caused by nuclear action is not considered a loss by fire, explosion or smoke.

   **We** do cover sudden and accidental direct physical loss by fire resulting from nuclear action.

d) war or warlike acts, including, but not limited to insurrection, rebellion or revolution.

e) failure by any **insured person** to take all reasonable steps to preserve property during and after a loss or when the property is endangered by a cause of loss **we** cover.

Any deductible shown on the Policy Declarations applicable to **Coverage C — Personal Property Protection**, also applies to a loss under this coverage.

6. **Coverage K**
   **Incidental Office, Private School or Studio**

   a) The $2000 limit applying to property used or intended for use in a **business** under **Coverage C — Personal Property Protection** does not apply to equipment, supplies and furnishings used in a described office, private school or studio at **your residence premises**. This does not include electronic data processing equipment or the recording or storage media used with that equipment.

   The **Coverage K** limits are shown on the Policy Declarations. The first limit applies to property on the **residence premises**. The second limit applies to property while away from the **residence premises**. These limits are not in addition to **Coverage C — Personal Property Protection, Limitations On Certain Personal Property** on property used or intended for use in a **business**. The increased coverage does not include property held for sample, sale or delivery after sale.

   b) **Coverage X — Family Liability Protection** and **Coverage Y — Guest Medical Protection** are extended to cover a described office, private school or studio occupied by an **insured person**. The occupancy of the described

property shall not be considered a **business**.

**We** do not cover **bodily injury** to:
a) any employee other than a **residence employee**; or
b) any person arising out of corporal punishment administered by or at the direction of an **insured person**.

7. **Coverage M**
   **Increased Coverage on Money**
   The $200 limitation on money, bullion, bank notes, coins and other numismatic property under **Coverage C — Personal Property Protection** is increased to the amount shown on the Policy Declarations.

8. **Coverage P**
   **Business Pursuits**
   **Coverage X — Family Liability Protection** and **Coverage Y — Guest Medical Protection** are extended to cover specified **business** pursuits of an **insured person**.

   **We** do not cover:
   a) **bodily injury** or **property damage** arising out of the **business** pursuits of an **insured person** when the **business** is owned or financially controlled by the **insured person**.

   This also means a partnership or joint venture of which an **insured person** is a partner or member;
   b) **bodily injury** or **property damage** arising out of the rendering or failure to render a professional service of any nature, other than teaching;
   c) **bodily injury** to a fellow employee of an **insured person** arising out of and in the course of employment;
   d) **bodily injury** or **property damage** when an **insured person** is a member of a teaching staff or faculty of any school or college and the **bodily injury** or **property damage** arises out of the maintenance

or use of saddle animals, vehicles used with saddle animals, motorized land vehicles, aircraft or watercraft when owned, hired or operated by an **insured person** or used for the purpose of instruction; or

e) **bodily injury** to any person arising out of corporal punishment administered by or at the direction of an **insured person** when an **insured person** is a member of the teaching staff or faculty of any school of instruction.

9. **Coverage R**
**Additional Dwelling Rented To Others**
The **Family Liability Protection** coverage and **Guest Medical Protection** coverage are extended to cover a one, two, three or four family **dwelling** rented to others. The definition of **insured premises** is amended to include the designated rented dwelling.

10. **Coverage S**
**Increased Coverage on Securities**
The $1,000 limitation on accounts, bills, deeds, evidences of debt, letters of credit, notes other than bank notes, passports, securities, tickets, or stamps, including philatelic property, covered under **Coverage C — Personal Property Protection**, is increased to the amount shown on the Policy Declarations.

11. **Coverage SD**
**Satellite Dish Antennas**
**Coverage C — Personal Property Protection**
is extended to pay for sudden and accidental

direct physical loss to satellite dish antennas and their systems on **your residence premises,** subject to the provisions of **Coverage C — Personal Property Protection.**

The amount of coverage is shown on the Policy Declarations.

12. **Coverage SE**
**Portable Cellular Communication Systems**
**Coverage C — Personal Property Protection**
is extended to portable cellular communication systems in or upon a motorized land vehicle or watercraft. This coverage applies only to portable systems that can be powered by electricity from a motorized land vehicle or watercraft. Coverage applies whether or not the portable cellular communication system is used in a **business**.

The amount of coverage is shown on the Policy Declarations.

13. **Coverage ST**
**Increased Coverage on Theft Of Silverware**
The $2,500 limitation on theft of silverware, pewterware and goldware under **Coverage C — Personal Property Protection** is increased to the amount shown on the Policy Declarations.

IN WITNESS WHEREOF, **Allstate** has caused this policy to be signed by its Secretary and its President at Northbrook, Illinois, and, if required by state law, this policy shall not be binding unless countersigned on the Declarations Page by an authorized agent of **Allstate**.

Secretary

President,
Personal Property & Casualty

## Policy Endorsement

*The following endorsement changes your policy. Please read this document carefully and keep it with your policy.*

### Amendatory Endorsement – AP4577

In **Section I—Conditions**, the **Property Insurance Adjustment** provision is replaced by the following:

**Property Insurance Adjustment**
When the Policy Declarations indicates that the Property Insurance Adjustment condition applies, **you** agree that, at each policy anniversary, **we** may increase the limit of liability shown on the Policy Declarations for **Coverage A—Dwelling Protection** to reflect the rate of change in the Index identified in the " Important Payment and Coverage Information" section of the Policy Declarations. The limit of liability for **Coverage A— Dwelling Protection** for the succeeding premium period will be determined by changing the existing limit in proportion to the change in the Index between the time the existing limit was established and the time the change is made. The resulting amount will be rounded to the nearest $1000.

Any adjustment in the limit of liability for **Coverage A—Dwelling Protection** will result in an adjustment in the limit of liability for **Coverage B —Other Structures Protection** and **Coverage C—Personal Property Protection** in accordance with **our** manual of Rules and Rates.

Any adjustment in premium resulting from the application of this condition will be made based on premium rates in use by **us** at the time a change in limits is made.

**We** will not reduce the limit of liability shown on the Policy Declarations without **your** consent. **You** agree that it is **your** responsibility to ensure that each of the limits of liability shown on the Policy Declarations are appropriate for **your** insurance needs. If **you** want to increase or decrease any of the limits of liability shown on the Policy Declarations, **you** must contact **us** to request such a change.

**We** have the right to change to another cost index or to withdraw this condition as of a policy anniversary date by giving **you** at least 30 days notice. This applies only if the change or withdrawal applies to all similar policies issued by us in **your** state.

All other policy terms and conditions apply.

# Policy Endorsement

The following endorsement changes your policy. Please read this document carefully and keep it with your policy.

*This Endorsement Changes Your Policy — Keep It With Your Policy*

## New York Amendatory Endorsement

## Deluxe Homeowners Policy, Deluxe Plus Homeowners Policy, Standard Homeowners Policy, Deluxe Select Value Policy, Standard Select Value Homeowners Policy — AP497-2

1. In the **General** Provisions section, the following changes are made:

   A. The **Cancellation** provision is replaced by the following:

   **Cancellation**
   **Your** Right to Cancel:
   **You** may cancel this policy by notifying **us** of the future date **you** wish to stop coverage.

   **Our** Right to Cancel:
   **Allstate** may cancel this policy by mailing notice to **you** at the mailing address shown on the Policy Declarations. If **we** mail notice during the first 60 days this policy is in effect and this is not a renewal with **us**, **we** may cancel the policy for any reason.

   If **we** mail notice after the first 60 days this policy is in effect, or if it is a renewal with **us**, **we** may cancel this policy for one or more of the following reasons:
   1) non-payment of premium;
   2) the policy was obtained by material misrepresentation, fraud or concealment of material facts;
   3) material misrepresentation, fraud, or concealment of material fact in presenting a claim, or violation of any of the policy terms;
   4) physical changes in the covered property that occur after the policy was issued or last renewed which makes the property uninsurable;
   5) **you** or any occupant of the covered property has been convicted of a crime and one of the elements of that crime was an act increasing any hazard **we** cover, or
   6) discovery of willful or reckless acts or omissions increasing any hazard **we** cover.

   **We** will mail **you** notice at least 10 days in advance of cancellation if evidence of any of the following is present:
   1) the policy was obtained by fraud, material misrepresentation, or concealment of material facts; or
   2) arson.

   If the cancellation is for non-payment of premium, **we** will mail **you** notice at least 15 days in advance. If the cancellation is for any other reason, **we** will mail **you** notice at least 30 days in advance.

Proof of **our** mailing the notice of cancellation to **you** will be deemed proof of notice. Coverage under this policy will terminate on the effective date and hour stated on the cancellation notice. **Your** return premium, if any, will be calculated on a pro rata basis and refunded at the time of cancellation or as soon as possible. However, refund of unearned premium is not a condition of cancellation.

**Our** Right Not to Renew or Continue:
If **we** don't intend to renew or continue the policy, **we** will mail **you** notice at least 45 days, but not more than 60 days before the end of the policy period. Proof of **our** mailing the notice of nonrenewal to **you** will be deemed proof of notice.

B.   The **Concealment or Fraud** provision is replaced by the following:

**Concealment or Fraud**
**Allstate** has the right to cancel or non-renew **your** policy if it was obtained by fraud, material misrepresentation, or concealment of material facts, or if **you** intentionally conceal any material fact or circumstance before or after a loss. Furthermore, **Allstate** does not cover you or any other person insured under this policy who has concealed or misrepresented any material fact or circumstance, before or after a loss.

2.   In the **Section I Conditions** section, the following changes are made:

A.   The following is added to the **What You Must Do After a Loss** provision:

Failure to give any notice required to be given by this policy within the time prescribed herein shall not invalidate any claim made by the **insured person**, injured person or any other claimant, unless the failure to provide timely notice has prejudiced **us**. However, failure to give any notice required to be given by this policy within the time prescribed herein, whether prejudicial to **us** or not, shall not invalidate any claim made by the **insured person**, an injured person or any other claimant if it shall be shown not to have been reasonably possible to give such notice within the prescribed time and that notice was given as soon as was reasonably possible thereafter.

3.   In the **Section II Conditions** section, the following changes are made:

A.   The following is added to the **What You Must Do After an Accidental Loss** provision:

Failure to give any notice required to be given by this policy within the time prescribed herein shall not invalidate any claim made by the **insured person**, injured person or any other claimant, unless the failure to provide timely notice has prejudiced **us**. However, failure to give any notice required to be given by this policy within the time prescribed herein, whether prejudicial to **us** or not, shall not invalidate any claim made by the **insured person**, an injured person or any other claimant if it shall be shown not to have been reasonably possible to give such notice within the prescribed time and that notice was given as soon as was reasonably possible thereafter.

B.   The following is added to the **What an Injured Person Must Do—Coverage Y—Guest Medical Protection** provision:

**Page 2**

Failure to give any notice required to be given by this policy within the time prescribed herein shall not invalidate any claim made by the **insured person**, injured person or any other claimant, unless the failure to provide timely notice has prejudiced **us**. However, failure to give any notice required to be given by this policy within the time prescribed herein, whether prejudicial to **us** or not, shall not invalidate any claim made by the **insured person**, an injured person or any other claimant if it shall be shown not to have been reasonably possible to give such notice within the prescribed time and that notice was given as soon as was reasonably possible thereafter.

C.   The **Suit Against Us** provision is replaced by the following:

**Suit Against Us**

a)   No suit or action can be brought against **us** unless there has been full compliance with all the terms of this policy.

b)   No suit or action can be brought against **us** under **Coverage X Family Liability Protection** until the obligation of an **insured person** to pay is determined either by final judgment against the **insured person** or by written agreement of the **insured person**, injured person, and **us**.

c)   No one shall have any right to make **us** a party to a suit to determine the liability of an **insured person**.

d)   If **we** deny coverage or disclaim liability based on the failure to provide timely notice, then the injured person or other claimant may bring a suit or action against **us** provided that:

1)   the suit or action is brought solely on the question of late notice; and

2)   **we** or an **insured person** have not, within 60 days of the denial of coverage or disclaimer of liability, brought a suit or action to declare the rights of the parties under this policy and named the injured person or other claimant as a party to this suit or action.

All other policy terms and conditions apply.

**Page 3**

# Policy Endorsement

*The following endorsement changes your policy. Please read this document carefully and keep it with your policy.*

*This Endorsement Changes Your Policy— Keep It With Your Policy*

## *Amendment of Policy Provisions* — AP521

This endorsement amends all of the following Allstate Insurance Company and Allstate Indemnity Company policies: Standard Mobilehome, Deluxe Mobilehome, Farmer's Comprehensive Personal Liability, Comprehensive Personal Liability, Residential Fire, Standard Homeowners, Deluxe Homeowners, Deluxe Plus Homeowners, Deluxe Select Value Homeowners, Standard Select Value Homeowners, Renters, Landlord Package Policy, Condominium Owners, Co-Op Owners, Boatowners, and Recreational Package Policy. This endorsement is in addition to all other endorsements which apply to these policies.

It is agreed that the following changes are made to the **General** provisions:

A. The following provision is added:

   **Conditional Reinstatement**
   If **we** mail a cancellation notice because **you** didn't pay the required premium when due and **you** then tender payment by check, draft, or other remittance which is not honored upon presentation, **your** policy will terminate on the date and time shown on the cancellation notice and any notice **we** issue which waives the cancellation or reinstates coverage is void. This means that **Allstate** will not be liable under this policy for claims or damages after the date and time indicated on the cancellation notice.

B. Under the provision titled **Cancellation**, the following is added:

   Any unearned premium amounts under $2.00 will be refunded only upon **your** request.

# Policy Endorsement

*The following endorsement changes your policy. Please read this document carefully and keep it with your policy.*

*This Endorsement Changes Your Policy— Keep It With Your Policy*

## New York Deductible for Severe Hurricanes Endorsement — AP585-1

It is agreed that your policy is amended as follows:

I.  In the **General** section of the policy, under **Definitions Used In This Policy**, the following definitions are added:

"**Hurricane**" means a weather system declared at any time during its existence by the **National Weather Service** to be a "**hurricane**."

"**National Weather Service**" means the National Weather Service or such other entity as determined by **Allstate,** if the National Weather Service ceases to:

a.  exist;
b.  perform the functions of measuring wind speed or declaring weather systems to be **hurricanes** or **tropical storms**; or
c.  perform the function of issuing **hurricane** watches or **hurricane** warnings.

"**Tropical Storm**" means a weather system declared by the **National Weather Service** to be a tropical storm.

"**Windstorm**" means wind, wind gusts, hail, rain, tornadoes or cyclones caused by, or resulting from, a **hurricane** which results in sudden and accidental direct physical loss or damage to covered property.

II.  Under **Section I Conditions**, Condition 1. **Deductible** is changed to read as follows:

1.  **Deductible**
    **We** will pay when a covered loss exceeds the deductible shown on the Policy Declarations. **We** will then pay only the excess amount, unless **we** have indicated otherwise in this policy.

    **Deductible for Severe Hurricanes**
    A. Deductible for Severe Hurricanes applies to any loss caused by **windstorm** to property covered under Section I of this policy during the following time period:

    a.  beginning 24 hours prior to the time that a wind speed exceeding 100 miles per hour occurs in any part of the State of New York during a **hurricane**, as estimated by the **National Weather Service;**
    b.  during the duration of such **hurricane**; and

Page 1

c.  ending 12 hours after the last time the **National Weather Service** declares that the **hurricane** has been downgraded to a tropical storm.

The Deductible for Severe Hurricanes applies regardless of any other cause or event contributing concurrently or in any sequence to the loss. If another deductible applicable to the loss exceeds the Deductible for Severe Hurricanes, the greater deductible will be applied to the loss.

The Deductible for Severe Hurricanes will not apply to coverage under the optional Water Back-Up endorsement. Damage amounts paid pursuant to the Water Back-Up endorsement will not reduce the Deductible for Severe Hurricanes.

The Deductible for Severe Hurricanes amount will appear on your Policy Declarations as " Deductible for Severe Hurricanes" . **We** will pay only when a covered loss exceeds the deductible amount. **We** will then pay only the excess amount. **We** reserve the right to limit changes to this and other deductibles at any time.

All other provisions of the policy apply.

# Policy Endorsement

*The following endorsement changes your policy. Please read this document carefully and keep it with your policy.*

*This Endorsement Changes Your Policy— Keep It With Your Policy*

## *Building Structure Reimbursement Extended Limits Endorsement* — AP693

For an additional premium and when the Policy Declarations indicates that the "**Building Structure Reimbursement Extended Limits Endorsement**" applies, the following amendment is made to condition 5 (titled "**How We Pay For A Loss**") in **Section I Conditions:**

> In provision c) (titled "**Building Structure Reimbursement**"), item 3) of the second paragraph is replaced by the following:
>
> 3) 125% of the limit of liability applicable to the **building structure(s)** as shown on the Policy Declarations for **Coverage A — Dwelling Protection** or **Coverage B — Other Structures Protection**, regardless of the number of **building structures** and structures other than **building structures** involved in the loss.

This endorsement applies only if:

1) **You** insure **your dwelling**, attached structures and detached **building structures** to 100% of replacement cost as determined by:

   a) an Allstate Home Replacement Cost Estimator completed and based on the accuracy of information **you** furnished; or
   b) **our** inspection of **your residence premises**;

2) **You** have accepted the Property Insurance Adjustment Condition, agree to accept each annual adjustment in the **Coverage A — Dwelling Protection** limit of liability, and pay any additional premium charged; and

3) **You** notify **us** within 60 days of the start of any modifications that increase the aggregate value of **your dwelling**, attached structures and detached **building structures** at the **residence premises** by $5,000 or more, and pay any resulting additional premium due for the increase in value.

All other policy terms and conditions apply.

# Policy Endorsement

*The following endorsement changes your policy. Please read this document carefully and keep it with your policy.*

## DECLARATIONS SUPPLEMENT PAGE (NEW YORK)— AU233-1

This form contains the provisions of the Standard Fire Policy. Whenever the terms and provisions of Section I can be construed to perform a liberalization of the provisions found in the Standard Fire Policy, the terms and provisions of Section I shall apply.

**In Consideration of the Provisions and Stipulations Herein or Added Hereto and of the Premium Specified in the Declarations** (or specified in endorsement attached thereto), **Allstate, for the term shown in the Declarations from inception date shown in the Declarations until cancelled or expiration** at location of property involved, to an amount not exceeding the limit of liability specified, does insure **the insured named in the Declarations** and legal representatives, to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss, without allowance for any increased cost of repair or reconstruction by reason of any ordinance or law regulating construction or repair, and without compensation for loss resulting from interruption of business or manufacture, nor in any event for more than the interest of the insured, against all DIRECT LOSS BY FIRE, LIGHTNING AND OTHER PERILS INSURED AGAINST IN THIS POLICY INCLUDING REMOVAL FROM PREMISES ENDANGERED BY THE PERILS INSURED AGAINST IN THIS POLICY, EXCEPT AS HEREINAFTER PROVIDED, to the property described herein while located or contained as described in this policy, or pro rata for five days at each proper place to which any of the property shall necessarily be removed for preservation from the perils insured against in this policy, but not elsewhere.

Assignment of this policy shall not be valid except with the written consent of Allstate.

This policy is made and accepted subject to the foregoing provisions and stipulations and those hereinafter stated, which are hereby made a part of this policy, together with such other provisions, stipulations and agreements as may be added hereto, as provided in this policy.

F1

| | |
|---|---|
| 1 Concealment, | This entire policy shall be void if, whether |
| 2 fraud. | before or after a loss, the insured has wil- |
| 3 | fully concealed or misrepresented any ma- |
| 4 | terial fact or circumstance concerning this insurance or the |
| 5 | subject thereof, or the interest of the insured therein, or in case |
| 6 | of any fraud or false swearing by the insured relating thereto. |
| 7 Uninsurable | This policy shall not cover accounts, bills, |
| 8 and | currency, deeds, evidences of debt, money or |
| 9 excepted property. | securities, nor unless specifically named |
| 10 | hereon in writing, bullion or manuscripts. |
| 11 Perils not | This Company shall not be liable for loss by |
| 12 included. | fire or other perils insured against in this |
| 13 | policy caused, directly or indirectly, by: (a) |
| 14 | enemy attack by armed forces, including action taken by mili- |
| 15 | tary, naval or air forces in resisting an actual or an immediately |
| 16 | impending enemy attack; (b) invasion; (c) insurrection; (d) |
| 17 | rebellion; (e) revolution; (f) civil war; (g) usurped power; (h) |
| 18 | order of any civil authority except acts of destruction at the time |
| 19 | of and for the purpose of preventing the spread of fire, provided |
| 20 | that such fire did not originate from any of the perils excluded |
| 21 | by this policy; (i) neglect of the insured to use all reasonable |
| 22 | means to save and preserve the property at and after a loss, or |
| 23 | when the property is endangered by fire in neighboring prem- |
| 24 | ises; (j) nor shall this Company be liable for loss by theft. |
| 25 Other insurance. | Other insurance may be prohibited or the |
| 26 | amount of insurance may be limited by en- |
| 27 | dorsement attached hereto |
| 28 | Conditions suspending or restricting insurance. Unless other- |
| 29 | wise provided in writing added hereto this Company shall not |
| 30 | be liable for loss occurring |
| 31 | (a) while the hazard is increased by any means within the con- |
| 32 | trol or knowledge of the insured; or |
| 33 | (b) while a described building, whether intended for occupancy |
| 34 | by owner or tenant, is vacant or unoccupied beyond a period of |
| 35 | sixty consecutive days; or |
| 36 | (c) as a result of explosion or riot, unless fire ensue, and in |
| 37 | that event for loss by fire only. |
| 38 Other perils | Any other peril to be insured against or sub- |
| 39 or subjects. | ject of insurance to be covered in this policy |
| 40 | shall be by endorsement in writing hereon or |
| 41 | added hereto |
| 42 Added provisions. | The extent of the application of insurance |
| 43 | under this policy and of the contribution to |
| 44 | be made by this Company in case of loss, and any other pro- |
| 45 | vision or agreement not inconsistent with the provisions of this |
| 46 | policy, may be provided for in writing added hereto, but no pro- |
| 47 | vision may be waived except such as by the terms of this policy |
| 48 | is subject to change. |
| 49 Waiver | No permission affecting this insurance shall |
| 50 provisions. | exist, or waiver of any provision be valid, |
| 51 | unless granted hereon or expressed in writing |
| 52 | added hereto. No provision, stipulation or forfeiture shall be |
| 53 | held to be waived by any requirement or proceeding on the part |
| 54 | of this Company relating to appraisal or to any examination |
| 55 | provided for herein |
| 56 Cancellation | This policy shall be cancelled at any time |
| 57 of policy. | at the request of the insured, in which case |
| 58 | this Company shall, upon demand and sur- |
| 59 | render of this policy, refund the excess of paid premium above |
| 60 | the customary short rates for the expired time. This pol- |
| 61 | icy may be cancelled at any time by this Company by giving |
| 62 | to the insured a five days' written notice of cancellation with |
| 63 | or without tender of the excess of paid premium above the pro |
| 64 | rata premium for the expired time, which excess, if not ten- |
| 65 | dered, shall be refunded on demand. Notice of cancellation shall |
| 66 | state that said excess premium (if not tendered) will be re- |
| 67 | funded on demand. |
| 68 Mortgagee | If loss hereunder is made payable, in whole |
| 69 interests and | or in part, to a designated mortgagee not |
| 70 obligations. | named herein as the insured, such interest in |
| 71 | this policy may be cancelled by giving to such |
| 72 | mortgagee a ten days' written notice of |
| 73 | cancellation. |
| 74 | If the insured fails to render proof of loss such mortgagee, upon |
| 75 | notice, shall render proof of loss in the form herein specified |
| 76 | within sixty (60) days thereafter and shall be subject to the pro- |
| 77 | visions hereof relating to appraisal and time of payment and of |
| 78 | bringing suit. If this Company shall claim that no liability ex- |
| 79 | isted as to the mortgagor or owner, it shall, to the extent of pay- |
| 80 | ment of loss to the mortgagee, be subrogated to all the mort- |
| 81 | gagee's rights of recovery, but without impairing mortgagee's |
| 82 | right to sue, or it may pay off the mortgage debt and require |
| 83 | an assignment thereof and of the mortgage. Other provisions |

| | |
|---|---|
| 84 | relating to the interests and obligations of such mortgagee may |
| 85 | be added hereto by agreement in writing. |
| 86 Pro rata liability. | This Company shall not be liable for a greater |
| 87 | proportion of any loss than the amount |
| 88 | hereby insured shall bear to the whole insurance covering the |
| 89 | property against the peril involved, whether collectible or not. |
| 90 Requirements in | The insured shall give immediate written |
| 91 case loss occurs. | notice to this Company of any loss, protect |
| 92 | the property from further damage, forthwith |
| 93 | separate the damaged and undamaged personal property, put |
| 94 | it in the best possible order, furnish a complete inventory of |
| 95 | the destroyed, damaged and undamaged property, showing in |
| 96 | detail quantities, costs, actual cash value and amount of loss |
| 97 | claimed; and within sixty days after the loss, unless such time |
| 98 | is extended in writing by this Company, the insured shall render |
| 99 | to this Company a proof of loss, signed and sworn to by the |
| 100 | insured, stating the knowledge and belief of the insured as to |
| 101 | the following: the time and origin of loss, the interest of the |
| 102 | insured and of all others in the property, the actual cash value of |
| 103 | each item thereof and the amount of loss thereto, all encum- |
| 104 | brances thereon, all other contracts of insurance, whether valid |
| 105 | or not, covering any of said property, any changes in the title, |
| 106 | use, occupation, location, possession or exposures of said prop- |
| 107 | erty since the issuing of this policy, by whom and for what |
| 108 | purpose any building herein described and the several parts |
| 109 | thereof were occupied at the time of loss and whether or not it |
| 110 | then stood on leased ground, and shall furnish a copy of all the |
| 111 | descriptions and schedules in all policies and, if required, verified |
| 112 | plans and specifications of any building, fixtures or machinery |
| 113 | destroyed or damaged. The insured, as often as may be reason- |
| 114 | ably required, shall exhibit to any person designated by this |
| 115 | Company all that remains of any property herein described, and |
| 116 | submit to examinations under oath by any person named by this |
| 117 | Company, and subscribe the same, and, as often as may be |
| 118 | reasonably required, shall produce for examination all books of |
| 119 | account, bills, invoices and other vouchers, or certified copies |
| 120 | thereof if originals be lost, at such reasonable time and place as |
| 121 | may be designated by this Company or its representative, and |
| 122 | shall permit extracts and copies thereof to be made. |
| 123 Appraisal. | In case the insured and this Company shall |
| 124 | fail to agree as to the actual cash value or |
| 125 | the amount of loss, then, on the written demand of either, each |
| 126 | shall select a competent and disinterested appraiser and notify |
| 127 | the other of the appraiser selected within twenty days of such |
| 128 | demand. The appraisers shall first select a competent and dis- |
| 129 | interested umpire, and failing for fifteen days to agree upon |
| 130 | such umpire, then, on request of the insured or this Company, |
| 131 | such umpire shall be selected by a judge of a court of record in |
| 132 | the state in which the property covered is located. The ap- |
| 133 | praisers shall then appraise the loss, stating separately actual |
| 134 | cash value and loss to each item, and, failing to agree, shall |
| 135 | submit their differences, only, to the umpire. An award in writ- |
| 136 | ing, so itemized, of any two when filed with this Company shall |
| 137 | determine the amount of actual cash value and loss. Each |
| 138 | appraiser shall be paid by the party selecting him and the ex- |
| 139 | penses of appraisal and umpire shall be paid by the parties |
| 140 | equally. |
| 141 Company's | It shall be optional with this Company to |
| 142 options. | take all, or any part, of the property at the |
| 143 | agreed or appraised value, and also to re- |
| 144 | pair, rebuild or replace the property destroyed or damaged with |
| 145 | other of like kind and quality within a reasonable time, on giv- |
| 146 | ing notice of its intention to do so within thirty days after the |
| 147 | receipt of the proof of loss herein required. |
| 148 Abandonment. | There can be no abandonment to this Com- |
| 149 | pany of any property. |
| 150 When loss | The amount of loss for which this Company |
| 151 payable. | may be liable shall be payable sixty days |
| 152 | after proof of loss, as herein provided, is |
| 153 | received by this Company and ascertainment of the loss is made |
| 154 | either by agreement between the insured and this Company or |
| 155 | by appraisal as herein provided, shall have been filed with this |
| 156 | Company and ascertainment of the loss is made |
| 157 Suit. | No suit or action on this policy for the recov- |
| 158 | ery of any claim shall be sustainable in any |
| 159 | court of law or equity unless all the requirements of this policy |
| 160 | shall have been complied with, and unless commenced within |
| 161 | two years next after inception of the loss. |
| 162 Subrogation. | This Company may require from the insured |
| 163 | an assignment of all right of recovery against |
| 164 | any party for loss to the extent that payment therefor is made |
| 165 | by this Company. |

F2

# Policy Endorsement

*The following endorsement changes your policy. Please read this document carefully and keep it with your policy.*

*This Endorsement Changes Your Policy— Keep It With Your Policy*

## OFF PREMISES THEFT ENDORSEMENT — AU9010-1
## (Section I)

In consideration of the reduced premium at which this policy is written, it is agreed that Coverage C, Personal Property Protection, of this policy does not apply to loss by theft of unscheduled personal property while away from the RESIDENCE PREMISES.

**EXHIBIT "B"**



## New York Property Market Claim Office

**Allstate**
You're in good hands.

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax: (866) 655-7603

| | | | |
|---|---|---|---|
| Insured: | CHRISTINE COLLURA | Home: | (516) 551-2140 |
| Property: | 14 LANDING LANE | E-mail: | MADAMEPURCHASE@AOL. |
| | SOUTHAMPTON, NY 11968-4405 | | COM |
| Home: | 14915 UNION TPKE | | |
| | FLUSHING, NY 11367-3849 | | |

| | | | |
|---|---|---|---|
| Claim Rep.: | Bob Koban | Business: | (866) 322-4754 x 1748590 |
| Position: | Senior Claim Consultant | E-mail: | bob.koban@allstate.com |
| Business: | 1125 RXR Plaza | | |
| | Uniondale, NY 11556 | | |

| | | | |
|---|---|---|---|
| Estimator: | Bob Koban | Business: | (866) 322-4754 x 1748590 |
| Position: | Senior Claim Consultant | E-mail: | bob.koban@allstate.com |
| Business: | 1125 RXR Plaza | | |
| | Uniondale, NY 11556 | | |

**Claim Number:** 0361697799          **Policy Number:** 000078711771          **Type of Loss:** Water

| | | | |
|---|---|---|---|
| Date Contacted: | 3/17/2015 12:00 PM | | |
| Date of Loss: | 3/16/2015 5:00 PM | Date Received: | 3/17/2015 1:01 PM |
| Date Inspected: | 3/19/2015 12:00 PM | Date Entered: | 5/1/2015 9:42 AM |
| Date Est. Completed: | 5/15/2015 7:39 AM | | |

| | |
|---|---|
| Price List: | NYLI8X_MAY15 |
| | Restoration/Service/Remodel |
| Estimate: | CHRISTINE_COLLURA1 |

Allstate is dedicated to providing you with outstanding service throughout the claim-handling process. If you have any questions regarding this estimate, or if there are differences with the estimate provided by your repairperson of choice, or if additional damage is found during the repair process, please contact us at (866) 322-4754 x 1748590.
Thank you,
Bob Koban



**New York Property Market Claim Office**

**Allstate**
You're in good hands.

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax: (866) 655-7603

**CHRISTINE_COLLURA1**

**Main Level**

Main Level

| DESCRIPTION | QTY | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| **AA-DWELLING** | | | | | |
| 1.  Final cleaning - construction - Residential | 2911.35  SF | 0.27 | 786.06 | (0.00) | 786.06 |
| **AA-Dwelling Totals:** | | | 786.06 | 0.00 | 786.06 |
| **Total:  Main Level** | | | 786.06 | 0.00 | 786.06 |

**Living Room**                                                          **Height: Peaked**

675.29 SF Walls                          388.62 SF Ceiling
1063.91 SF Walls & Ceiling               359.32 SF Floor
39.92 SY Flooring                        61.50 LF Floor Perimeter
81.94 LF Ceil. Perimeter

| Window | 6' 4" X 4' | Opens into Exterior |
|---|---|---|
| Window | 6' 4" X 4' | Opens into Exterior |
| Missing Wall - Goes to Floor | 3' X 6' 8" | Opens into SMALL_HALL_A |
| Missing Wall - Goes to Floor | 3' X 6' 8" | Opens into HALLWAY |
| Missing Wall - Goes to Floor | 4' 10" X 6' 8" | Opens into KITCHEN_1 |

| DESCRIPTION | QTY | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| **AA-DWELLING** | | | | | |
| 2.  Contents - move out then reset | 0.50  EA | 57.24 | 28.62 | (0.00) | 28.62 |
| 3.  Remove Paneling | 231.00  SF | 0.42 | 97.02 | (0.00) | 97.02 |
| 4.  Window blind - single cell - up to 7 SF | 1.00  EA | 99.19 | 99.19 | (39.68) | 59.51 |
| 5.  Remove 1/2" drywall - hung, taped, floated, ready for paint | 170.00  SF | 0.64 | 108.80 | (0.00) | 108.80 |
| 6.  Batt insulation - 4" - R13 - paper faced | 170.00  SF | 0.94 | 159.80 | (2.13) | 157.67 |
| 7.  1/2" drywall - hung, taped, floated, ready for paint | 675.29  SF | 2.15 | 1,451.87 | (19.36) | 1,432.51 |
| 8.  Seal/prime then paint part of the walls twice (3 coats) - 2 colors | 444.29  SF | 1.60 | 710.86 | (94.78) | 616.08 |

CHRISTINE_COLLURA1

5/24/2015          Page: 2



**New York Property Market Claim Office**

**Allstate**
You're in good hands.

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax: (866) 655-7603

**CONTINUED - Living Room**

| DESCRIPTION | QTY | | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|
| 9. Siding - board & batten - cedar reclaimed wood | 477.00 | SF | 4.87 | 2,322.99 | (46.46) | 2,276.53 |
| 10. Finish Carpenter - per hour cut star pattern | 6.00 | HR | 93.70 | 562.20 | (0.00) | 562.20 |
| 11a. Remove Baseboard heat cover - steam/hot water - over 85" long | 5.00 | EA | 2.93 | 14.65 | (0.00) | 14.65 |
| 11b. Baseboard heat cover - steam/hot water - over 85" long | 5.00 | EA | 78.19 | 390.95 | (39.10) | 351.85 |
| 12. Baseboard - 4 1/4" | 30.50 | LF | 4.26 | 129.93 | (1.73) | 128.20 |
| 13. Seal & paint baseboard, oversized - three coats | 30.50 | LF | 2.59 | 79.00 | (10.53) | 68.47 |
| 14. Remove Fireplace mantel - wood beam or shelf only (per LF) | 9.00 | LF | 12.81 | 115.29 | (0.00) | 115.29 |
| 15. (Install) Fireplace mantel - wood beam or shelf only (per LF) | 9.00 | LF | 37.48 | 337.32 | (4.50) | 332.82 |
| 16. Oak flooring - clear grade - no finish | 359.32 | SF | 9.42 | 3,384.79 | (45.13) | 3,339.66 |
| 17. Sand, stain, and finish wood floor | 359.32 | SF | 4.54 | 1,631.31 | (326.26) | 1,305.05 |
| 18. Additional coats of finish (per coat) bleach work | 359.32 | SF | 1.04 | 373.69 | (74.74) | 298.95 |
| 19. Mask or cover per square foot | 492.00 | SF | 0.31 | 152.52 | (0.00) | 152.52 |
| **AA-Dwelling Totals:** | | | | **12,150.80** | **704.40** | **11,446.40** |
| **Totals: Living Room** | | | | **12,150.80** | **704.40** | **11,446.40** |



**New York Property Market Claim Office**

**Allstate**
You're in good hands.

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax: (866) 655-7603

| Entry/Foyer | | | | | Height: 8' |
|---|---|---|---|---|---|

| | |
|---|---|
| 141.33 SF Walls | 40.44 SF Ceiling |
| 181.78 SF Walls & Ceiling | 40.44 SF Floor |
| 4.49 SY Flooring | 20.67 LF Floor Perimeter |
| 26.67 LF Ceil. Perimeter | |

| | | |
|---|---|---|
| **Window** | 8' X 4' | **Opens into Exterior** |
| **Missing Wall - Goes to Floor** | 3' X 6' 8" | **Opens into SMALL_HALL_A** |
| **Door** | 3' X 6' 8" | **Opens into Exterior** |

| DESCRIPTION | QTY | | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|
| AA-DWELLING | | | | | | |
| 21a.  Remove Baseboard heat cover - steam/hot water - 12"- 36" long | 1.00 | EA | 2.70 | 2.70 | (0.00) | 2.70 |
| 21b.  Baseboard heat cover - steam/hot water - 12"- 36" long | 1.00 | EA | 37.82 | 37.82 | (3.78) | 34.04 |
| 22.  Oak flooring - clear grade - no finish | 40.44 | SF | 9.42 | 380.94 | (5.08) | 375.86 |
| 23.  Sand, stain, and finish wood floor | 40.44 | SF | 4.54 | 183.60 | (36.72) | 146.88 |
| 24.  Additional coats of finish (per coat) bleach work | 40.44 | SF | 1.04 | 42.06 | (8.41) | 33.65 |
| 25.  Baseboard - 4 1/4" | 17.67 | LF | 4.26 | 75.27 | (1.00) | 74.27 |
| 26.  Seal & paint baseboard, oversized - three coats | 17.67 | LF | 2.59 | 45.77 | (6.10) | 39.67 |
| 27.  Casing - oversized - 3 1/4" | 8.00 | LF | 3.15 | 25.20 | (0.34) | 24.86 |
| 28.  Paint door or window opening - 2 coats (per side) | 6.00 | EA | 35.65 | 213.90 | (28.52) | 185.38 |
| 29.  Interior door - Colonist - pre-hung unit | 2.00 | EA | 198.93 | 397.86 | (7.96) | 389.90 |
| 30.  Detach & Reset Door knob - interior | 2.00 | EA | 28.81 | 57.62 | (0.00) | 57.62 |
| 31.  Paint door slab only - 2 coats (per side) | 4.00 | EA | 34.65 | 138.60 | (18.48) | 120.12 |
| 32.  Mask or cover per square foot | 165.33 | SF | 0.31 | 51.25 | (0.00) | 51.25 |
| 34.  Bead board - 1/4" to 3/8" hardwood | 141.33 | SF | 3.73 | 527.16 | (7.03) | 520.13 |
| 35.  Seal & paint paneling | 141.33 | SF | 1.20 | 169.60 | (22.61) | 146.99 |
| **AA-Dwelling Totals:** | | | | **2,349.35** | **146.03** | **2,203.32** |
| **Totals:  Entry/Foyer** | | | | **2,349.35** | **146.03** | **2,203.32** |



## New York Property Market Claim Office

**Allstate**
You're in good hands.

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax:  (866) 655-7603

| Small hall at entry | | | | | Height: Sloped |
|---|---|---|---|---|---|
| 56.04 SF Walls | | | 16.91 SF Ceiling | | |
| 72.95 SF Walls & Ceiling | | | 16.33 SF Floor | | |
| 1.81 SY Flooring | | | 6.33 LF Floor Perimeter | | |
| 16.66 LF Ceil. Perimeter | | | | | |

| | | | |
|---|---|---|---|
| **Door** | 4' X 6' 8" | **Opens into LAUNDRY_CLOS** | |
| **Missing Wall - Goes to Floor** | 3' X 6' 8" | **Opens into LIVING_ROOM** | |
| **Missing Wall - Goes to Floor** | 3' X 6' 8" | **Opens into ENTRY_FOYER** | |
| **Window** | 2' X 5' | **Opens into Exterior** | |

| DESCRIPTION | QTY | | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|
| **AA-DWELLING** | | | | | | |
| 36.  1/2" drywall - hung, taped, floated, ready for paint | 25.33 | SF | 2.15 | 54.46 | (0.73) | 53.73 |
| 37.  Seal/prime then paint more than the floor perimeter (2 coats) | 25.33 | SF | 0.95 | 24.06 | (3.21) | 20.85 |
| 38.  Paint more than the ceiling perimeter - one coat | 66.65 | SF | 0.65 | 43.32 | (5.78) | 37.54 |
| 39.  Batt insulation - 4" - R13 - paper faced | 20.00 | SF | 0.94 | 18.80 | (0.25) | 18.55 |
| 40.  Siding - board & batten - cedar | 25.33 | SF | 4.87 | 123.36 | (2.47) | 120.89 |
| 41.  Casing - 2 1/4" | 14.00 | LF | 2.53 | 35.42 | (0.47) | 34.95 |
| 42.  Casing - oversized - 3 1/4" | 32.00 | LF | 3.15 | 100.80 | (1.34) | 99.46 |
| 43.  Seal & paint casing - three coats | 46.00 | LF | 2.48 | 114.08 | (15.21) | 98.87 |
| **AA-Dwelling Totals:** | | | | **514.30** | **29.46** | **484.84** |
| **Totals:  Small hall at entry** | | | | **514.30** | **29.46** | **484.84** |

| Laundry closet | | | | | Height: Sloped |
|---|---|---|---|---|---|
| 83.02 SF Walls | | | 10.06 SF Ceiling | | |
| 93.09 SF Walls & Ceiling | | | 9.72 SF Floor | | |
| 1.08 SY Flooring | | | 9.50 LF Floor Perimeter | | |
| 13.83 LF Ceil. Perimeter | | | | | |

| | | | |
|---|---|---|---|
| **Door** | 4' X 6' 8" | **Opens into SMALL_HALL_A** | |

| DESCRIPTION | QTY | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|



**New York Property Market Claim Office**

**Allstate.**
You're in good hands.

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax: (866) 655-7603

**CONTINUED - Laundry closet**

| DESCRIPTION | QTY | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| **AA-DWELLING** | | | | | |
| 44. Contents - move out then reset | 0.50 EA | 57.24 | 28.62 | (0.00) | 28.62 |
| 45. Washing machine - Remove & reset | 1.00 EA | 44.67 | 44.67 | (0.00) | 44.67 |
| 46. Dryer - Remove & reset | 1.00 EA | 37.08 | 37.08 | (0.00) | 37.08 |
| 47. 1/2" drywall - hung, taped, floated, ready for paint | 38.00 SF | 2.15 | 81.70 | (1.09) | 80.61 |
| 48. Seal/prime then paint more than the floor perimeter (2 coats) | 38.00 SF | 0.95 | 36.10 | (4.81) | 31.29 |
| 49. Paint the walls - one coat | 83.02 SF | 0.65 | 53.96 | (7.19) | 46.77 |
| 50. Baseboard - 4 1/4" | 9.50 LF | 4.26 | 40.47 | (0.54) | 39.93 |
| 51. Seal & paint baseboard, oversized - three coats | 9.50 LF | 2.59 | 24.61 | (3.28) | 21.33 |
| 52. Detach & Reset Shelving - 12" - in place | 2.00 LF | 9.39 | 18.78 | (0.00) | 18.78 |
| 53. Casing - 2 1/4" | 16.00 LF | 2.53 | 40.48 | (0.54) | 39.94 |
| 54. Paint door slab only - 2 coats (per side) | 2.00 EA | 34.65 | 69.30 | (9.24) | 60.06 |
| 55. Paint door or window opening - 2 coats (per side) | 2.00 EA | 35.65 | 71.30 | (9.51) | 61.79 |
| **AA-Dwelling Totals:** | | | **547.07** | **36.20** | **510.87** |
| **Totals: Laundry closet** | | | **547.07** | **36.20** | **510.87** |



**New York Property Market Claim Office**

**Allstate**
You're in good hands.

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax: (866) 655-7603

| Kitchen 1 | | | Height: Sloped |
|---|---|---|---|

| | |
|---|---|
| 453.01 SF Walls | 238.38 SF Ceiling |
| 691.39 SF Walls & Ceiling | 232.00 SF Floor |
| 25.78 SY Flooring | 36.80 LF Floor Perimeter |
| 63.33 LF Ceil. Perimeter | |

| | | |
|---|---|---|
| Door | 6' 6" X 6' 8" | Opens into DEN |
| Window | 4' 3" X 5' 2" | Opens into Exterior |
| Window | 2' 9" X 3' | Opens into Exterior |
| Missing Wall - Goes to Floor | 4' 10" X 6' 8" | Opens into LIVING_ROOM |

| DESCRIPTION | QTY | | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|
| **AA-DWELLING** | | | | | | |
| 56. Remove 1/2" drywall - hung, taped, floated, ready for paint | 16.00 | SF | 0.64 | 10.24 | (0.00) | 10.24 |
| 57. 1/2" drywall - hung, taped, floated, ready for paint | 453.01 | SF | 2.15 | 973.97 | (12.99) | 960.98 |
| 58. Seal/prime then paint the walls twice (3 coats) - 2 colors | 453.01 | SF | 1.60 | 724.82 | (96.64) | 628.18 |
| 59a. Remove Baseboard heat cover - steam/hot water - over 85" long | 2.00 | EA | 2.93 | 5.86 | (0.00) | 5.86 |
| 59b. Baseboard heat cover - steam/hot water - over 85" long | 2.00 | EA | 78.19 | 156.38 | (15.64) | 140.74 |
| 60. Baseboard - 4 1/4" | 22.80 | LF | 4.26 | 97.13 | (1.30) | 95.83 |
| 61. Seal & paint baseboard, oversized - three coats | 22.80 | LF | 2.59 | 59.05 | (7.87) | 51.18 |
| 62. Casing - oversized - 3 1/4" | 54.00 | LF | 3.15 | 170.10 | (2.27) | 167.83 |
| 63. Seal & paint casing - three coats | 54.00 | LF | 2.48 | 133.92 | (17.86) | 116.06 |
| 64. Paint bifold door set - slab only - 2 coats (per side) | 1.00 | EA | 48.04 | 48.04 | (6.41) | 41.63 |
| 65. Baseboard - 6" | 15.80 | LF | 5.36 | 84.69 | (1.13) | 83.56 |
| 66. Seal & paint wood window (per side) | 2.00 | EA | 56.31 | 112.62 | (15.02) | 97.60 |
| 67. Cabinetry - lower (base) units - High grade | 15.58 | LF | 226.53 | 3,529.34 | (141.17) | 3,388.17 |
| 68. Cabinetry - upper (wall) units - High grade | 15.42 | LF | 179.88 | 2,773.75 | (110.95) | 2,662.80 |
| 69. Cabinetry - full height unit - High grade | 1.25 | LF | 359.61 | 449.51 | (17.98) | 431.53 |
| 70. (Install) Kitchen Sink - single basin | 1.00 | EA | 145.74 | 145.74 | (5.83) | 139.91 |
| 71. Countertop - solid surface/granite - Reset | 40.26 | SF | 16.43 | 661.47 | (0.00) | 661.47 |
| 72. Countertop - Granite or Marble - buff & polish | 40.26 | SF | 14.98 | 603.09 | (0.00) | 603.09 |

CHRISTINE_COLLURA1



**Allstate**
You're in good hands

**New York Property Market Claim Office**

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax:  (866) 655-7603

**CONTINUED - Kitchen 1**

| DESCRIPTION | QTY | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| 73.  (Install) Dishwasher | 1.00  EA | 268.01 | 268.01 | (59.56) | 208.45 |
| 74.  (Install) Range - freestanding - electric | 1.00  EA | 234.39 | 234.39 | (36.06) | 198.33 |
| 75.  Microwave oven - over range type - Detach & reset | 1.00  EA | 127.91 | 127.91 | (0.00) | 127.91 |
| 76.  Garbage disposer - Detach & reset | 1.00  EA | 161.99 | 161.99 | (0.00) | 161.99 |
| 77.  Regrout tile floor | 232.00  SF | 3.51 | 814.32 | (162.86) | 651.46 |
| 78a.  Remove Window drapery - hardware - Small | 1.00  EA | 6.88 | 6.88 | (0.00) | 6.88 |
| 78b.  Window drapery - hardware - Small | 1.00  EA | 83.68 | 83.68 | (16.74) | 66.94 |
| 79.  Add for prefinished crown molding per LF | 15.42  LF | 10.24 | 157.90 | (2.11) | 155.79 |
| 80.  (Install) Sink strainer and drain assembly | 1.00  EA | 39.96 | 39.96 | (0.00) | 39.96 |
| 81.  (Install) Sink faucet - Kitchen - High grade | 1.00  EA | 78.81 | 78.81 | (0.00) | 78.81 |
| **AA-Dwelling Totals:** | | | 12,713.57 | 730.39 | 11,983.18 |
| **Totals:  Kitchen 1** | | | 12,713.57 | 730.39 | 11,983.18 |

| Den | | | | | Height: 8' |
|---|---|---|---|---|---|
| | 313.33  SF Walls | | | 204.00  SF Ceiling | |
| | 517.33  SF Walls & Ceiling | | | 204.00  SF Floor | |
| | 22.67  SY Flooring | | | 45.00  LF Floor Perimeter | |
| | 58.00  LF Ceil. Perimeter | | | | |

| Door | 6' 6" X 6' 8" | Opens into Exterior |
|---|---|---|
| Window | 16' X 4' | Opens into Exterior |
| Door | 6' 6" X 6' 8" | Opens into KITCHEN_1 |

| DESCRIPTION | QTY | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|

AA-DWELLING
CHRISTINE_COLLURA1



**Allstate**
You're in good hands.

**New York Property Market Claim Office**

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax:  (866) 655-7603

**CONTINUED - Den**

| DESCRIPTION | QTY | | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|
| 82.  Contents - move out then reset | 0.50 | EA | 57.24 | 28.62 | (0.00) | 28.62 |
| 83.  Remove Oak flooring - clear grade - no finish | 22.00 | SF | 3.46 | 76.12 | (0.00) | 76.12 |
| 84.  Oak flooring - clear grade - no finish | 72.00 | SF | 9.42 | 678.24 | (9.04) | 669.20 |
| 85.  Sand & finish wood floor (natural finish) | 204.00 | SF | 3.78 | 771.12 | (154.22) | 616.90 |
| 86.  Mask or cover per square foot | 360.00 | SF | 0.31 | 111.60 | (0.00) | 111.60 |
| **AA-Dwelling Totals:** | | | | **1,665.70** | **163.26** | **1,502.44** |
| **Totals:  Den** | | | | **1,665.70** | **163.26** | **1,502.44** |

| **Bathroom** | | **Height: Sloped** |
|---|---|---|

164.22 SF Walls
208.69 SF Walls & Ceiling
3.33 SY Flooring
27.79 LF Ceil. Perimeter

44.47 SF Ceiling
30.00 SF Floor
14.58 LF Floor Perimeter

| **Door** | **2' 5" X 6' 8"** | **Opens into HALLWAY** |
|---|---|---|

| DESCRIPTION | QTY | | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|
| AA-DWELLING | | | | | | |
| 88a.  Remove 1/2" water rock (greenboard) hung, taped ready for texture | 32.00 | SF | 0.64 | 20.48 | (0.00) | 20.48 |
| 88b.  1/2" water rock (greenboard) hung, taped ready for texture | 32.00 | SF | 1.99 | 63.68 | (0.85) | 62.83 |
| 89.  Bead board - 1/4" to 3/8" hardwood | 64.00 | SF | 3.73 | 238.72 | (3.18) | 235.54 |
| 90.  Seal & paint paneling | 58.33 | SF | 1.20 | 70.00 | (9.33) | 60.67 |
| 91.  Cove molding - 3/4" cap molding | 8.00 | LF | 1.54 | 12.32 | (0.16) | 12.16 |

CHRISTINE_COLLURA1



**New York Property Market Claim Office**

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax: (866) 655-7603

**CONTINUED - Bathroom**

| DESCRIPTION | QTY | | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|
| 92. Seal/prime then paint more than the ceiling perimeter twice (3 coats) - 2 colors | 111.16 | SF | 1.60 | 177.86 | (23.71) | 154.15 |
| 93. Detach & Reset Medicine cabinet | 1.00 | EA | 57.59 | 57.59 | (0.00) | 57.59 |
| 94. Detach & Reset Light fixture | 1.00 | EA | 54.70 | 54.70 | (0.00) | 54.70 |
| 95. Casing - 2 1/4" | 68.00 | LF | 2.53 | 172.04 | (2.29) | 169.75 |
| 96. Paint door or window opening - 1 coat (per side) | 2.00 | EA | 21.14 | 42.28 | (5.64) | 36.64 |
| 97. (Install) Vanity | 3.50 | LF | 70.95 | 248.33 | (9.93) | 238.40 |
| 98. (Install) Vanity top - one sink - cultured marble | 3.50 | LF | 51.61 | 180.64 | (18.06) | 162.58 |
| 99. Detach & Reset Toilet | 1.00 | EA | 244.72 | 244.72 | (0.00) | 244.72 |
| 100. Baseboard - 6" | 5.00 | LF | 5.36 | 26.80 | (0.36) | 26.44 |
| 101. Seal & paint baseboard, oversized - three coats | 11.08 | LF | 2.59 | 28.70 | (3.83) | 24.87 |
| 102. (Install) P-trap assembly - ABS (plastic) | 1.00 | EA | 64.61 | 64.61 | (0.00) | 64.61 |
| **AA-Dwelling Totals:** | | | | **1,703.47** | **77.34** | **1,626.13** |
| **Totals: Bathroom** | | | | **1,703.47** | **77.34** | **1,626.13** |



**Allstate**
You're in good hands

**New York Property Market Claim Office**

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax: (866) 655-7603

| **Hallway** | | | **Height: 8'** |
|---|---|---|---|
| | 171.44 SF Walls | 46.41 SF Ceiling | |
| | 217.85 SF Walls & Ceiling | 46.41 SF Floor | |
| | 5.16 SY Flooring | 18.75 LF Floor Perimeter | |
| | 34.83 LF Ceil. Perimeter | | |

| | | |
|---|---|---|
| **Door** | 2' 5" X 6' 8" | **Opens into BATHROOM** |
| **Missing Wall - Goes to Floor** | 3' X 6' 8" | **Opens into LIVING_ROOM** |
| **Door** | 2' 11" X 6' 8" | **Opens into MIDDLE_BEDRO** |
| **Door** | 2' 11" X 6' 8" | **Opens into LEFT_REAR_BE** |
| **Door** | 2' 11" X 6' 8" | **Opens into RIGHT_REAR_B** |
| **Door** | 1' 11" X 6' 8" | **Opens into LINEN_CLOSET** |

| DESCRIPTION | QTY | | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|
| **AA-DWELLING** | | | | | | |
| 103. Door knob - interior | 1.00 | EA | 55.29 | 55.29 | (5.53) | 49.76 |
| 104. Remove 1/2" drywall - hung, taped, floated, ready for paint | 249.64 | SF | 0.64 | 159.77 | (0.00) | 159.77 |
| 105. 1/2" drywall - hung, taped, floated, ready for paint | 171.44 | SF | 2.15 | 368.60 | (4.91) | 363.69 |
| 106. Siding - board & batten - cedar | 75.00 | SF | 4.87 | 365.25 | (7.31) | 357.94 |
| 107. Seal/prime then paint more than the ceiling perimeter twice (3 coats) - 2 colors | 139.33 | SF | 1.60 | 222.93 | (29.72) | 193.21 |
| 108. Finish Carpenter - per hour | 1.00 | HR | 93.70 | 93.70 | (0.00) | 93.70 |
| 109. Oak flooring - clear grade - no finish | 46.41 | SF | 9.42 | 437.18 | (5.83) | 431.35 |
| 110. Sand, stain, and finish wood floor | 46.41 | SF | 4.54 | 210.70 | (42.14) | 168.56 |
| 111. Additional coats of finish (per coat) | 46.41 | SF | 1.04 | 48.27 | (9.65) | 38.62 |
| 112. Mask or cover per square foot | 278.67 | SF | 0.31 | 86.39 | (0.00) | 86.39 |
| 113. Interior door - Colonist - pre-hung unit | 1.00 | EA | 198.93 | 198.93 | (3.98) | 194.95 |
| 114. Paint door or window opening - 2 coats (per side) | 8.00 | EA | 35.65 | 285.20 | (38.03) | 247.17 |
| 115. Casing - 2 1/4" | 68.00 | LF | 2.53 | 172.04 | (2.29) | 169.75 |
| 116. Baseboard - 4 1/4" | 18.75 | LF | 4.26 | 79.88 | (1.07) | 78.81 |
| 117. Seal & paint baseboard, oversized - three coats | 18.75 | LF | 2.59 | 48.56 | (6.47) | 42.09 |
| 118. Paint door slab only - 2 coats (per side) | 2.00 | EA | 34.65 | 69.30 | (9.24) | 60.06 |
| 119. Detach & Reset Thermostat | 1.00 | EA | 60.82 | 60.82 | (0.00) | 60.82 |



**New York Property Market Claim Office**

Allstate
You're in good hands.

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax:  (866) 655-7603

## CONTINUED - Hallway

| DESCRIPTION | QTY | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| **AA-Dwelling Totals:** | | | 2,962.81 | 166.17 | 2,796.64 |
| **Totals: Hallway** | | | 2,962.81 | 166.17 | 2,796.64 |



**Middle bedroom**  |  **Height: 8'**

247.67 SF Walls
333.06 SF Walls & Ceiling
9.49 SY Flooring
37.00 LF Ceil. Perimeter

85.39 SF Ceiling
85.39 SF Floor
29.75 LF Floor Perimeter

**Door**      2' 11" X 6' 8"      **Opens into HALLWAY**



**Subroom:  closet 2 (1)**  |  **Height: 8'**

77.78 SF Walls
87.11 SF Walls & Ceiling
1.04 SY Flooring
13.33 LF Ceil. Perimeter

9.33 SF Ceiling
9.33 SF Floor
9.00 LF Floor Perimeter

**Door**      4' 4" X 6' 8"      **Opens into MIDDLE_BEDRO**

| DESCRIPTION | QTY | | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|
| AA-DWELLING | | | | | | |
| 121.  Door knob - interior | 1.00 | EA | 55.29 | 55.29 | (5.53) | 49.76 |
| 122.  1/2" - drywall per LF - up to 2' tall | 2.00 | LF | 7.82 | 15.64 | (0.21) | 15.43 |
| 123.  1/2" drywall - hung, taped, floated, ready for paint | 325.44 | SF | 2.15 | 699.70 | (9.33) | 690.37 |
| 124.  Seal/prime then paint the walls twice (3 coats) | 325.44 | SF | 1.35 | 439.34 | (58.58) | 380.76 |
| 125.  Crown molding - 4 1/4" | 10.00 | LF | 5.81 | 58.10 | (0.77) | 57.33 |
| 126.  Paint crown molding - two coats | 50.33 | LF | 1.51 | 76.00 | (10.13) | 65.87 |

CHRISTINE_COLLURA1

5/24/2015      Page: 12



### New York Property Market Claim Office

**Allstate**
You're in good hands.

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax: (866) 655-7603

**CONTINUED - Middle bedroom**

| DESCRIPTION | QTY | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| 127a. Remove Baseboard heat cover - steam/hot water - over 85" long | 1.00 EA | 2.93 | 2.93 | (0.00) | 2.93 |
| 127b. Baseboard heat cover - steam/hot water - over 85" long | 1.00 EA | 78.19 | 78.19 | (7.82) | 70.37 |
| 128. Baseboard - 4 1/4" | 28.75 LF | 4.26 | 122.48 | (1.63) | 120.85 |
| 129. Seal & paint baseboard, oversized - three coats | 28.75 LF | 2.59 | 74.46 | (9.93) | 64.53 |
| 130. Interior door - Colonist - pre-hung unit | 1.00 EA | 198.93 | 198.93 | (3.98) | 194.95 |
| 131. Seal & paint door or window opening (per side) | 4.00 EA | 36.13 | 144.52 | (19.27) | 125.25 |
| 132. Bypass (sliding) door set - Colonist | 1.00 EA | 185.30 | 185.30 | (3.71) | 181.59 |
| 133. Door opening (jamb & casing) - 36"to60"wide - paint grade | 1.00 EA | 166.90 | 166.90 | (2.23) | 164.67 |
| 134. Casing - 2 1/4" | 20.00 LF | 2.53 | 50.60 | (0.67) | 49.93 |
| 135. Paint door slab only - 2 coats (per side) | 6.00 EA | 34.65 | 207.90 | (27.72) | 180.18 |
| 136. Detach & Reset Shelving - 12" - in place | 4.67 LF | 9.39 | 43.85 | (0.00) | 43.85 |
| 137. Remove Intruder alarm panel | 1.00 EA | 14.64 | 14.64 | (0.00) | 14.64 |
| 138. (Install) Intruder alarm panel | 1.00 EA | 258.60 | 258.60 | (51.72) | 206.88 |
| 139. Oak flooring - clear grade - no finish | 94.72 SF | 9.42 | 892.26 | (11.90) | 880.36 |
| 140. Sand, stain, and finish wood floor | 94.72 SF | 4.54 | 430.03 | (86.01) | 344.02 |
| 141. Additional coats of finish (per coat) | 94.72 SF | 1.04 | 98.51 | (19.70) | 78.81 |
| 142. Mask or cover per square foot | 402.67 SF | 0.31 | 124.83 | (0.00) | 124.83 |

| **AA-Dwelling Totals:** | | | **4,439.00** | **330.84** | **4,108.16** |
|---|---|---|---|---|---|
| **Totals: Middle bedroom** | | | **4,439.00** | **330.84** | **4,108.16** |



**New York Property Market Claim Office**

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax: (866) 655-7603



| Left rear bedroom | | Height: 8' |
|---|---|---|
| 281.67 SF Walls | 133.05 SF Ceiling | |
| 414.72 SF Walls & Ceiling | 133.05 SF Floor | |
| 14.78 SY Flooring | 32.92 LF Floor Perimeter | |
| 46.67 LF Ceil. Perimeter | | |

| **Door** | 6' 6" X 6' 8" | **Opens into Exterior** |
|---|---|---|
| **Door** | 2' 11" X 6' 8" | **Opens into HALLWAY** |



| Subroom: closet 1 (1) | | Height: 8' |
|---|---|---|
| 77.78 SF Walls | 9.33 SF Ceiling | |
| 87.11 SF Walls & Ceiling | 9.33 SF Floor | |
| 1.04 SY Flooring | 9.00 LF Floor Perimeter | |
| 13.33 LF Ceil. Perimeter | | |

| **Door** | 4' 4" X 6' 8" | **Opens into LEFT_REAR_BE** |
|---|---|---|

| DESCRIPTION | QTY | | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|
| AA-DWELLING | | | | | | |
| 144. Oak flooring - clear grade - no finish | 142.38 | SF | 9.42 | 1,341.22 | (17.88) | 1,323.34 |
| 145. Sand, stain, and finish wood floor | 142.38 | SF | 4.54 | 646.41 | (129.28) | 517.13 |
| 146. Additional coats of finish (per coat) | 142.38 | SF | 1.04 | 148.08 | (29.62) | 118.46 |
| 147. Mask or cover per square foot | 142.38 | SF | 0.31 | 44.14 | (0.00) | 44.14 |
| 148a. Remove Baseboard heat cover - steam/hot water - over 85" long | 2.00 | EA | 2.93 | 5.86 | (0.00) | 5.86 |
| 148b. Baseboard heat cover - steam/hot water - over 85" long | 2.00 | EA | 78.19 | 156.38 | (15.64) | 140.74 |
| 149. Baseboard - 4 1/4" | 25.92 | LF | 4.26 | 110.42 | (1.47) | 108.95 |
| 150. Seal & paint baseboard, oversized - three coats | 25.92 | LF | 2.59 | 67.13 | (8.95) | 58.18 |
| 151. Drywall patch / small repair, ready for paint | 1.00 | EA | 66.38 | 66.38 | (0.89) | 65.49 |
| 152. Spot seal w/oil based/hybrid stain blocker | 1.00 | EA | 26.43 | 26.43 | (3.52) | 22.91 |
| 153. Paint the walls and ceiling - one coat | 501.83 | SF | 0.65 | 326.19 | (43.49) | 282.70 |
| 154. Paint crown molding - two coats | 60.00 | LF | 1.51 | 90.60 | (12.08) | 78.52 |

CHRISTINE_COLLURA1

5/24/2015        Page: 14



**New York Property Market Claim Office**

**Allstate**
You're in good hands.

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax: (866) 655-7603

### CONTINUED - Left rear bedroom

| DESCRIPTION | QTY | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| 155. Seal & paint casing - three coats | 20.00 LF | 2.48 | 49.60 | (6.61) | 42.99 |
| 156. Detach & Reset Interior door - Colonist - pre-hung unit | 1.00 EA | 91.81 | 91.81 | (0.00) | 91.81 |
| 157. Seal & paint door or window opening (per side) | 3.00 EA | 36.13 | 108.39 | (14.45) | 93.94 |
| 158. Paint door slab only - 2 coats (per side) | 2.00 EA | 34.65 | 69.30 | (9.24) | 60.06 |
| **AA-Dwelling Totals:** | | | **3,348.34** | **293.12** | **3,055.22** |
| **Totals: Left rear bedroom** | | | **3,348.34** | **293.12** | **3,055.22** |

**closet rt rr br**                                                                                 **Height: 8'**

| | |
|---|---|
| 115.11 SF Walls | 16.13 SF Ceiling |
| 131.24 SF Walls & Ceiling | 16.13 SF Floor |
| 1.79 SY Flooring | 13.50 LF Floor Perimeter |
| 18.83 LF Ceil. Perimeter | |

**Door**                          5' 4" X 6' 8"                     Opens into RIGHT_REAR_B

| DESCRIPTION | QTY | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| AA-DWELLING | | | | | |
| 160. 1/2" drywall - hung, taped, floated, ready for paint | 115.11 SF | 2.15 | 247.49 | (3.30) | 244.19 |
| 161. Seal/prime then paint the walls twice (3 coats) | 115.11 SF | 1.35 | 155.40 | (20.72) | 134.68 |
| 162. Baseboard - 4 1/4" | 13.50 LF | 4.26 | 57.51 | (0.77) | 56.74 |
| 163. Seal & paint baseboard, oversized - three coats | 13.50 LF | 2.59 | 34.97 | (4.66) | 30.31 |
| 164. Oak flooring - clear grade - no finish | 16.13 SF | 9.42 | 151.94 | (2.03) | 149.91 |
| 165. Sand, stain, and finish wood floor | 16.13 SF | 4.54 | 73.23 | (14.65) | 58.58 |

CHRISTINE_COLLURA1

5/24/2015        Page: 15



**New York Property Market Claim Office**

Allstate.
You're in good hands.

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax: (866) 655-7603

### CONTINUED - closet rt rr br

| DESCRIPTION | QTY | | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|
| 166. Additional coats of finish (per coat) | 16.13 | SF | 1.04 | 16.78 | (3.36) | 13.42 |
| 167. Mask or cover per square foot | 150.67 | SF | 0.31 | 46.71 | (0.00) | 46.71 |
| 168. Detach & Reset Shelving - wire (vinyl coated) | 9.50 | LF | 10.91 | 103.65 | (0.00) | 103.65 |
| **AA-Dwelling Totals:** | | | | **887.68** | **49.49** | **838.19** |
| **Totals: closet rt rr br** | | | | **887.68** | **49.49** | **838.19** |

**Right rear bedroom**                                    Height: 8'

284.22 SF Walls                           154.13 SF Ceiling
438.35 SF Walls & Ceiling                 154.13 SF Floor
17.13 SY Flooring                         32.67 LF Floor Perimeter
49.83 LF Ceil. Perimeter

| Door | 6' 6" X 6' 8" | Opens into Exterior |
|---|---|---|
| Door | 2' 11" X 6' 8" | Opens into HALLWAY |
| Door | 5' 4" X 6' 8" | Opens into CLOSET_RT_RR |
| Door | 2' 5" X 6' 8" | Opens into Exterior |

| DESCRIPTION | QTY | | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|
| AA-DWELLING | | | | | | |
| 170. Oak flooring - clear grade - no finish | 154.13 | SF | 9.42 | 1,451.90 | (19.36) | 1,432.54 |
| 171. Sand, stain, and finish wood floor | 154.13 | SF | 4.54 | 699.75 | (139.95) | 559.80 |
| 172. Additional coats of finish (per coat) | 154.13 | SF | 1.04 | 160.30 | (32.06) | 128.24 |
| 173. Mask or cover per square foot | 154.13 | SF | 0.31 | 47.78 | (0.00) | 47.78 |
| 174a. Remove Baseboard heat cover - steam/hot water - over 85" long | 2.00 | EA | 2.93 | 5.86 | (0.00) | 5.86 |

CHRISTINE_COLLURA1

5/24/2015        Page: 16



**Allstate.**
You're in good hands.

## New York Property Market Claim Office

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax: (866) 655-7603

### CONTINUED - Right rear bedroom

| DESCRIPTION | QTY | | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|
| 174b.  Baseboard heat cover - steam/hot water - over 85" long | 2.00 | EA | 78.19 | 156.38 | (15.64) | 140.74 |
| 175.  Baseboard - 6" | 19.67 | LF | 5.36 | 105.43 | (1.41) | 104.02 |
| 176.  Seal & paint baseboard, oversized - three coats | 19.67 | LF | 2.59 | 50.95 | (6.79) | 44.16 |
| 177.  Paint crown molding - two coats | 49.83 | LF | 1.51 | 75.24 | (10.03) | 65.21 |
| 178.  1/2" drywall - hung, taped, floated, ready for paint | 130.67 | SF | 2.15 | 280.94 | (3.75) | 277.19 |
| 179.  Seal/prime then paint more than the floor perimeter (2 coats) | 130.67 | SF | 0.95 | 124.14 | (16.55) | 107.59 |
| 180.  Paint the walls - one coat | 284.22 | SF | 0.65 | 184.74 | (24.63) | 160.11 |
| 181.  Detach & Reset Interior door - Colonist - pre-hung unit | 2.00 | EA | 91.81 | 183.62 | (0.00) | 183.62 |
| 182.  Paint door slab only - 2 coats (per side) | 2.00 | EA | 34.65 | 69.30 | (9.24) | 60.06 |
| 183.  Seal & paint door or window opening (per side) | 5.00 | EA | 36.13 | 180.65 | (24.09) | 156.56 |
| 184.  Door opening (jamb & casing) - 32"to36"wide - paint grade | 1.00 | EA | 140.34 | 140.34 | (1.87) | 138.47 |
| **AA-Dwelling Totals:** | | | | **3,917.32** | **305.37** | **3,611.95** |
| **Totals:  Right rear bedroom** | | | | **3,917.32** | **305.37** | **3,611.95** |

Crawlspace                                                                 Height: 3'

475.50 SF Walls
2036.89 SF Walls & Ceiling
173.49 SY Flooring
158.50 LF Ceil. Perimeter

1561.39 SF Ceiling
1561.39 SF Floor
158.50 LF Floor Perimeter

| DESCRIPTION | QTY | | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|
| **AA-DWELLING** | | | | | | |
| 186.  Batt insulation - 8" - R25 - unfaced batt | 1561.39 | SF | 1.44 | 2,248.40 | (29.98) | 2,218.42 |

CHRISTINE_COLLURA1



**New York Property Market Claim Office**

**Allstate.**
You're in good hands.

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax: (866) 655-7603

### CONTINUED - Crawlspace

| DESCRIPTION | QTY | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| 187. Batt insulation – Add-on for confined spaces | 1561.39  SF | 0.60 | 936.83 | (12.49) | 924.34 |
| 188. Foam pipe insulation - 1" wall for 1/8" to 3/4" pipe | 75.00  LF | 4.75 | 356.25 | (4.75) | 351.50 |
| **AA-Dwelling Totals:** | | | **3,541.48** | **47.22** | **3,494.26** |
| **Totals:  Crawlspace** | | | **3,541.48** | **47.22** | **3,494.26** |

#### General Items

| DESCRIPTION | QTY | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| AA-DWELLING | | | | | |
| 189.  Lead Paint Safety (Bid Item) | 1.00  EA | 0.00 | 0.00 | (0.00) | 0.00 |
| 190.  Dumpster load – Approx. 30 yards, 5-7 tons of debris | 1.00  EA | 725.00 | 725.00 | (0.00) | 725.00 |
| 191.  Megohmmeter check electrical circuits - average residence | 1.00  EA | 945.84 | 945.84 | (0.00) | 945.84 |
| 211.  Framing & Rough Carpentry (Bid Item)-SALCO floor replacement | 1.00  EA | 5,864.00 | 5,864.00 | (0.00) | 5,864.00 |
| **AA-Dwelling Totals:** | | | **7,534.84** | **0.00** | **7,534.84** |
| **Totals:  General Items** | | | **7,534.84** | **0.00** | **7,534.84** |
| **Area AA-Dwelling Total:** | | | **59,061.79** | **3,079.29** | **55,982.50** |
| **Totals:  Main Level** | | | **59,061.79** | **3,079.29** | **55,982.50** |

**Labor Minimums Applied**

| DESCRIPTION | QTY | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| AA-DWELLING | | | | | |

CHRISTINE_COLLURA1



**New York Property Market Claim Office**

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax:  (866) 655-7603

### CONTINUED - Labor Minimums Applied

| DESCRIPTION | QTY | UNIT PRICE | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|
| 192.  Heat, vent, & air cond. labor minimum | 1.00  EA | 44.59 | 44.59 | (0.00) | 44.59 |
| 193.  Tile / marble labor minimum | 1.00  EA | 149.21 | 149.21 | (0.00) | 149.21 |
| **AA-Dwelling Totals:** | | | **193.80** | **0.00** | **193.80** |
| **Totals:  Labor Minimums Applied** | | | **193.80** | **0.00** | **193.80** |
| **Area AA-Dwelling Total:** | | | **59,255.59** | **3,079.29** | **56,176.30** |
| **Line Item Totals: CHRISTINE_COLLURA1** | | | **59,255.59** | **3,079.29** | **56,176.30** |

### Grand Total Areas:

| | | | | | |
|---|---|---|---|---|---|
| 3,672.70 | SF Walls | 2,962.43 | SF Ceiling | 6,635.13 | SF Walls and Ceiling |
| 2,911.35 | SF Floor | 323.48 | SY Flooring | 505.05 | LF Floor Perimeter |
| 0.00 | SF Long Wall | 0.00 | SF Short Wall | 669.05 | LF Ceil. Perimeter |
| 2,911.35 | Floor Area | 3,109.65 | Total Area | 3,672.70 | Interior Wall Area |
| 1,913.01 | Exterior Wall Area | 330.83 | Exterior Perimeter of Walls | | |
| 0.00 | Surface Area | 0.00 | Number of Squares | 0.00 | Total Perimeter Length |
| 0.00 | Total Ridge Length | 0.00 | Total Hip Length | | |

CHRISTINE_COLLURA1



**Allstate**
You're in good hands.

**New York Property Market Claim Office**

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax: (866) 655-7603

## Summary for
### AA-Dwelling
#### Summary for All Items

| | |
|---|---:|
| Line Item Total | 59,255.59 |
| General Contractor Overhead | 5,339.19 |
| General Contractor Profit | 5,339.19 |
| Total Tax(Rep-Maint) | 5,526.07 |
| **Replacement Cost Value** | **$75,460.04** |
| Less Depreciation | (4,013.86) |
| **Actual Cash Value** | **$71,446.18** |
| Less Prior Payment(s) | (5,864.00) |
| **Net Claim Remaining** | **$65,582.18** |
| Total Recoverable Depreciation | 4,013.86 |
| **Net Claim Remaining if Depreciation is Recovered** | **$69,596.04** |

Bob Koban
Senior Claim Consultant



**New York Property Market Claim Office**

**Allstate**
You're in good hands.

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax: (866) 655-7603

### Recap of Taxes, General Contractor Overhead and Profit

| | GC Overhead (10%) | GC Profit (10%) | Total Tax(Rep-Maint) (8.625%) | Mat Tax (Cap Impr) (8.625%) | Clothing Local Tax (4.625%) | Clothing State Tax (4%) | Manuf. Home Tax (8.625%) | Storage Rental Tax (8.625%) |
|---|---|---|---|---|---|---|---|---|
| **Line Items** | | | | | | | | |
| | 5,339.19 | 5,339.19 | 5,526.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total** | | | | | | | | |
| | 5,339.19 | 5,339.19 | 5,526.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |



**New York Property Market Claim Office**

**Allstate**
You're in good hands.

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax:  (866) 655-7603

## Recap by Room

**Estimate: CHRISTINE_COLLURA1**

| | | |
|---|---:|---:|
| **Area: Main Level** | **786.06** | **1.33%** |
| **Living Room** | **12,150.80** | **20.51%** |
| **Entry/Foyer** | **2,349.35** | **3.96%** |
| **Small hall at entry** | **514.30** | **0.87%** |
| **Laundry closet** | **547.07** | **0.92%** |
| **Kitchen 1** | **12,713.57** | **21.46%** |
| **Den** | **1,665.70** | **2.81%** |
| **Bathroom** | **1,703.47** | **2.87%** |
| **Hallway** | **2,962.81** | **5.00%** |
| **Middle bedroom** | **4,439.00** | **7.49%** |
| **Left rear bedroom** | **3,348.34** | **5.65%** |
| **closet rt rr br** | **887.68** | **1.50%** |
| **Right rear bedroom** | **3,917.32** | **6.61%** |
| **Crawlspace** | **3,541.48** | **5.98%** |
| **General Items** | **7,534.84** | **12.72%** |
| **Area Subtotal:  Main Level** | **59,061.79** | **99.67%** |
| **Labor Minimums Applied** | **193.80** | **0.33%** |
| **Subtotal of Areas** | **59,255.59** | **100.00%** |
| **Total** | **59,255.59** | **100.00%** |



**Allstate**
You're in good hands.

**New York Property Market Claim Office**

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax: (866) 655-7603

## Recap by Category with Depreciation

| General Contractor O&P Items | RCV | Deprec. | ACV |
|---|---|---|---|
| APPLIANCES | 874.05 | 95.62 | 778.43 |
| CABINETRY | 8,480.98 | 282.14 | 8,198.84 |
| CLEANING | 786.06 | | 786.06 |
| CONTENT MANIPULATION | 85.86 | | 85.86 |
| GENERAL DEMOLITION | 1,372.10 | | 1,372.10 |
| DOORS | 1,256.45 | 19.63 | 1,236.82 |
| DRYWALL | 4,304.43 | 57.41 | 4,247.02 |
| ELECTRICAL | 945.84 | | 945.84 |
| ELECTRICAL - SPECIAL SYSTEMS | 258.60 | 51.72 | 206.88 |
| FLOOR COVERING - CERAMIC TILE | 814.32 | 162.86 | 651.46 |
| FLOOR COVERING - WOOD | 14,917.53 | 1,223.02 | 13,694.51 |
| FINISH CARPENTRY / TRIMWORK | 2,896.53 | 27.65 | 2,868.88 |
| FINISH HARDWARE | 168.20 | 11.06 | 157.14 |
| FIREPLACES | 337.32 | 4.50 | 332.82 |
| HEAT, VENT & AIR CONDITIONING | 1,081.51 | 97.62 | 983.89 |
| INSULATION - MECHANICAL | 356.25 | 4.75 | 351.50 |
| INSULATION | 3,363.83 | 44.85 | 3,318.98 |
| LIGHT FIXTURES | 54.70 | | 54.70 |
| MARBLE - CULTURED OR NATURAL | 180.64 | 18.06 | 162.58 |
| PLUMBING | 573.84 | 5.83 | 568.01 |
| PANELING & WOOD WALL FINISHES | 765.88 | 10.21 | 755.67 |
| PAINTING | 6,372.99 | 849.70 | 5,523.29 |
| SIDING | 2,811.60 | 56.24 | 2,755.36 |
| TIL | 149.21 | | 149.21 |
| WINDOW TREATMENT | 182.87 | 56.42 | 126.45 |
| **General Contractor O&P Items Subtotal** | 53,391.59 | 3,079.29 | 50,312.30 |

| Non-General Contractor O&P Items | RCV | Deprec. | ACV |
|---|---|---|---|
| FRAMING & ROUGH CARPENTRY | 5,864.00 | | 5,864.00 |
| **Non-General Contractor O&P Items Subtotal** | 5,864.00 | 0.00 | 5,864.00 |
| **General Contractor O&P Items Subtotal** | 53,391.59 | 3,079.29 | 50,312.30 |
| General Contractor Overhead | 5,339.19 | 307.91 | 5,031.28 |
| General Contractor Profit | 5,339.19 | 307.91 | 5,031.28 |
| Total Tax(Rep-Maint) | 5,526.07 | 318.75 | 5,207.32 |
| **Total** | 75,460.04 | 4,013.86 | 71,446.18 |



**Allstate**
You're in good hands.

### New York Property Market Claim Office

1125 RXR Plaza
Uniondale, NY. 11556
Phone: (866) 322-4754
Fax: (866) 655-7603

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.
Specialized skill, licensing or certification may be needed of any contractor(s) that you retain, for instance, to identify the presence and nature of any potential contaminants, toxins, pollutants, or other hazards that may be encountered during the course of the work, or to utilize appropriate work practices and procedures during the course of the work. Check with your local or State public health or environmental agency regarding potential hazards, including contractor qualifications and other requirements.
For your safety, it is prudent to avoid areas where damaged structures, materials or unknown substances may be present, and to not disturb such structures, material, or unknown substances until your contractors have inspected the work site.
The suggestions above are provided only for your consideration. They in no way supplement, alter or modify your existing coverage. Your insurance policy is the legal contract that contains the terms and limitations of your coverage.
If you have any concerns about the grade of flooring on your estimate, you may take advantage of a free service that will provide you with a more specific analysis. To use this option, please keep a 12" x 12" sample of your damaged flooring, and notify your Allstate adjuster that you would like the additional analysis.

Main Level



Crawlspace



reclaimed Barnwood paneling on full wall- 4 ft wainscot on balance

Main Level

Page: 25

5/24/2015

CHRISTINE_COLLURA1

# EXHIBIT "C"



New York Property
1125 RXR PLAZA
UNIONDALE NY 11556

DDFADAFATFDTAFDFTTAADFFDTADAAATAATFTADATDDTFFTA
FDDAFAFFAFATAADTFA

PAUL S. AND CHRISTINE G. COLLURA
14915 UNION TPKE
FLUSHING NY 113673849

August 11, 2015

INSURED: CHRISTINE COLLURA  
DATE OF LOSS: March 16, 2015  
CLAIM NUMBER: 0361697799 GBK  
DATE OF SETTLEMENT: August 11, 2015

PHONE NUMBER: 866-322-4754  
FAX NUMBER: 866-655-7605  
OFFICE HOURS:

Dear PAUL S. AND CHRISTINE G. COLLURA,

Thank you for allowing us to spend time with you regarding your recent claim.  When replacement cost coverage is afforded by your policy, the following will apply:

The following calculations summarize our settlement agreement:

| | | |
|---|---|---|
| 1. | The full cost of repair or replacement is | $ 75,460.04 |
| 2. | The recoverable depreciation is | $ 4,013.86 |
| 3. | The non-recoverable depreciation is | $ 0.00 |
| 4. | The actual cash value of the loss is | $ 65,582.18 |
| 5. | Prior Payment Flooring | $ 5864.00 |
| 6. | Your deductible is | $ 0.00 |
| 7. | The actual cash value payment is | $ 65,582.18 |

Depreciation has been deducted from the full cost of the repair or replacement to your property to determine the actual cash value.

You may make a claim for additional payment as described in the Building Structure Reimbursement provision and, when applicable, the Personal Property Reimbursement provision if you repair or replace the damaged, destroyed or stolen covered property "within two years after the date of the loss".

Please mail your receipts and any other documentation (building permits, contracts, invoices, etc.) to support that the repair or replacement has been completed within the two year period. In no event will the actual cash value payment and supplemental payment exceed the amount actually and necessarily spent, less the deductible.

Please call me at the number below and refer to our claim number if you wish to discuss any aspect of this case, including this letter.

Sincerely,

*ROBERT KOBAN*

ROBERT KOBAN
866-322-4754 Ext. 1748590
Allstate Insurance Company

# EXHIBIT "D"



# INVOICE

Payable to AFX Research, LLC
211B Tank Farm Road
San Luis Obispo, CA 93401
EIN: 45-4499321
EFT [routing: 061000227]
[Acct:2000008132981]

Invoice #:          0361697799
Invoice Date:
Account:           Allstate - New York
Ordered By:        Celestina Argueta
Client Ref #       0361697799

**Description:**
**14 landing lane south hampton new york 11968  suffolk Christine Collura**

**Amount:**
**$159.95**

Thank you for your order. Should you have any questions concerning this invoice,
please contact us at 877-848-5337.

---

**AFX Research, LLC**
211-B Tank Farm Road
San Luis Obispo, CA 93401

**www.TitleSearch.com**
877.848.5337
Fax: 805.521.3231

# TitleSearch.com

**50 State Coverage · Serving the Real Estate Industry since 1995**

## PROPERTY AND OWNERSHIP INFORMATION

| | | | |
|---|---|---|---|
| Owner's Name | PAUL COLLURA AND CHRISTINE CULLURA | Order # | 0361697799 |
| Property Address0 | 14 LANDING LANE | Completed Date | 04/14/2015 |
| City/State | SOUTHAMPTON, NY | Effective Date | 02/19/2015 |
| APN/Parcel/PIN0 | 0900-211-00-04-00-045-000 | County | SUFFOLK |

## CURRENT DEED

| | | | |
|---|---|---|---|
| Grantee | PAUL COLLURA AND CHRISTINE CULLURA, HIS WIFE | Deed Date | 07/15/1998 |
| Grantor | KENNETH SALAV AND ROBERTA L. SALAV, HIS WIFE | Recorded Date | 07/30/1998 |
| Consideration | $10.00 | Instrument \|Book/Page | 11907/784 |
| Sale Price | | Deed Type | BARGAIN AND SALE DEED |
| Notes: | | | |

## TAX INFORMATION

| Year | Property Tax Status | Due Date | Amount |
|---|---|---|---|
| 2014 TOWN 1ST HALF | DELINQUENT | 01/11/2014 | $3,279.74 |
| 2014 TOWN 2ND HALF | DELINQUENT | 06/03/2014 | $3,279.74 |
| Notes: | PAYOFF OF $5,647.82 03/31/2014 | Land Value | $461,600.00 |
| | | Building/Improvements | $216,100.00 |
| | | TOTAL ASSESSED VALUE | $677,700.00 |

## OPEN MORTGAGE/DEED OF TRUST INFORMATION

| | | | |
|---|---|---|---|
| Mortgagor | PAUL COLLURA AND CHRISTINE COLLURA, HIS WIFE | Dated | 05/04/2007 |
| Mortgagee | MERS, INC., AS A NOMINEE FOR CAPITAL ONE HOME LOANS, LLC | Date Recorded | 05/25/2007 |
| Trustee | | Instrument \|Book/Page | 21541/47 |
| Type | MORTGAGE | Original Amount | $700,000.00 |
| Related | ASSIGNMENT OF MORTGAGE/ASSIGNED TO: THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWALT, INC., ALTERNATIVE LOAN TRUST 2007-19 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-19 | Recorded Date \| Book/Page | 07/24/2012 22230/6 |
| Related | PER MERS SERVICER ID, SERVICER IS BRANCH BANK OF AMERICA, N.A. | Recorded Date \| Book/Page | UNRECORDED |
| | MIN #1003932-2007127551-2, STATUS: INACTIVE | | |

## RELATED JUDGMENTS, UCC AND LIENS AGAINST OWNER

| Instrument # | Description | Date Recorded | Amount |
|---|---|---|---|
| 14-01713 | NOTICE OF PENDENCY/AGAINST: PAUL COLLURA AND CHRISTINE COLLURA | 01/24/2014 | $700,000.00 |
| 11-0047829 | NOTICE OF FTL/AGAINST: PAUL AND CHRISTINE COLLURA | 04/26/2011 | $80,537.52 |

Matters affecting the above real estate which do not directly appear among the land records, or are not indexed to the exact listed names and legal descriptions above are not included in this report.  This is not a commitment for insurance nor is it an opinion on marketability of title.  Subject to terms and conditions at TitleSearch.com

**www.titlesearch.com | www.afxtitle.com**          *AFX*          **877-TITLE-37 | 877-848-5337**

# TitleSearch.com

**50 State Coverage · Serving the Real Estate Industry since 1995**

| | NOTICE OF FTL/AGAINST: PAUL AND CHRISTINE | | |
|---|---|---|---|
| 10-0033909 | GUNZER COLLURA | 03/23/2010 | $75,690.80 |
| **EASEMENTS AND RESTRICTIONS FOR CURRENT OWNER AGAINST PROPERTY** | | | |
| Instrument # | Description | | Date Recorded |
| | NO EASEMENTS OR RESTRICTIONS FOUND FOR CURRENT | | |
| | OWNER ON SUBJECT PROPERTY | | |
| **ADDITIONAL COMMENTS/INFORMATION** | | | |

Matters affecting the above real estate which do not directly appear among the land records, or are not indexed to the exact listed names and legal descriptions above are not included in this report.  This is not a commitment for insurance nor is it an opinion on marketability of title.  Subject to terms and conditions at TitleSearch.com

www.titlesearch.com | www.afxtitle.com          877-TITLE-37 | 877-848-5337

BOXES 5 THRU 9 MUST BE TYPED OR PRINTED IN **BLACK INK ONLY** PRIOR TO RECORDING OR FILING.

| 1 SUFFOLK COUNTY CLERK | 2 | 47043 | 3 |
|---|---|---|---|

**1 SUFFOLK COUNTY CLERK**

L/P# 11907P0784

Number of pages _____

TORRENS

Serial # _____

Certificate # _____

Prior Ctfd _____

Deed / Mortgage Instrument

**2**

RECEIVED
5 _1198_
REAL ESTATE

JUL 30 1998

TRANSFER TAX
SUFFOLK
COUNTY    47043

Deed / Mortgage Tax Stamp

**3** RECORDED

98 JUL 30 AM 8:35
EDWARD P. ROMAINE
CLERK OF
SUFFOLK COUNTY

Recording / Filing Stamps

**4** FEES

Page / Filing Fee _12.__
Handling _5.__
TP-584 _5.__
Notation _____
EA-5217 (County) _5.__    Sub Total _27.__
EA-5217 (State) _25.__
R.P.T.S.A. _15.00_
Comm. of Ed. _5.00_
Affidavit _____
Certified Copy _____
Reg. Copy _____    Sub Total _45.__
Other _____    GRAND TOTAL _72.__

Mortgage Amt. _____
1. Basic Tax _____
2. SONYMA _____
Sub Total _____
3. Spec./Add. _____
TOT. MTG. TAX _____
Dual Town ____ Dual County ____
Held for Apportionment ____
Transfer Tax _1198_
Mansion Tax _____
The property covered by this mortgage is or will be improved by a one or two family dwelling only.
YES ✓ or NO ____
If NO, see appropriate tax clause on page # _____ of this instrument.

**5** Real Property Tax Service Agency Verification

| Dist | Section | Block | Lot |
|---|---|---|---|
| 0900 | 211.00 | 04.00 | 045.000 |
| | | | |
| | | | |

**6** Title Company Information

Continental t.c.
Company Name

S 338201
Title Number

**7** FEE PAID BY:
Cash ____ Check ____ Charge ____
Payer same as R & R ____
OR: _____

David J Baron ESQ
118-21 Queens Blvd.
Forest Hills, N.Y. 11375

**8** RECORD & RETURN TO
(ADDRESS)

**9** **Suffolk County Recording & Endorsement Page**

This page forms part of the attached _Deed_ made by:
(Deed, Mortgage, etc.)

_SALAV_
TO

_CollukA_

The premises herein is situated in
SUFFOLK COUNTY, NEW YORK.

In the TOWN of _Southampton._

In the VILLAGE or HAMLET of _Southampton._

12-0104 4/01

S. 338201

Standard N Y B I L' Form 8042-8052 — Bargain and Sale Deed with Covenant against Grantor's Acts—Individual or Corporation, single sheet}
CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT - THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY

**THIS INDENTURE**, made the  /5ᵗʰ  day of  July  , nineteen hundred and **ninety-eight**

**BETWEEN**

        **KENNETH SALAV and ROBERTA L. SALAV, His Wife,
presently residing at 179 Northside Drive,
Sag Harbor, New York,**

party of the first part, and

        **PAUL COLLURA and CHRISTINE COLLURA, His Wife,
presently residing at 1782 Frederick Avenue,
Merrick, New York,**

party of the second part,

**WITNESSETH**, that the party of the first part, in consideration of ten dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being known at Shinnecock Hills, Town of Southampton, County of Suffolk and State of New York, more particularly known and designated as and by Lot No. 8 on a certain map entitled, "Subdivision Map of Southampton Harbour Section 3, situate Shinnecock Hills, Town of Southampton, County of Suffolk and State of New York", dated November 25, 1949, Theodore F. Squires, Licensed Land Surveyor No. 15683, Southampton, New York, and which said map was filed in the Office of the Clerk of the County of Suffolk on December 16, 1949 as and by the Map No. 1723, being more particularly bounded and described as follows: BEGINNING at a point on the southerly side of Landing Lane where the same is intersected by the division line between lots 8 and 9 on the aforesaid map; said point or place of beginning being also distant the following 2 courses and distances from the southerly end of a curve having a radius of 25.00 feet, a length of 39.27 feet which said curve connects the southeasterly side of Landing Lane with the southerly side of Montauk Highway;
(1) Southwesterly as measured along the southeasterly side of Landing Lane, North 24 degrees 52 minutes 50 seconds East, 35.00 feet;
(2) South 76 degrees 32 minutes 25 seconds West, 209.21 feet as measured along the southerly side of Landing Lane the true point or place of beginning;
RUNNING THENCE from said point or place of beginning along said division line South 13 degrees 27 minutes 35 seconds East, 76.41 feet

    *Continued on Schedule A description*
    *See next page.*

**DISTRICT**
**0900**

**SECTION**
**211.00**

**BLOCK**
**04.00**

**LOT**
**045.000**

**BEING AND INTENDED TO BE** the same premises conveyed to the parties of the first part by deed dated 7/29/88 and recorded 8/8/88 in the Office of the Clerk of the County of Suffolk in Liber 10662 of Deeds at page 304.

**TOGETHER** with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof; **TOGETHER** with the appurtenances and all the estate and rights of the party of the first part in and to said premises; **TO HAVE AND TO HOLD** the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

**AND** the party of the first part covenants that the party of the first part has not done or suffered anything whereby the said premises have been encumbered in any way whatever, except as aforesaid.
**AND** the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.
The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.
**IN WITNESS WHEREOF**, the party of the first part has duly executed this deed the day and year first above written.

In Presence of:

                            _____
                            KENNETH SALAV

                            _____
                            ROBERTA L. SALAV

STATE OF NEW YORK, COUNTY OF **Suffolk**   ss:

On the _16_ day of   July,   19 98 , before me
personally came

**Kenneth Salav and Robert L. Salav**

to me known to be the individuals described in and who
executed the foregoing instrument, and acknowledged that
they executed the same.

_Anita K. Schulman_

ANITA R. SHULMAN
Notary Public, State Of New York
No. 4800911
Qualified in Nassau County
Comm. Expires January 31, 2000

STATE OF NEW YORK, COUNTY OF   ss:

On the   day of   19   , before me
personally came

to me known to be the individual   described in and who
executed the foregoing instrument, and acknowledged that
executed the same.

STATE OF NEW YORK, COUNTY OF   ss:

On the   day of   19   , before me
personally came
to me known, who, being by me duly sworn, did depose and
say that   he resides at No.   ;

that   he is the
of

, the corporation described
in and which executed the foregoing instrument; that   he
knows the seal of said corporation; that the seal affixed
to said instrument is such corporate seal; that it was so
affixed by order of the board of directors of said corpora-
tion, and that   he signed h   name thereto by like order.

STATE OF NEW YORK, COUNTY OF   ss:

On the   day of   19   , before me
personally came
the subscribing witness to the foregoing instrument, with
whom I am personally acquainted, who, being by me duly
sworn, did depose and say that   he resides at No.   ;

that   he knows

to be the individual
described in and who executed the foregoing instrument;
that   he, said subscribing witness, was present and saw
execute the same; and that   he, said witness,
at the same time subscribed h   name as witness thereto.

### Bargain and Sale Deed
WITH COVENANT AGAINST GRANTOR'S ACTS

TITLE NO. **S 3 3 5 2 0 1**

**SALAV**

TO

**COLLURA**

STANDARD FORM OF NEW YORK BOARD OF TITLE UNDERWRITERS



CONTINENTAL ABSTRACT CORPORATION
ONE OLD COUNTRY ROAD
CARLE PLACE, NEW YORK 11514
(516) 936-2000   (516) 249-1190

SECTION   **211.00**

BLOCK   **04.00**

LOT   **045.000**

COUNTY OR TOWN   **Suffolk/Southampton**

Recorded at Request of
CHICAGO TITLE INSURANCE COMPANY

Return by Mail to

DAVID J. BARON, ESQ.
BARON & BARON
118-21 Queens Boulevard
Forest Hills, New York 11375
Zip No.

RESERVE THIS SPACE FOR USE OF RECORDING OFFICE







# SUFFOLK COUNTY CLERK
## RECORDS OFFICE
## RECORDING PAGE

Type of Instrument: MORTGAGE/MMM          Recorded:     05/25/2007
Number of Pages: 21                       At:           11:07:25 AM
Receipt Number : 07-0050509
MORTGAGE NUMBER: CY015987                 LIBER:     M00021541
                                          PAGE:      047

District:          Section:          Block:          Lot:
0900               211.00            04.00           045.000
                   EXAMINED AND CHARGED AS FOLLOWS
Mortgage Amount:          $700,000.00

Received the Following Fees For Above Instrument
                              Exempt                              Exempt
  Page/Filing      $63.00      NO     Handling          $5.00      NO
  COE               $5.00      NO     NYS SRCHG         $15.00      NO
  Affidavit         $0.00      NO     Cert.Copies        $0.00      NO
  RPT              $30.00      NO     SCTM               $0.00      NO
  Mort.Basic    $3,500.00      NO     Mort.Addl      $2,070.00      NO
  Mort.SplAddl      $0.00      NO     Mort.SplAsst   $1,750.00      NO
                                      Fees Paid      $7,438.00

MORTGAGE NUMBER: CY015987
                THIS PAGE IS A PART OF THE INSTRUMENT
                    THIS IS NOT A BILL

                    Judith A. Pascale
                    County Clerk, Suffolk County

**1 1 2**

Number of pages  **21**

This document will be public record. Please remove all Social Security Numbers prior to recording.

RECORDED
2007 May 25 11:07:25 AM
Judith A. Pascale
CLERK OF
SUFFOLK COUNTY
L N00021541
P 047
CY015997

| Deed / Mortgage Instrument | Deed / Mortgage Tax Stamp | Recording / Filing Stamps |
|---|---|---|

**3** | FEES

Page / Filing Fee _____

Handling  **5. 00**

TP-584 _____

Notation _____

EA-52 17 (County) _____  Sub Total _____

EA-5217 (State) _____

R.P.T.S.A.  **20**

Comm. of Ed.  **5. 00**

Affidavit _____

Certified Copy _____

NYS Surcharge  **15. 00**  Sub Total _____

Other _____  Grand Total  **118-**

**9**

Mortgage Amt.  **700,000—**
1. Basic Tax _____
2. Additional Tax _____
Sub Total _____
Spec./Assit.
  or
Spec. /Add. _____
TOT. MTG. TAX  **7320—**
Dual Town ____ Dual County ____
Held for Appointment _____
Transfer Tax _____
Mansion Tax _____
The property covered by this mortgage is or will be improved by a one or two family dwelling only.
YES __ or NO _____
If NO, see appropriate tax clause on page # ____ of this instrument.

**4** | Dist.     0900 21100 0400 045000

Real Prop
Tax Servic
Agency
Verificatio
P T S
R SFL A
21-MAY-07

**5** | Community Preservation Fund

Consideration Amount S _____

CPF Tax Due       S _____

Improved _____

Vacant Land _____

TD _____
TD _____
TD _____

**6** | Satisfactions/Discharges/Releases List Property Owners Mailing Address
RECORD & RETURN TO:

US Recordings, Inc.
PO Box 19989,
Louisville, KY 40259
3902 3476

Mail to: Judith A. Pascale, Suffolk County Clerk
310 Center Drive, Riverhead, NY 11901
www.suffolkcountyny.gov/clerk

**7** | Title Company Information

Co. Name _____

Title # _____

**8** | # Suffolk County Recording & Endorsement Page

This page forms part of the attached  **MORTGAGE**  made
by:                                     (SPECIFY TYPE OF INSTRUMENT)

**PAUL COLLURA AND CHRISTINE**

**COLLURA**

TO

**CAPITAL ONE HOME LOANS, LLC**

The premises herein is situated in
SUFFOLK COUNTY, NEW YORK.

In the TOWN of  **SOUTH HAMPTON**

In the VILLAGE _____

or HAMLET of  **SOUTH HAMPTON**

BOXES 6 THRU 8 MUST BE TYPED OR PRINTED IN BLACK INK ONLY PRIOR TO RECORDING OR FILING.

(over)

## IMPORTANT NOTICE

If the document you've just recorded is your <u>SATISFACTION OF MORTGAGE</u>, please be aware of the following:

If a portion of your monthly mortgage payment included your property taxes, <u>*you will now need to contact your local Town Tax Receiver so that you may be billed directly for all future property tax statements.</u>

Local property taxes are payable twice a year: on or before January 10th and on or before May 31st. Failure to make payments in a timely fashion could result in a penalty.

Please contact your local Town Tax Receiver with any questions regarding property tax payment.

Babylon Town Receiver of Taxes
200 East Sunrise Highway
North Lindenhurst, N.Y. 11757
(631) 957-3004

Brookhaven Town Receiver of Taxes
One Independence Hill
Farmingville, N.Y. 11738
(631) 451-9009

East Hampton Town Receiver of Taxes
300 Pantigo Place
East Hampton, N.Y. 11937
(631) 324-2770

Huntington Town Receiver of Taxes
100 Main Street
Huntington, N.Y. 11743
(631) 351-3217

Islip Town Receiver of Taxes
40 Nassau Avenue
Islip, N.Y. 11751
(631) 224-5580

Riverhead Town Receiver of Taxes
200 Howell Avenue
Riverhead, N.Y. 11901
(631) 727-3200

Shelter Island Town Receiver of Taxes
Shelter Island Town Hall
Shelter Island, N.Y. 11964
(631) 749-3338

Smithtown Town Receiver of Taxes
99 West Main Street
Smithtown, N.Y. 11787
(631) 360-7610

Southampton Town Receiver of Taxes
116 Hampton Road
Southampton, N.Y. 11968
(631) 283-6514

Southold Town Receiver of Taxes
53095 Main Street
Southold, N.Y. 11971
(631) 765-1803

Sincerely,

Judith A. Pascale
Suffolk County Clerk

dw
2/99

Return To:

Recording Requested by &
When Recorded Return To:
US Recordings, Inc.
PO Box 18989
Louisville, KY 40259

Prepared By: *3902 3476*
Tony Williams
12800 Foster Street
Overland Park, KS 66213

—— ———— [Space Above This Line For Recording Data] —— ————

# MORTGAGE MIN 1003932-2007127551-2

## WORDS USED OFTEN IN THIS DOCUMENT

(A) "Security Instrument." This document, which is dated    May 4, 2007
together with all Riders to this document, will be called the "Security Instrument."
(B) "Borrower." Paul Collura and Christine Collura, His Wife

whose address is 14 Landing Lane, South Hampton, NY 11968

sometimes will be called "Borrower" and sometimes simply "I" or "me."
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is organized and
existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint,
MI 48501-2026, tel. (888) 679-MERS. FOR PURPOSES OF RECORDING THIS MORTGAGE,
MERS IS THE MORTGAGEE OF RECORD.
(D) "Lender." Capital One Home Loans, LLC

will be called "Lender." Lender is a corporation or association which exists under the laws of
the United States of America      . Lender's address is 12800 Foster Street,
Overland Park, KS 66213

64818
Miller
Rd.

| Section: | Block: | Lot: | Unit: |
|---|---|---|---|
| 2007127551 | | 2007/127551 | 0 |

NEW YORK - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS    Form 3033 1/01

-6A(NY) (0309) 01   MW 05/05.01
Page 1 of 17   Initials
VMP Mortgage Solutions, Inc.

(E) "Note." The note signed by Borrower and dated          May 4, 2007          , will be called the "Note." The Note shows that I owe Lender Seven Hundred Thousand and no/100

Dollars (U.S. $ 700,000.00          )
plus interest and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to pay the debt in full by          June 1, 2037          .

(F) "Property." The property that is described below in the section titled "Description of the Property," will be called the "Property."

(G) "Loan." The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Sums Secured." The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

(I) "Riders." All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider    ☐ Condominium Rider           ☒ Second Home Rider
☐ Balloon Rider            ☐ Planned Unit Development Rider  ☐ 1-4 Family Rider
☐ VA Rider                 ☐ Biweekly Payment Rider        ☐ Other(s) [specify]

(J) "Applicable Law." All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

(K) "Community Association Dues, Fees, and Assessments." All dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

(L) "Electronic Funds Transfer." "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items." Those items that are described in Section 3 will be called "Escrow Items."

(N) "Miscellaneous Proceeds." "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds, as defined in, and paid under the coverage described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

(O) "Mortgage Insurance." "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment." The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

(Q) "RESPA." "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

2007127551                    2007127551                              0

⬡ -6A(NY) (0308) 01            Page 2 of 17           Initials                Form 3033 1/01

BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY
    I mortgage, grant and convey the Property to MERS (solely as nominee for Lender and Lender's successors in interest) and its successors in interest subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;
(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and
(C) Keep all of my other promises and agreements under this Security Instrument and the Note.
    I understand and agree that MERS holds only legal title to the rights granted by me in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:
(A) to exercise any or all of those rights, including, but not limited to, the right to foreclose and sell the Property; and
(B) to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

DESCRIPTION OF THE PROPERTY
    I give MERS (solely as nominee for Lender and Lender's successors in interest) rights in the Property described in (A) through (G) below:
(A) The Property which is located at 14 Landing Lane

                                                                                                [Street]

Southampton                         [City, Town or Village]. New York    11968    [Zip Code].
This Property is in SUFFOLK                                      County. It has the following legal
description:
See Attached

(B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;
(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"
(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

2007127551                     2007127551                                              0

D6D-6A(NY) (0305) 01          Page 3 of 17          Initials    Form 3833 1/01

(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

## BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

## PLAIN LANGUAGE SECURITY INSTRUMENT

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

## COVENANTS

I promise and I agree with Lender as follows:

1. **Borrower's Promise to Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on unapplied funds accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

2. **Application of Borrower's Payments and Insurance Proceeds.** Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:

First, to pay interest due under the Note;

Next, to pay principal due under the Note; and

Next, to pay the amounts due Lender under Section 3 of this Security Instrument.

Such payments will be applied to each Periodic Payment in the order in which it became due.

Any remaining amounts will be applied as follows:

First, to pay any late charges;

Next, to pay any other amounts due under this Security Instrument; and

Next, to reduce the principal balance of the Note.

2007127551                    2007127551                              0

-6A(NY) (0501) 01              Page 4 of 17        Initials          Form 3033 1/01

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

3. Monthly Payments For Taxes And Insurance.

(a) Borrower's Obligations.

I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1) The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a Lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2) The leasehold payments or ground rents on the Property (if any);

(3) The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4) The premium for Mortgage Insurance (if any);

(5) The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6) If required by Lender, the amount for any Community Association Dues, Fees, and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

2007127551                           2007127551                                             0

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

(b) Lender's Obligations.

Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

(c) Adjustments to the Escrow Funds.

Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 12.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

4. Borrower's Obligation to Pay Charges, Assessments And Claims. I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior Lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security

2007127551                      2007127551                                      0

-6A(NY) (0301).01                        Page 6 of 17            Initials                Form 3033 1/01

Instrument is superior to the Lien held by that Person. If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Borrower a notice identifying the superior Lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance. I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period

2007127551                          2007127551                                      0

-6A(NY) (0809).01                    Page 7 of 17              Initials          Form 3033 1/01

that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Borrower's Obligations to Occupy The Property. I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

7. Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.

(a) Maintenance and Protection of the Property.

I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as defined in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

(b) Lender's Inspection of Property.

Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

2007127551                          2007127551                                              0

GMACM-BA(NY) (0508) 01                  Page 8 of 17                 Initials                Form 3033 1/01

8. **Borrower's Loan Application.** If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

9. **Lender's Right to Protect Its Rights in The Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture (as defined in Section 11), proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a Lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any Lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance

coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance from time to time. Mortgage insurers may enter into agreements with other parties to share or change their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, or any other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has - if any - regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

11. Agreements About Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in

value, the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action. If Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required Immediate Payment in Full (as defined in Section 22). The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

**12. Continuation of Borrower's Obligations And of Lender's Rights.**

**(a) Borrower's Obligations.**

Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

**(b) Lender's Rights.**

Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**13. Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.** If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to

2007127551                    2007127551                                    0

-6A(NY) (0309) 01                    Page 11 of 17                    Initials                    Form 3033 1/01

delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

14. Loan Charges. Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

15. Notices Required under this Security Instrument. All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Law That Governs this Security Instrument; Word Usage. This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. I will be given one copy of the Note and of this Security Instrument.

18. Agreements about Lender's Rights If the Property Is Sold or Transferred. Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission.

2007127551                    2007127551                                    0

CCOD-6A(NY) (0505) 01                    Page 12 of 17          Initials ___          Form 3033 1/01

If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

19. **Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right, I will meet the following conditions:

(a) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

(b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(c) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

(d) I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

20. **Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If

2007127551                                    2007127551                                                                                   0

-6A(NY) (0604) 01                               Page 13 of 17                          Initials                              Form 3033 1/01

Applicable Law provides a time period which will elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

21. Continuation of Borrower's Obligations to Maintain and Protect the Property. The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS

I also promise and agree with Lender as follows:

22. Lender's Rights If Borrower Fails to Keep Promises and Agreements. Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."

If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another

2007127551                    2007127551                              0

-6A(NY) (0305).01                     Page 14 of 17              Initials            Form 3033 1/01

Person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:

(a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;

(b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:

(1) The promise or agreement that I failed to keep or the default that has occurred;

(2) The action that I must take to correct that default;

(3) A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;

(4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;

(5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and

(6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.

23. Lender's Obligation to Discharge this Security Instrument. When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

24. Agreements about New York Lien Law. I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

25. Borrower's Statement Regarding the Property [check box as applicable].

[X] This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

[ ] This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

[ ] This Security Instrument does not cover real property improved as described above.

2007127551                   2007127551                                          0

-6A(NY) (9302) 01                Page 15 of 17                        Form 3033 1/01

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 17 of this Security Instrument and in any Rider signed by me and recorded with it.

Witnesses:



_____ _Paul Collura_ (Seal)
                                  Paul Collura      -Borrower

_____ _Christine Collura_ (Seal)
                                  Christine Collura  -Borrower

_____ (Seal)      _____ (Seal)
                          -Borrower                                  -Borrower

_____ (Seal)      _____ (Seal)
                          -Borrower                                  -Borrower

_____ (Seal)      _____ (Seal)
                          -Borrower                                  -Borrower

2007127551                      2007127551                          0

-6A(NY) (0506) 01               Page 16 of 17                       Form 3033 1/01

STATE OF NEW YORK,

County of Suffolk

On the  4th  day of  May 2007  before me, the undersigned, a notary public in and for said state, personally appeared  Paul Collura and Christine Collura

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public

Tax Map Information: 211000400045000

EVELYN GONZALEZ
Notary Public, State of New York
No. 01GO6012610
Qualified in Suffolk County
Commission Expires August 31, 20__

2007127551

WMP-6A(NY) (0301) 01

2007127551

Page 17 of 17

Initials  PC
          CC

0

Form 3033 1/01

## SECOND HOME RIDER

THIS SECOND HOME RIDER is made this    4th     day of     May 2007    ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower" whether there are one or more persons undersigned) to secure
Borrower's Note to   Capital One Home Loans, LLC

(the "Lender") of the same date and covering the Property described in the Security
Instrument (the "Property"), which is located at:
14 Landing Lane                     ,Southampton,NY 11968

[Property Address]

In addition to the covenants and agreements made in the Security Instrument, Borrower
and Lender further covenant and agree that Sections 6 and 8 of the Security Instrument are
deleted and are replaced by the following:

6. Occupancy. Borrower shall occupy, and shall only use, the Property as
Borrower's second home. Borrower shall keep the Property available for Borrower's
exclusive use and enjoyment at all times, and shall not subject the Property to any
timesharing or other shared ownership arrangement or to any rental pool or
agreement that requires Borrower either to rent the Property or give a management
firm or any other person any control over the occupancy or use of the Property.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan
application process, Borrower or any persons or entities acting at the direction of
Borrower or with Borrower's knowledge or consent gave materially false, misleading,
or inaccurate information or statements to Lender (or failed to provide Lender with
material information) in connection with the Loan. Material representations include,
but are not limited to, representations concerning Borrower's occupancy of the
Property as Borrower's second home.

2007127551                     2007127551                         0

MULTISTATE SECOND HOME RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM
INSTRUMENT
Form 3890 1/01 MW 11/04              Page 1 of 2          Initials: 
     -365R (0411)      VMP Mortgage Solutions, Inc. (800)521-7291

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Second Home Rider.



_____ (Seal)
Paul Collura            -Borrower

_____ (Seal)
Christina Collura        -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

2007127551                    2007127551                    0

-365R (0411)              Page 2 of 2              Form 3890 1/01



# EXHIBIT A

THE FOLLOWING DESCRIBED REAL PROPERTY SITUATE IN THE TOWN OF SOUTH HAMPTON, COUNTY OF SUFFOLK, AND STATE OF NEW YORK, TO WIT:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, WITH THE BUILDINGS AND IMPROVEMENTS THEREON ERECTED, SITUATE, LYING AND BEING AT SHINNECOOK HILLS TOWN OF SOUTHAMPTON, COUNTY OF SUFFOLK AND STATE OF NEW YORK, MORE PARTICULARLY KNOWN AND DESIGNATED AS AND BY LOT NO. 8 ON A CERTAIN MAP ENTITLED, "SUBDIVISION MAP OF SOUTHAMPTON HARBOUR SECTION 3, SITUATE SHINNECOCK HILLS, TOWN OF SOUTHAMPTON, COUNTY OF SUFFOLK AND STATE OF NEW YORK", DATED NOVEMBER 25, 1949, THEODORE F. SQUIRES LICENSED LAND SURVEYOR NO. 15683, SOUTHAMPTON, NEW YORK, AND WHICH SAID MAP WAS FILED IN THE OFFICE OF THE CLERK OF THE COUNTY OF SUFFOLK ON DECEMBER 16, 1949 AS AND BY THE MAP NO. 1723, BEING MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF LANDING LANE WHERE THE SAME IS INTERSECTED BY THE DIVISION LINE BETWEEN LOTS 5 AND 9 ON THE AFORESAID MAP; SAID POINT OR PLACE OF BEGINNING BEING ALSO DISTANT THE FOLLOWING 2 COURSES AND DISTANCES FROM THE SOUTHERLY MUD OF A CURVE HAVING A RADIUS OF 25.00 FEET, A LENGTH OF 39.27 FEET WHICH SAID CURVE CONNECTS THE SOUTHEASTERLY SIDE, OF LANDING LANE WITH THE SOUTHERLY SIDE OF MONTAUK HIGHWAY;

(1) SOUTHWESTERLY AS MEASURED ALONG THE SOUTHEASTERLY SIDE OF LANDING LANE, NORTH 24 DEGREES 52 MINUTES 50 SECONDS EAST, 35.00 FEET;

(2) SOUTH 76 DEGREES 32 MINUTES 25 SECONDS WEST, 209.21 FEET AS MEASURED ALONG THE SOUTHERLY SIDE OF LANDING LANE THE TRUE POINT OR PLACE, OF BEGINNING;

RUNNING THENCE FROM SAID POINT OR PLACE OF BEGINNING ALONG SAID DIVISION LINE SOUTH 13 DEGREES 27 MINUTES 35 SECONDS EAST, 76.41 FEET (DEED) 76.03 FEET (ACTUAL) TO BULKHEAD LINE OF THE LAGOON;

THENCE ALONG THE BULKHEAD LINE OF THE LAGOON SOUTH 56 DEGREES 46 MINUTES 33 SECONDS WEST 9561 FEET (DEED) SOUTH 16 DEGREES 24 MINUTES 57 SECONDS WEST, 95.85 FEET (ACTUAL) TO THE DIVISION LINE BETWEEN LOTS 7 AND 8,

THENCE ALONG SAID LAST MENTIONED DIVISION LINE NORTH 13 DEGREES 27 MINUTES 35 SECONDS WEST, 108.69 FEET (DEED) 109.00 FEET (ACTUAL) TO THE SOUTHERLY SIDE OF LANDING LANE; AND

THENCE ALONG THE SOUTHERLY SIDE OF LANDING LANE NORTH 76 DEGREES 32 MINUTES 25 SECONDS EAST, 90.00 FEET TO THE POINT OR PLACE OF BEGINNING.

SAID PREMISES ALSO KNOWN AS 14 LANDING LANE, SOUTHHAMPTON, NY 11968

THENCE ALONG THE SOUTHERLY SIDE OF LANDING LANE NORTH 76 DEGREES 32 MINUTES 25 SECONDS EAST, 90.00 FOOT TO THE POINT OR PLACE OF BEGINNING.

TAX ID #: 211.00-04.00-045.000

BY FEE SIMPLE DEED FROM KENNETH SALAV AND ROBERTA L. SALAV, HIS WIFE AS SET FORTH IN DEED BOOK 11907, PAGE 784 AND RECORDED ON 7/30/1998, SUFFOLK COUNTY RECORDS.

THE SOURCE DEED AS STATED ABOVE IS THE LAST RECORD OF VESTING FILED FOR THIS PROPERTY. THERE HAVE BEEN NO VESTING CHANGES SINCE THE DATE OF THE ABOVE REFERENCED SOURCE.

U39023476-010P21
MORTGAGE
LOAN# 2007127551
US Recordings







## SUFFOLK COUNTY CLERK
### RECORDS OFFICE
### RECORDING PAGE

Type of Instrument: ASSIGNMENT OF MORTGAGE      Recorded:    07/24/2012
Number of Pages: 2                                 At:         04:05:40 PM
Receipt Number : 12-0084251

LIBER:     M00022230
PAGE:      006

District:          Section:          Block:         Lot:
0900             211.00           04.00         045.000

EXAMINED AND CHARGED AS FOLLOWS
Received the Following Fees For Above Instrument

|  |  | Exempt |  |  | Exempt |
|---|---|---|---|---|---|
| Page/Filing | $10.00 | NO | Handling | $20.00 | NO |
| COE | $5.00 | NO | NYS SRCHG | $15.00 | NO |
| Notation | $0.50 | NO | Cert.Copies | $0.00 | NO |
| RPT | $60.00 | NO |  |  |  |
|  |  |  | Fees Paid | $110.50 |  |

THIS PAGE IS A PART OF THE INSTRUMENT
THIS IS NOT A BILL

JUDITH A. PASCALE
County Clerk, Suffolk County

| 1 | 2 |

Number of pages    2

This document will be public record. Please remove all Social Security Numbers prior to recording.

RECORDED
2012 Jul 24 04:05:40 PM
JUDITH A. PASCALE
CLERK OF
SUFFOLK COUNTY
L M00022230
P 006

| Deed / Mortgage Instrument | Deed / Mortgage Tax Stamp | Recording / Filing Stamps |

**3**        FEES

| | | |
|---|---|---|
| Page / Filing Fee | 10 | Mortgage Amt. _____ |
| Handling | 20. 00 | 1. Basic Tax _____ |
| TP-584 | | 2. Additional Tax _____ |
| | | Sub Total |
| Notation | 50 | Spec./Assit. |
| | | or |
| EA-52 17 (County) _____ | Sub Total _____ | Spec./Add. _____ |
| EA-5217 (State) | | TOT. MTG. TAX _____ |
| R.P.T.S.A. | 60 | Dual Town ____ Dual County ____ |
| | | Held for Appointment _____ |
| Comm. of Ed. | 5. 00 | Transfer Tax _____ |
| Affidavit | | Mansion Tax _____ |
| Certified Copy | | The property covered by this mortgage is |
| NYS Surcharge | 15. 00 | or will be improved by a one or two |
| | Sub Total _____ | family dwelling only. |
| Other | | YES _____ or NO _____ |
| | Grand Total 110 50 | If NO, see appropriate tax clause on page # _____ of this instrument. |

10

| **4** | Dist. | 0900 21100 0400 045000 | **5** | Community Preservation Fund |

Real Property Tax Service Agency Verification

R POL A
12-JUL-12

Consideration Amount $ _____

CPF Tax Due    $ _____

| | |
|---|---|
| Improved _____ | |
| Vacant Land _____ | |
| TD _____ | |
| TD _____ | |
| TD _____ | |

**6** Satisfactions/Discharges/Releases List Property Owners Mailing Address
**RECORD & RETURN TO:**

CoreLogic
450 E. Boundary St.
Chapin, SC 29036

| Mail to: Judith A. Pascale, Suffolk County Clerk | **7** | **Title Company Information** |
| 310 Center Drive, Riverhead, NY 11901 | Co. Name | |
| www.suffolkcountyny.gov/clerk | Title # | 18865141 |

**8**   **Suffolk County Recording & Endorsement Page**

This page forms part of the attached    Assignment of Mortgage    made
by:     (SPECIFY TYPE OF INSTRUMENT)

Mortgage Electronic Registration Systems, Inc.,
Capital One Home Loans, LLC

The premises herein is situated in
SUFFOLK COUNTY, NEW YORK.

TO

In the TOWN of SOUTH HAMPTON

The Bank of New York Mellon FKA

In the VILLAGE

The Bank of New York

or HAMLET of _____

BOXES 6 THRU 8 MUST BE TYPED OR PRINTED IN BLACK INK ONLY PRIOR TO RECORDING OR FILING.

(over)

## IMPORTANT NOTICE

If the document you've just recorded is your <u>SATISFACTION OF MORTGAGE</u>, please be aware of the following:

If a portion of your monthly mortgage payment included your property taxes, <u>*you will now need to contact your local Town Tax Receiver so that you may be billed directly for all future property tax statements.</u>

Local property taxes are payable twice a year: on or before January 10₄ and on or before May 31₄. Failure to make payments in a timely fashion could result in a penalty.

Please contact your local Town Tax Receiver with any questions regarding property tax payment.

Babylon Town Receiver of Taxes
200 East Sunrise Highway
North Lindenhurst, N.Y. 11757
(631) 957-3004

Brookhaven Town Receiver of Taxes
One Independence Hill
Farmingville, N.Y. 11738
(631) 451-9009

East Hampton Town Receiver of Taxes
300 Pantigo Place
East Hampton, N.Y. 11937
(631) 324-2770

Huntington Town Receiver of Taxes
100 Main Street
Huntington, N.Y. 11743
(631) 351-3217

Islip Town Receiver of Taxes
40 Nassau Avenue
Islip, N.Y. 11751
(631) 224-5580

Riverhead Town Receiver of Taxes
200 Howell Avenue
Riverhead, N.Y. 11901
(631) 727-3200

Shelter Island Town Receiver of Taxes
Shelter Island Town Hall
Shelter Island, N.Y. 11964
(631) 749-3338

Smithtown Town Receiver of Taxes
99 West Main Street
Smithtown, N.Y. 11787
(631) 360-7610

Southampton Town Receiver of Taxes
116 Hampton Road
Southampton, N.Y. 11968
(631) 283-6514

Southold Town Receiver of Taxes
53095 Main Street
Southold, N.Y. 11971
(631) 765-1803

Sincerely,

Judith A. Pascale

Judith A. Pascale
Suffolk County Clerk

dw
2/99

Recording Requested By:
**Bank of America**
·Prepared By: **Bank of America**
800-444-4302
When recorded mail to:
**CoreLogic**
450 E. Boundary St.
Attn: Release Dept.
Chapin, SC 29036

DocID# 20315948821218973
Property Address:
**14 Landing La**
**Southampton, NY 11968-4405**
Property Location:
**Township of SOUTH HAMPTON**
NY034-AM 18865141     6/15/2012

This space for Recorder's use

MIN #: 1003932-2007127551-2      MERS Phone #: 888-679-6377

## ASSIGNMENT OF MORTGAGE

For Value Received, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR CAPITAL ONE HOME LOANS, LLC**, the undersigned holder of the Mortgage described below (herein "Assignor") whose address is 1901 E Voorhees Street, Suite C, Danville, IL 61834 does hereby grant, sell, assign, transfer and convey unto **THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWALT, INC., ALTERNATIVE LOAN TRUST 2007-19 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-19** whose address is C/O BAC, M/C: CA6-914-01-43, 1800 Tapo Canyon Road, Simi Valley, CA 93063 all beneficial interest under that certain security instrument described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said security instrument.

| | |
|---|---|
| Original Lender: | **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR CAPITAL ONE HOME LOANS, LLC** |
| Made By: | **PAUL COLLURA AND CHRISTINE COLLURA, HIS WIFE** |
| Date of Mortgage: | 5/4/2007 |
| Original Loan Amount: | $700,000.00 |
| Section: 211.00 | Lot: 045.000    Block: 04.00 |

Recorded in Suffolk County, NY on: 5/25/2007, book M00021541, page 047 and instrument number CY015987

This assignment is not subject to the requirements of Section 275 of the Real Property Law because it is an assignment within the secondary mortgage market.

This Mortgage has not been assigned unless otherwise stated below:

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Mortgage to be executed on Dated:
~~JUN 1 5 2012~~

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC., AS NOMINEE FOR CAPITAL ONE
HOME LOANS, LLC

By: _____
Janet Gordon
Assistant Secretary

State of California
County of Ventura

On JUN 1 5 2012 _____ before me, Jacqueline Benson _____, Notary Public, personally appeared _____ JANET GORDON _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Notary Public: _____ Jacqueline Benson _____    (Seal)
My Commission Expires: _____ 12/9/15 _____



JACQUELINE BENSON
Commission # 1963212
Notary Public · California
Los Angeles County
My Comm. Expires Dec 9, 2015





## SUFFOLK COUNTY CLERK
### RECORDS OFFICE
### RECORDING PAGE

Type of Instrument: FEDERAL TAX LIEN - IRS PAYMENT      Filed:    04/26/2011
Number of Pages: 0      At:    02:47:20 PM
Receipt Number : 11-0047829      Lien Num:    LFED00012535
Tax Map #    :

EXAMINED AND CHARGED AS FOLLOWS

Lien Fee    :      $40.00

Received the Following Fees For Above Instrument

Exempt    NO
Fees Paid      $40.00

THIS PAGE IS A PART OF THE INSTRUMENT
THIS IS NOT A BILL

JUDITH A. PASCALE
County Clerk, Suffolk County

| Form 668 (Y)(c)<br>(Rev. February 2004) | 11874 | Department of the Treasury - Internal Revenue Service<br>**Notice of Federal Tax Lien** | | |
|---|---|---|---|---|

| Area:<br>SMALL BUSINESS/SELF EMPLOYED AREA #1<br>Lien Unit Phone: (800) 829-3903 | Serial Number<br><br>777701011 | For Optional Use by Recording Office |
|---|---|---|

As provided by section 6321, 6322, and 6323 of the Internal Revenue Code, we are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid. Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of these taxes, and additional penalties, interest, and costs that may accrue.

Name of Taxpayer PAUL & CHRISTINE COLLURA

Residence      38 COTTONTAIL RD
               MELVILLE, NY 11747-2319

**IMPORTANT RELEASE INFORMATION:** For each assessment listed below, unless notice of the lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax<br>(a) | Tax Period<br>Ending<br>(b) | Identifying Number<br>(c) | Date of<br>Assessment<br>(d) | Last Day for<br>Refiling<br>(e) | Unpaid Balance<br>of Assessment<br>(f) |
|---|---|---|---|---|---|
| 1040 | 12/31/2009 | XXX-XX-7083 | 11/22/2010 | 12/22/2020 | 80537.52 |

| Place of Filing | Suffolk County Clerk<br>Suffolk County<br>Riverhead, NY 11901 | Total | $ | 80537.52 |
|---|---|---|---|---|

This notice was prepared and signed at _____ MANHATTAN, NY _____, on this,

the ___19th___ day of ___April___, ___2011___.

| Signature<br><br>for FRED BANKS | Title<br>ACS SBSE<br>(800) 829-3903 | 21-00-0008 |
|---|---|---|

(NOTE: Certificate of officer authorized by law to take acknowledgment is not essential to the validity of Notice of Federal Tax lien
Rev. Rul. 71-466, 1971 - 2 C.B. 409)      Part 1 - Kept By Recording Office

Form 668(Y)(c) (Rev. 2 2004)
CAT. NO 60025X





## SUFFOLK COUNTY CLERK
### RECORDS OFFICE
### RECORDING PAGE

Type of Instrument: FEDERAL TAX LIEN - IRS PAYMENT
Number of Pages: 0
Receipt Number : 10-0033909
Tax Map # :

Filed:        03/23/2010
At:           09:34:42 AM
Lien Num:     LFED00007659

EXAMINED AND CHARGED AS FOLLOWS

Lien Fee    :          $40.00

Received the Following Fees For Above Instrument

Exempt        NO
Fees Paid          $40.00

THIS PAGE IS A PART OF THE INSTRUMENT
THIS IS NOT A BILL

JUDITH A. PASCALE
County Clerk, Suffolk County

Form 668 (Y)(c)
(Rev. February 2004)

9607

Department of the Treasury · Internal Revenue Service

## Notice of Federal Tax Lien

Area:
SMALL BUSINESS/SELF EMPLOYED AREA #2
Lien Unit Phone: (800) 913-6050

Serial Number

633298210

For Optional Use by Recording Office

As provided by section 6321, 6322, and 6323 of the Internal Revenue Code, we are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid. Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of these taxes, and additional penalties, interest, and costs that may accrue.

Name of Taxpayer PAUL & CHRISTINE GUNZER COLLURA

Residence          38 COTTONTAIL RD
                   MELVILLE, NY 11747-2319

IMPORTANT RELEASE INFORMATION: For each assessment listed below, unless notice of the lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax (a) | Tax Period Ending (b) | Identifying Number (c) | Date of Assessment (d) | Last Day for Refiling (e) | Unpaid Balance of Assessment (f) |
|---|---|---|---|---|---|
| 1040 | 12/31/2007 | | 11/24/2008 | 12/24/2018 | 21498.56 |
| 1040 | 12/31/2008 | | 11/23/2009 | 12/23/2019 | 54192.24 |

Place of Filing     Suffolk County Clerk
                    Suffolk County
                    Riverhead, NY 11901

Total | $ | 75690.80

This notice was prepared and signed at _____ MANHATTAN, NY _____ , on this,

the ___10th___ day of ___March___, ___2010___.

Signature  *R. A. Mitchell*          Title  ACS          22-00-0008
for MICHAEL W. COX                    (800) 829-3903

(NOTE: Certificate of officer authorized by law to take acknowledgment is not essential to the validity of Notice of Federal Tax lien
Rev. Rul. 71-466, 1971 - 2 C.B. 409)

Part 1 - Kept By Recording Office

Form 668(Y)(c) (Rev. 2-2004)
CAT. NO 60025X



# Civil Court Minutes Report

Index #: 14 01713

Print Date: 4/14/2015

**Court:** S          **Case Type:**          **Application Date:**

**Plaintiff(s)**

BANK OF NEW YORK MELLON F/K/A
BANK OF NEW YORK

**Defendant(s):**

COLLURA, PAUL
COLLURA, CHRISTINE
INTERNAL REVENUE SERVICE
ETAL

**Minutes :**

| Seq # | Process Date | Type | Minutes | |
|---|---|---|---|---|
| 1 | 1/24/2014 12:0 | R | LIS PENDENS | SOUTHAMPTON |
| 2 | 1/24/2014 12:0 | | SUMMONS & COMPLAINT | VER |
| 3 | 1/24/2014 12:0 | | SECTION 1303 NOTICE OF FCL | |
| 4 | 1/24/2014 12:0 | | EXHIBITS | |
| 5 | 1/24/2014 12:0 | | CERTIFICATE OF MERIT | |
| 6 | 2/6/2014 12:0 | | AFFIDAVIT OF SERVICE | 01-30-14 |
| 7 | 2/7/2014 12:00 | | AFFIDAVIT OF SERVICE | 2-5-14 |
| 8 | 2/20/2014 12:0 | | AFFIDAVIT OF SERVICE | 02-10-14 |
| 9 | 2/20/2014 12:0 | | AFFIDAVIT OF SERVICE | 02-10-14 |
| 10 | 3/24/2014 12:0 | | NOTICE OF APPEARANCE | |
| 11 | 3/24/2014 12:0 | | AFFIDAVIT OF SERVICE | 3-12-14 |
| 12 | 3/24/2014 12:0 | | STIPULATION | COPY |
| 13 | 4/29/2014 12:0 | | R.J.I. | PD |
| 14 | 5/5/2014 12:00 | | NOTICE OF APPEARANCE | |
| 15 | 8/14/2014 12:0 | | SUBSTITUTION OF ATTORNEY | |
| 16 | 8/14/2014 12:0 | | CONSENT TO CHANGE ATTORNEY | |
| 17 | 8/14/2014 12:0 | | AFFIDAVIT OF SERVICE | 8-6-14 |
| 18 | 10/29/2014 12 | | SHORT FORM ORDER | |
| 19 | 11/3/2014 12:0 | | ORDER | |
| 20 | 11/3/2014 12:0 | | NOTICE OF MOTION | |
| 21 | 11/3/2014 12:0 | | SUPPORTING PAPERS | |
| 22 | 12/24/2014 12 | | RADI - NOTICE OF APPEAL | |
| 23 | 12/24/2014 12 | | ORDER-(COPY) | |
| 24 | 12/24/2014 12 | | AFFIDAVIT OF SERVICE | 12-23-14 |

**Total Minute Records :24**

**Notations :**

| Minute | Seq | Liber | Page | LP No | Notation |
|---|---|---|---|---|---|

**Total Notation Records :0**

**Tax Map Info :**

<u>Minute</u>                    <u>Seq</u>   <u>Tax Map Number</u>

Total Tax Map Records :0





SUFFOLK COUNTY CLERK
RECORDS OFFICE
RECORDING PAGE

Type of Instrument: LIS PENDENS

Index Number: 14 01713

Recorded: 24-Jan-2014

Sequence_Number: 257464

TAX MAP NO
0900-211.00-04.00-045.000

Liber Page(s):
M00021541   047

THIS PAGE IS A PART OF THE INSTRUMENT
THIS IS NOT A BILL

Judith A. Pascale
County Clerk, Suffolk County

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

THE BANK OF NEW YORK MELLON F/K/A THE
BANK OF NEW YORK, AS TRUSTEE FOR THE
CERTIFICATEHOLDERS OF CWALT, INC.,
ALTERNATIVE LOAN TRUST 2007-19
MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2007-19,
Plaintiff,

v.

PAUL COLLURA; CHRISTINE COLLURA;
INTERNAL REVENUE SERVICE; "JOHN DOE #1-
10" AND "JANE DOE #1-10", the names John Doe
and Jane Doe being fictitious, their identities being
unknown to the Plaintiffs, it being the intention of
Plaintiff to designate any and all unknown persons,
including, but not limited to, the tenants, occupants,
corporations, and judgment creditors, if any, holding
or claiming some right, title, interest or lien in or to the
mortgaged premises herein,
Defendants.

NOTICE OF PENDENCY

INDEX NO. 14-01713

FILED WITH THE   COUNTY
CLERK ON:

MORTGAGED PREMISES:
14 Landing Lane
Southampton, NY 11968

District: 0900, Section: 211.00,
Block: 04.00, Lot: 045.000

NOTICE IS HEREBY GIVEN, that an action has been commenced and is now pending in the Supreme Court for Suffolk County upon the Verified Complaint of the above named Plaintiff against the above named Defendants for the foreclosure of a Mortgage that was executed, acknowledged and delivered by Paul Collura and Christine Collura to Mortgage Electronic Registration Systems, Inc., as Nominee for Capital One Home Loans, LLC, in the amount of $700,000.00, dated May 4, 2007, and recorded on May 25, 2007 in Suffolk County Clerk's Office, in Book 21541, Page 47.

AND NOTICE IS FURTHER GIVEN, that said mortgage was assigned by Mortgage Electronic Registration Systems, Inc., as Nominee for Capital One Home Loans, LLC to The Bank of New York Mellon f/k/a The Bank of New York, as Trustee in for the Certificateholders of CWALT, Inc., Alternative Loan Trust 2007-19 Mortgage Pass-Through Certificates, Series 2007-19 on June 15, 2012 and recorded on July 24, 2012, in the Suffolk County Clerk's Office, in Book 22230, Page 6.

AND NOTICE IS FURTHER GIVEN, that the mortgaged premises described in the Mortgage

affected by said foreclosure action, the filing of this Notice, situate in the Suffolk County, State of New

York, and is described in "Schedule A" attached hereto and made a part hereof.

The Clerk of the County of Suffolk is directed to index this Notice against the names of all the

defendants.

Dated: 12|27|13

By Stephen M. Valente, Esq.
Kevin G. Graves, Esq.
Reneau J. Longoria, Esq.
Doonan, Graves & Longoria, LLC
*Attorneys for Plaintiff*
100 Cummings Center
Suite 225D
Beverly, MA  01915
Tel:  978-921-2670
Fax:  978-921-4870

# New York Title
### Research Corporation

Title No: **SS6073**

## SCHEDULE A

ALL that certain plot, piece or parcel of land, situate, lying and being at Shinnecock Hills, Town of Southampton, County of Suffolk and State of New York, more particularly known and designated as and by Lot No. 8 on a certain map entitled "Subdivision Map of Southampton Harbour Section 3, situate at Shinnecock Hills, Town of Southampton, County of Suffolk and State of New York", dated November 25, 1949, Theodore F. Squires, Licensed Land Surveyor No. 15683, Southampton, New York and which said map was filed in the Office of the Clerk of the County of Suffolk on December 16, 1949 as and by the Map No. 1723, being more particularly bounded and described as follows:

BEGINNING at a point on the southerly side of Landing Lane, where the same is intersected by the division line between Lot Nos. 8 & 9 on the aforesaid Map; said point or place of beginning being also distant the following two (2) courses and distances from the southerly end of a curve having a radius of 25.00 feet, a length of 39.27 feet which said curve connects the southeasterly side of Landing Lane with the southerly side of Montauk Highway;

Southwesterly as measured along the southeasterly side of Landing Lane, North 24 degrees 52 minutes 50 seconds East, 35.00 feet;

South 76 degrees 32 minutes 25 seconds West, 209.21 feet, as measured along the southerly side of Landing Lane the true point or place of beginning.

RUNNING THENCE from said point or place of beginning along said division line, South 13 degrees 27 minutes 35 seconds East, 76.41 feet to Bulkhead line of the Lagoon;

THENCE along the bulkhead line of the Lagoon, South 56 degrees 48 minutes 33 seconds West, 95.61 feet to the division line between Lot Nos. 7 & 8;

THENCE along the said last mentioned division line, North 13 degrees 27 minutes 35 seconds West, 108.69 feet to the southerly side of Landing Lane; and

THENCE along the southerly side of Landing Lane, North 76 degrees 32 minutes 25 seconds East, 90.00 feet to the point and place of BEGINNING.

RECORDED
2014 JAN 24  PM 2:40
JUDITH A. PASCALE
SUFFOLK COUNTY CLERK

**EXHIBIT "E"**

Index No.: 1713/14

SUPREME COURT - STATE OF NEW YORK
I.A.S. PART 11 - SUFFOLK COUNTY



PRESENT: HON. JAMES F. QUINN
      Acting Justice

**DECISION AND ORDER**

Mot. Seq. No. 2, Mot-D
Mot. Date:    6/9/14
Mot Submitted: 10/29/14

---

The Bank of New York Mellon f/k/a The Bank of
New York, as Trustee for the Certificate Holders of
CWALT, Inc., et al.,

                            Plaintiff,

  - against -

Paul Collura, et al,

                           Defendants.

Plaintiff's Attorney
Doonan, Graves & Longoria
100 Cummings Center, Ste. 225D
Beverly, MA 01915

Defendant's Attorney
Eisenberg & Carton
1227 Main Street, Ste. 101
Port Jefferson, NY 11777

---

It is hereby **ORDERED** that this motion by the defendants Paul and Christine Collura for an order dismissing the complaint, is *granted*.

The Collura defendants move to dismiss the complaint pursuant to CPLR 3211(a)(3) and CPLR 3211(a)(7) on the ground that the plaintiff lacks standing to prosecute this mortgage foreclosure action.

On May 4, 2007, the Collura defendants executed and delivered to Capital One Home Loans, LLC ("Capital One"), a promissory note in the amount of $700,000.00 which was secured by a mortgage on a parcel of real property located in Southampton, NY. The mortgagee of record was Mortgage Electronic Registration Systems, Inc. ("MERS"), as nominee for the lender, Capital One. An undated allonge affixed to the note indicates that the note was indorsed by Capital One to Countrywide Home Loans, Inc. ("Countrywide Home Loans"), which indorsed it in blank. By an "Assignment of Mortgage" dated June 15, 2012, MERS, as nominee for Capital One, assigned the mortgage to the plaintiff, Bank of New York Mellon. The "Assignment of Mortgage" specified that it included the mortgage "together with the note(s) and obligations therein described."

The transfer of an instrument vests in the transferee such rights as the transferor has therein (UCC 3-201 [1]). Negotiation is the transfer of an instrument in such form that the transferee becomes a holder (UCC 3-202 [1]). A holder is a person in possession of an instrument drawn, issued, or indorsed to him or to his order, or to bearer, or in blank (UCC 1-201 [20]). If the instrument is payable to order, it is

negotiated by delivery with any necessary indorsement (UCC 3-202 [1]).  An instrument payable to order and indorsed in blank becomes payable to bearer and may be negotiated by delivery alone (UCC 3-204 [2]); Corporacion Venezolana de Fomento v. Vintero Sales Corp., 452 F.Supp. 1108, 1117; Bank of New York Mellon v. Deane, 41 Misc.3d 494.502.

When the issue of standing is raised by a defendant, the plaintiff must prove its standing in order to be entitled to relief (GRP Loan, LLC v. Taylor, 95 A.D.3d 1172, 1173).  A plaintiff has standing to prosecute a mortgage foreclosure action when, at the time the action is commenced (1) the plaintiff is the holder of the note, (2) the plaintiff has possession of the note by delivery from a person entitled to enforce it for the purpose of giving the plaintiff the right to enforce it, or (3) the plaintiff has been assigned the note by a person entitled to enforce it for purpose of giving the plaintiff the right to collect the debt evidenced by the note and the plaintiff tenders the note at the time of any judgment (Mellon v. Deane, supra, at 506).

The plaintiff, Bank of New York Mellon, has failed to establish that it has standing to prosecute this mortgage foreclosure action.  The promissory note that is the subject of this action was originally payable to the order of Capital One, which indorsed it to Countrywide Bank, which indorsed it to Countrywide Home Loans, which indorsed it in blank.  When the note was indorsed in blank, it became a bearer instrument.  There is no evidence in the record that it was negotiated back to Capital One after it was indorsed in blank and before it was assigned to the plaintiff.  Thus, Capital One was no longer the holder of the note when it assigned the note to the plaintiff, and Capital One did not transfer any rights in the note to the plaintiff.  Accordingly, the motion is *granted*, and the complaint is dismissed.

The foregoing constitutes the decision and order of the Court.

Dated: Central Islip, New York
        October 30, 2014

ENTER:

JAMES F. QUINN
Hon. James F. Quinn, A.J.S.C.